1 Jacob A. Walker (CA Bar # 271217)
2 Jeffrey C. Block (admitted *pro hac vice*)
  Stephen J. Teti (admitted *pro hac vice*)
3 **BLOCK & LEVITON LLP**
4 260 Franklin St., Suite 1860
  Boston, MA 02110
5 Tel.: (617) 398-5600
  Fax: (617) 507-6020
6

7 Whitney E. Street (CA Bar # 223870)
8 **BLOCK & LEVITON LLP**
  100 Pine Street, Suite 1250
9 San Francisco, CA 94111
  Tel.: (415) 968-1852
10 Fax: (617) 507-6020
11

12 *Attorneys for Lead Plaintiff and the Proposed Class*
13

14

15          **UNITED STATES DISTRICT COURT**
16          **SOUTHERN DISTRICT OF CALIFORNIA**

17

18 SCOTT KUHNE, individually and on
   behalf of all others similarly situated,
19

20      Plaintiff,                          Case No. 3:20-cv-00649-DMS-DEB

21 v.

22 GOSSAMER BIO, INC., SHEILA              **AMENDED CLASS ACTION**
   GUJRATHI, M.D., BRYAN                   **COMPLAINT FOR VIOLATIONS**
23 GIRAUDO, FAHEEM HASNAIN,                **OF THE FEDERAL SECURITIES**
   JOSHUA H. BILENKER, M.D.,               **LAWS**
24
   KRISTINA BUROW, RUSSELL
25 COX, THOMAS DANIEL, M.D.,               **JURY TRIAL DEMANDED**
   RENEE GALA, OTELLO
26 STAMPACCHIA, Ph.D., MERRILL
27 LYNCH, PIERCE, FENNER &
28

1  SMITH INCORPORATED, SVB
2  LEERINK LLC, BARCLAYS
3  CAPITAL INC., and EVERCORE
   GROUP L.L.C.,
4
        Defendants.
5

6

7          Lead Plaintiff, Scott Kuhne, ("Lead Plaintiff"), individually and on behalf of

8  all others similarly situated, by and through his attorneys, alleges the following

9  upon personal knowledge as to his own acts, and upon information and belief as to

10 all other matters, based upon the investigation conducted by and through his

11 attorneys, which included, among other things, a review of documents filed by

12

13 Defendants (as defined below) with the United States Securities and Exchange

14 Commission (the "SEC"), news reports, press releases issued by Defendants, and

15 other publicly available documents. Lead Plaintiff believes that substantial

16

17 additional evidentiary support will exist for the allegations set forth herein after a

18 reasonable opportunity for discovery.

19

20                 **NATURE AND SUMMARY OF THE ACTION**

21

22         1.     This is a federal securities class action on behalf of all investors who

23 purchased or otherwise acquired Gossamer Bio, Inc. ("Gossamer" or the

24 "Company") common stock between February 8, 2019 and December 13, 2019,

25
   inclusive (the "Class Period"), and/or who acquired Gossamer shares pursuant or
26
   traceable to Gossamer's Registration Statement and Prospectus in connection with
27

28 its February 8, 2019 Initial Public Offering (the "IPO"), seeking to recover

AMENDED COMPLAINT
CASE NO. 3:20-CV-00649-DMS-DEB

damages caused by Defendants' violations of the federal securities laws and to pursue remedies under §§ 11 and 15 of the Securities Act of 1933 (the "Securities Act") and under §§ 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. § 240.10b-5.

2.     The issuance of Gossamer common stock in connection with the IPO was registered under the Securities Act, as amended, pursuant to Gossamer's Registration Statement on Form S-1 (File No. 333-228984) declared effective on February 7, 2019. This case arises from untrue statements and omissions of material fact made in these IPO materials, and in subsequent public statements by Defendants.

3.     Gossamer is a clinical-stage biopharmaceutical company focused on discovering, acquiring, developing, and commercializing therapeutics in the disease areas of immunology, inflammation, and oncology. The Company's lead and most advanced drug candidate, GB001, is an oral antagonist of prostaglandin D2 receptor 2, or DP2, in development for the treatment of moderate-to-severe eosinophilic asthma and other allergic conditions. Gossamer's GB001 product is in Phase 2 development for asthma and rhinosinusitis.

4.     In its IPO, Gossamer and the Underwriter Defendants sold 19,837,500 shares of common stock at an initial public offering price of $16.00 per share, for a

total offering price of $317.4 million. Proceeds to the Company, net of underwriting discounts and commissions, were $256.68 million.

5.     Defendants in this action consist of Gossamer, the Gossamer executives and directors who signed the Registration Statement, and the underwriters to the IPO (collectively, "Defendants").

6.     In violation of the Securities Act, Defendants issued untrue statements of material facts and omitted to state material facts required to be stated from the Registration Statement and accompanying and incorporated offering materials that Gossamer filed with the SEC in support of the IPO. Specifically, Defendants misrepresented and/or misled investors, among other things, that: (1) Novartis, who had a product that would compete against GB001 in the works, had a successful Phase 2 trial that had clinically validated DP2 antagonism; and (2) upon the release of the results of a successful interim analysis of the Phase 2b LEDA study for GB001 in the first half of 2020, Gossamer would launch the first of two planned Phase 3 studies for GB001.

7.     Defendants are strictly liable for any material untrue statements or omissions in the IPO materials. Furthermore, because this case involves a Registration Statement, Defendants also had an independent, affirmative duty to provide adequate disclosures about adverse conditions, risks, and uncertainties. *See* Item 303 of SEC Reg. S-K, 17 C.F.R. § 229.303(a)(3)(ii) (requiring that the materials incorporated in a Registration Statement disclose all "known trends or

AMENDED COMPLAINT
CASE NO. 3:20-CV-00649-DMS-DEB

uncertainties" reasonably expected to have a material unfavorable impact on the Company's operations); and Item 105 of SEC Reg. S-K, 17 C.F.R. § 229.105 (requiring the materials in a Registration Statement to disclose a "discussion of the most significant factors that make the offering speculative or risky").

8.     Thus, Defendants had an affirmative duty to ensure that the Registration Statement and the materials incorporated therein disclosed material trends and uncertainties that they knew or should have reasonably expected would have a materially adverse impact on Gossamer's business. Defendants failed to fulfill this obligation. Unfortunately for investors who purchased Gossamer's shares pursuant and/or traceable to the IPO, however, the truth did not begin to emerge until after the IPO was complete.

9.     Over the next several months, and in violation of the Exchange Act, Gossamer continued to publicly state that "DP2 antagonism has been clinically validated by Novartis' oral DP2 antagonist, fevipiprant." Moreover, Gossamer continued to assure investors that upon the release of the results of a successful interim analysis of the Phase 2b LEDA study for GB001 in the first half of 2020, Gossamer would launch the first of two planned Phase 3 studies for GB001. Based on these representations, Gossamer's stock price soared to a high of $27.15 per share.

10.     In the materials accompanying the IPO and throughout the Class Period, Defendants made materially false and/or misleading statements, as well as

5

failed to disclose material adverse facts about the Company's business, operations, and compliance policies. Specifically, Defendants misrepresented and/or failed to disclose to investors: (1) the purported clinical validation of Novartis' oral DP2 antagonist; (2) that Gossamer did not plan to release the details of its interim analysis of the Phase 2b LEDA study and did not plan to launch a Phase 3 trial for GB001 upon such analysis; and (3) as a result of the foregoing, Defendants' public statements were materially false and misleading at all relevant times.

11.   In October 2019, Novartis announced that its fevipiprant product had failed to improve long function in two Phase 3 trials, as measured by FEV1, over placebo.

12.   Then on November 12, 2019, Gossamer stated that it would not be releasing any of the data associated with its purported interim analysis of the Phase 2b LEDA study in the first half of 2020, but would only "be indicating whether we think the data's in support of moving forward into Phase III, planning and initiation purposes," and would not even disclose the Company's decision on whether to commence a Phase III trial.

13.   On December 16, 2019, Novartis announced that it was terminating the development of its DP2 antagonist fevipiprant for asthma after it failed another pair of Phase 3 clinical trials.

14.   Analysts noted that "[w]hen Gossamer raised $276 million in an IPO earlier in [2019], it said Novartis' fevipiprant phase 2 had been clinically validated

AMENDED COMPLAINT
CASE NO. 3:20-CV-00649-DMS-DEB

DP2 antagonism. ***That statement now looks premature, particularly when viewed in light of the failures of other DP2 drugs.***"[1]

15.     On this news, the stock plummeted from a December 13, 2019 closing price of $25.37 per share to $15.96 per share, a one day drop of $9.41 or over 37%.

16.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Lead Plaintiff and other Class members have suffered significant losses and damages.

17.     By this action, Lead Plaintiff, on behalf of himself and other Class Members who also: (a) acquired Gossamer's shares pursuant or traceable to the Offering; and/or (b) purchased or otherwise acquired Gossamer's shares between February 8, 2019 and December 13, 2019, inclusive, now seeks to obtain a recovery for the damages suffered as a result of Defendants' violations of the Securities Act and the Exchange Act, as alleged herein.

18.     The Securities Act claims asserted herein are purely strict liability and negligence claims and do not sound in fraud.

## JURISDICTION AND VENUE

19.     The federal law claims asserted herein arise under and pursuant to §§ 10(b) and 20(a) of the Exchange Act, 15 U.S.C. § 78(b) and 78t(a), and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. § 240.10b-5, as well as under and pursuant to §§ 11 and 15 of the Securities Act (15 U.S.C. §§ 77k and 77o).

---

[1] https://www.fiercebiotech.com/biotech/novartis-asthma-drug-fails-phase-3-raising-doubts-about-gossamer-s-prospects (last visited on August 30, 2020).

20.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §1331, § 27 of the Exchange Act, 15 U.S.C. § 78aa, and § 22 of the Securities Act.

21.     This Court has jurisdiction over each Defendant named herein because each Defendant is an individual or corporation who has sufficient minimum contacts with this District so as to render the exercise of jurisdiction by the District Court permissible under traditional notions of fair play and substantial justice.

22.     Venue is proper in this District pursuant to § 27 of the Exchange Act, 15 U.S.C. § 78aa and 28 U.S.C. § 1931(b), as the Company has its principal executive offices located in this District and conducts substantial business here.

23.     In connection with the acts, omissions, conduct and other wrongs in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to the United States mail, interstate telephone communications and the facilities of the national securities exchange.

## PARTIES

24.     Lead Plaintiff Scott Kuhne, as reflected in his Certification (ECF No. 1-2), acquired shares of Gossamer common stock at artificially inflated prices, pursuant and/or traceable to the IPO, and has been damaged.

AMENDED COMPLAINT
CASE NO. 3:20-CV-00649-DMS-DEB

25. Defendant Gossamer Bio, Inc. is incorporated under the laws of Delaware, with its principal place of business at 3013 Science Park Road, San Diego, CA 92121. Its common stock trades on the Nasdaq stock exchange under the symbol GOSS.

26. Defendant Sheila Gujrathi, M.D., is the Co-Founder and Chief Executive Officer of Gossamer, and has served in those capacities at all times relevant hereto. Dr. Gujrathi signed the false and misleading Registration Statement.

27. Defendant Bryan Giraudo is Gossamer's Chief Financial Officer, and has served in that capacity at all times relevant hereto. Mr. Giraudo signed the false and misleading Registration Statement.

28. Defendants Gujrathi and Giraudo are named as Defendants for violations of all counts asserted herein, and are sometimes referred to as the "Management Defendants." The Management Defendants, because of their positions with the Company, possessed the power and authority to control the contents of the Company's reports to the SEC, press releases and presentations to securities analysts, money and portfolio managers, and the investing public, *i.e.,* the market. The Individual Defendants were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to

material, non-public information available to them, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations that were being made were then materially false and/or misleading. The Individual Defendants are therefore liable for the misstatements and omissions plead herein.

29.     Defendant Faheem Hasnain is the Executive Chairman of the Board of Directors, and he signed the false and misleading Registration Statement.

30.     Defendant Joshua H. Bilenker, M.D., is a Director on Gossamer's Board of Directors, and he signed the false and misleading Registration Statement.

31.     Defendant Kristina Burow is a Director on Gossamer's Board of Directors, and she signed the false and misleading Registration Statement.

32.     Defendant Russell Cox is a Director on Gossamer's Board of Directors, and he signed the false and misleading Registration Statement.

33.     Defendant Thomas Daniel, M.D., is a Director on Gossamer's Board of Directors, and he signed the false and misleading Registration Statement.

34.     Defendant Renée Galá, is a Director on Gossamer's Board of Directors, and she signed the false and misleading Registration Statement.

35.     Defendant Otello Stampacchia, Ph.D., is a former Director on Gossamer's Board of Directors, and he signed the false and misleading Registration Statement. Defendant Stampacchia is the founder and managing

10

director of Omega Funds, a company that invests in biopharma and medical device startups in the United States.

36.     Defendants Hasnain, Bilenker, Burow, Cox, Daniel, Galá, and Stampacchia are named as Defendants for violations of the Securities Act.

***Underwriter Defendants***

37.     Defendant Merrill Lynch, Pierce, Fenner & Smith Incorporated ("Merrill Lynch") was an underwriter of Gossamer's IPO and assisted in the preparation and dissemination of Gossamer's IPO materials.

38.     Defendant SVB Leerink LLC ("Leerink") was an underwriter of Gossamer's IPO and assisted in the preparation and dissemination of Gossamer's IPO materials.

39.     Defendant Barclays Capital Inc. ("Barclays") was an underwriter of Gossamer's IPO and assisted in the preparation and dissemination of Gossamer's IPO materials.

40.     Defendant Evercore Group L.L.C. ("Evercore") was an underwriter of Gossamer's IPO and assisted in the preparation and dissemination of Gossamer's IPO materials.

41.     Defendants Merrill Lynch, Leerink, Barclays, and Evercore are sometimes referred to herein as the "Underwriter Defendants," and are named as Defendants for violations of § 11 of the Securities Act.

AMENDED COMPLAINT
CASE NO. 3:20-CV-00649-DMS-DEB

42.     The Underwriter Defendants were instrumental in soliciting and making the stock offered in the IPO available to the investing public, as set forth in the following chart:

| **Name** | **Number of Shares** |
|---|---|
| Merrill Lynch | 5,175,000 |
| Leerink | 4,830,000 |
| Barclays | 3,795,000 |
| Evercore | 3,450,000 |

43.     Pursuant to the Securities Act, the Underwriter Defendants are liable for the false and misleading statements in the IPO materials. The Underwriter Defendants' failure to conduct adequate due diligence investigations was a substantial factor leading to the harm complained of herein.

44.     The Underwriter Defendants are primarily investment banking houses that specialize in, among other things, underwriting public offerings of securities. As the underwriters of the IPO, the Underwriter Defendants earned lucrative underwriting fees as a result of their participation in the IPO.

45.     In addition, the Underwriter Defendants met with potential investors and presented highly favorable, but materially incorrect and/or materially misleading, information about Gossamer, its business, products, plans, and financial prospects, and/or omitted to disclose material information required to be

AMENDED COMPLAINT
CASE NO. 3:20-CV-00649-DMS-DEB

disclosed under the federal securities laws and applicable regulations promulgated thereunder.

46.     Representatives of the Underwriter Defendants also assisted Gossamer and the Individual Defendants in planning the IPO. They further purported to conduct an adequate and reasonable investigation into the business, operations, products, and plans of the Company, an undertaking known as a "due diligence" investigation. During their "due diligence," the Underwriter Defendants had continual access to confidential corporate information concerning Gossamer's business, financial condition, products, plans, and prospects.

47.     In addition to having access to internal corporate documents, the Underwriter Defendants and/or their agents, including their counsel, had access to Gossamer's lawyers, management, directors, and top executives to determine: (1) the strategy to best accomplish the IPO; (2) the terms of the IPO, including the price at which Gossamer's common stock would be sold; (3) the language to be used in the Registration Statement and Prospectus; (4) what disclosures about Gossamer would be made in the Registration Statement and Prospectus; and (5) what responses would be made to the SEC in connection with its review of the Registration Statement. As a result of those constant contacts and communications between the Underwriter Defendants' representatives and Gossamer's management and top executives, at a minimum, the Underwriter Defendants should have known

AMENDED COMPLAINT
CASE NO. 3:20-CV-00649-DMS-DEB

of the undisclosed and/or misrepresented issues at Gossamer in the IPO materials as alleged herein.

48.     The Underwriter Defendants caused the Registration Statement to be filed with the SEC and declared effective in connection with offers and sales of Gossamer's shares pursuant and/or traceable to the IPO and relevant offering materials, including to Lead Plaintiff and the Class.

## SUBSTANTIVE ALLEGATIONS

49.     Gossamer is a clinical-stage biopharmaceutical company focused on discovering, acquiring, developing, and commercializing therapeutics in the disease areas of immunology, inflammation, and oncology. The Company's lead and most advanced drug candidate, GB001, is an oral antagonist of prostaglandin D2 receptor 2, or DP2, in development for the treatment of moderate-to-severe eosinophilic asthma and other allergic conditions. Gossamer's GB001 product is in Phase 2 development for asthma and rhinosinusitis.

50.     Gossamer "acquired GB001 pursuant to a merger agreement with AA Biopharma" in January 2018, "under which [the Company] issued to former AA Biopharma shareholders an aggregate of 20,000,000 shares of [Gossamer's] Series Seed convertible preferred stock and 1,101,278 shares of [Gossamer's] common stock."[2] Specifically, Gossamer acquired GB001 through an acquisition of Pulmagen Therapeutics (Asthma) Limited, or Pulmagen, a wholly-owned

---

[2] https://www.sec.gov/Archives/edgar/data/1728117/000119312519032320/d626440d424b4.htm at 82.

AMENDED COMPLAINT
CASE NO. 3:20-CV-00649-DMS-DEB

subsidiary of AA BioPharma, "after its partner, Teijin, completed a positive Phase 2, proof-of-concept clinical trial in Japanese patients."[3]

51.     Gossamer commenced a Phase 2b clinical trial for GB001 in October 2018.

52.     According to the Company:

> GB001 has been shown in preclinical studies to be a selective antagonist of the DP2 receptor. GB001 binds reversibly to human DP2 with an affinity, or Ki, of 1 to 2 nanomolar, significantly greater than its affinity for the other PGD2 receptors. No significant activity was demonstrated in a standard selectivity panel of 90 other receptors and enzymes. GB001 has also shown a slow rate of disassociation from DP2, with a receptor residence time of 19.8 minutes, as measured by half-life. Additionally, in an *in vitro* assay, GB001 inhibited PGD2 induced internalization of DP2. Combined with our observed human plasma half-life of 10 to 15 hours, we believe these measurements support the oral, once-daily dosing regimen of GB001.[4]

## DEFENDANTS' MATERIALLY UNTRUE AND MISLEADING STATEMENTS AND/OR OMISSIONS REGARDING THE IPO

53.     The IPO materials and Gossamer's post-IPO public statements contained materially misleading misrepresentations and omitted information necessary to make the statements made therein not misleading, and omitted material facts required to be stated therein. Specifically, as alleged herein, the IPO materials and Gossamer's post-IPO statements misled investors with respect to: (1) the purported clinical validation of Novartis' oral DP2 antagonist; and (2) Gossamer's purported plan to release the results of its interim analysis of the Phase

---

[3] *Id.* at 95.
[4] *Id.* at 93.

2b LEDA study and to launch the first of two Phase 3 trials for GB001 upon such analysis.

54.     On or about December 21, 2018, Gossamer filed with the SEC a Form S-1 Registration Statement (File Number 333-228984), beginning the process toward what would lead to the Company's February 2019 IPO.

55.     The S-1 Registration Statement provided, in relevant part:

*GB001 (DP2 Antagonist)*

GB001 is an oral antagonist of prostaglandin D2 receptor 2, or DP2, in development for the treatment of moderate-to-severe eosinophilic asthma and other allergic conditions. Eosinophilic asthma is caused by high levels of white blood cells known as eosinophils and is associated with more severe symptoms, late-onset disease and resistance to steroid treatment. We estimate that approximately 50% of severe asthma patients in the United States have eosinophilic asthma. Despite the availability of new biologic therapies for these patients, asthma exacerbations remain a significant healthcare problem and unmet medical need. As of December 15, 2018, GB001 had been studied in 409 subjects in total and was generally well tolerated. In a Phase 2 clinical trial conducted in Japan, GB001 showed a statistically significant improvement in time-to-first asthma exacerbation compared to placebo. In a separate 248 subject Phase 2 clinical trial, neither treatment group, GB001 nor montelukast, achieved the primary endpoint of improvement in forced expiratory volume in one second, or FEV1, as compared to placebo, which we believe was primarily related to study design and execution issues related to patient selection, including adherence to inhaled corticosteroid therapy, eosinophilic phenotype thresholds and disease severity. A single serious adverse event deemed by the investigator likely to be related to study drug was observed in a Japanese patient who had received a 160 mg dose of GB001 in a Phase 1 clinical trial conducted by Teijin Pharma Limited, or Teijin. The patient had GB001 levels approximately three to five times higher than the other patients receiving the 160 mg dose, and the dose was significantly higher than the highest dose of 60 mg currently being evaluated in our

16

ongoing Phase 2b clinical trial. We commenced a Phase 2b clinical trial in moderate-to-severe eosinophilic asthma in October 2018.

Furthermore, we believe that there are a number of indications along the allergic spectrum for which GB001 may provide benefit. Accordingly, we plan to pursue the parallel development of GB001 in chronic rhinosinusitis with nasal polyps, or CRSwNP, and chronic spontaneous urticaria, or CSU. We expect to initiate proof-of-concept Phase 2 clinical trials for these indications in 2019. We retain worldwide rights to GB001, excluding Japan.

56.    The S-1 Registration Statement further provided, in relevant part:

***DP2 antagonism has been clinically validated by Novartis' oral DP2 antagonist, fevipiprant, in a Phase 2 clinical trial.*** In this trial, both the 150 mg once-daily and 75 mg twice-daily doses demonstrated statistically significant improvements in $FEV_1$ compared to placebo in adult patients with asthma inadequately controlled with ICS. In addition, post hoc analyses of Phase 2 safety data related to asthma worsening, including exacerbations, appeared to demonstrate a reduction in the number of subjects experiencing an asthma event on fevipiprant compared to placebo. As of December 15, 2018, fevipiprant, at 150 mg once-daily and 450 mg once-daily doses, is being investigated by Novartis in six Phase 3 clinical trials in asthma patients.

(Emphasis added.)

57.    The S-1 Registration Statement further provided, in relevant part:

*Clinical Development History of GB001*

We acquired GB001 through our acquisition of Pulmagen Therapeutics (Asthma) Limited, or Pulmagen, a wholly-owned subsidiary of our AA BioPharma Inc. subsidiary, in January 2018, after its partner, Teijin, completed a positive Phase 2, proof-of-concept clinical trial in Japanese patients. We have rights outside of Japan to all of the data from the two Phase 2 clinical trials conducted by Pulmagen and Teijin described below. As of December 15, 2018, 409 subjects have received at least one dose of GB001.

17

*Summary of Completed Pulmagen Phase 2 Clinical Trial*

In December 2014, Pulmagen completed a Phase 2 clinical trial of GB001, the primary objectives of which were (1) to evaluate the safety and efficacy of 20 mg GB001 once daily compared to placebo and an active comparator, montelukast, over a 10-week treatment period and (2) to evaluate the effect of the co-administration of 10 mg montelukast once daily with GB001 treatment in a two-week extension. The primary endpoint was improvement in FEV1 over 10 weeks. The study enrolled 248 patients with mild to moderate asthma that were uncontrolled on low- or medium-dose ICS, randomized 1:1:1 to placebo, 20 mg GB001 once daily and 10 mg montelukast once daily. Patients were put on a standard medium-dose of ICS in a four week lead-in to the study, during which they were also removed from their LABA, if applicable.

GB001 was generally well tolerated with a treatment emergent adverse event, or TEAE, rate similar to placebo, but the study did not meet its primary endpoint. Notably, neither the active comparator, montelukast, nor GB001, showed statistically significant differences in FEV1 improvement as compared to placebo. We believe the lack of statistically significant differences between the active treatment arms and placebo was primarily related to study design and execution issues related to patient selection, including adherence to ICS therapy, eosinophilic phenotype thresholds and disease severity.

58.     The S-1 Registration Statement was signed by Defendants Gujrathi, Giraudo, Hasnain, Bilenker, Burow, Cox, Daniel, Galá, and Stampacchia. This document also identified the Underwriter Defendants as the underwriters of the IPO.

59.     On or about January 23, 2019, Gossamer filed with the SEC a Form S-1/A Registration Statement, which would later be utilized for the IPO, and which incorporated a prospectus to be used in connection with the offer and sale of Gossamer shares.

18

60.     The January 23, 2019 Form S-1/A Registration Statement contained substantially similar representations regarding GB001 and Novartis' Phase 2 clinical trial as those in the Form S-1 Registration Statement set forth above.

61.     The January 23, 2019 Form S-1/A Registration Statement was signed by Defendants Gujrathi, Giraudo, Hasnain, Bilenker, Burow, Cox, Daniel, Galá, and Stampacchia. This document also identified the Underwriter Defendants as the underwriters of the IPO.

62.     On or about January 30, 2019, Gossamer filed with the SEC a Form S-1/A Registration Statement, which would later be utilized for the IPO, and which incorporated a prospectus to be used in connection with the offer and sale of Gossamer shares.

63.     The January 30, 2019 Form S-1/A Registration Statement contained substantially similar representations regarding GB001 and Novartis' Phase 2 clinical trial as those in the Form S-1 Registration Statement set forth above.

64.     The January 30, 2019 Form S-1/A Registration Statement was signed by Defendants Gujrathi, Giraudo, Hasnain, Bilenker, Burow, Cox, Daniel, Galá, and Stampacchia. This document also identified the Underwriter Defendants as the underwriters of the IPO.

65.     On or about February 8, 2019, Gossamer filed the final version of the public offering prospectus for the IPO with the SEC on Form 424(b)(4) (the

19

"Prospectus"),[5] which forms part of the Registration Statement that became effective on February 7, 2019 (collectively, the "Offering Documents"). The Prospectus solicited investors for an IPO of 17.25 million shares of Gossamer common stock at a price of $16.00 per share, for proceeds – after underwriting discounts and commissions, but before expenses – to the Company of approximately $256.68 million.

66.    According to the Prospectus, "[o]ur directors and executive officers and holders of substantially all of our outstanding securities have entered into lock-up agreements with the underwriters pursuant to which they may not, with limited exceptions, for a period of 180 days from the date of this prospectus, offer, sell or otherwise transfer or dispose of any of our securities, without the prior written consent of" the Underwriter Defendants.

67.    The Prospectus further provided that:

DP2 antagonism has been clinically validated by Novartis' oral DP2 antagonist, fevipiprant, in a Phase 2 clinical trial. In this trial, both the 150 mg once-daily and 75 mg twice-daily doses demonstrated statistically significant improvements in $FEV_1$ compared to placebo in adult patients with asthma inadequately controlled with ICS. In addition, post hoc analyses of Phase 2 safety data related to asthma worsening, including exacerbations, appeared to demonstrate a reduction in the number of subjects experiencing an asthma event on fevipiprant compared to placebo. As of December 31, 2018, fevipiprant, at 150 mg once-daily and 450 mg once-daily doses, is being investigated by Novartis in six Phase 3 clinical trials in asthma patients.

---

[5] https://www.sec.gov/Archives/edgar/data/1728117/000119312519032320/d626440d424b4.htm.

AMENDED COMPLAINT
CASE NO. 3:20-CV-00649-DMS-DEB

GB001 has been shown in preclinical studies to be a selective antagonist of the DP2 receptor. GB001 binds reversibly to human DP2 with an affinity, or Ki, of 1 to 2 nanomolar, significantly greater than its affinity for the other PGD2 receptors. No significant activity was demonstrated in a standard selectivity panel of 90 other receptors and enzymes. GB001 has also shown a slow rate of disassociation from DP2, with a receptor residence time of 19.8 minutes, as measured by half-life. Additionally, in an *in vitro* assay, GB001 inhibited PGD2 induced internalization of DP2. Combined with our observed human plasma half-life of 10 to 15 hours, we believe these measurements support the oral, once-daily dosing regimen of GB001.

68.     In the Prospectus, Gossamer stated that it "expect[ed] to conduct an interim analysis in the first half of 2020" on GB001, and that "[i]f the interim analysis is positive, we plan on initiating a Phase 3 clinical trial thereafter."

69.     In the Prospectus, Gossamer further stated:

We commenced a Phase 2b clinical trial of GB001 in moderate-to-severe eosinophilic asthma in October 2018, and we expect to conduct an interim analysis of the results of this trial in the first half of 2020. ***We have designed this trial to efficiently assess proof-of-principle and help enable rapid transition to Phase 3 clinical trials,*** and we have held a Type C meeting with the FDA to inform our trial design and endpoints. We plan on enrolling 480 patients in the study in a 1:1:1:1 randomized to three GB001 dose arms of 20 mg, 40 mg and 60 mg per day and one placebo arm with once-daily dosing.

We believe that we have designed our trial in a manner to address the potential shortcomings of the Pulmagen Phase 2 clinical trial, in that:

- the study population will consist of more severe patients than those enrolled in the Pulmagen Phase 2 clinical trial;

- enrollment inclusion criteria will be based on a history of asthma exacerbations within the last year;

- enrolled patients will be required to have moderate-to-severe asthma with eosinophil counts greater than or equal to 250 cells/µL; and

- enrolled patients will be closely monitored during the run-in period to help ensure that the lack of adherence to background therapy is not a contributing factor for their poorly controlled asthma.

The primary endpoint is reduction in asthma worsening from baseline, assessed at week 24, with an additional four weeks of follow-up. The parameters included in the asthma worsening composite primary endpoint include changes in FEV$_1$, AM PEF, rescue medication use and asthma control and severe asthma exacerbations. We will also assess FEV$_1$ independently as a secondary efficacy measure.

We plan to conduct an interim analysis after approximately 320 patients complete the 24-week treatment period, and we expect the results of this interim analysis to be available in the first half of 2020. If the results obtained in the interim analysis support further development, we plan on initiating our first Phase 3 clinical trial thereafter. We expect to report full data from the Phase 2b clinical trial in the second half of 2020. If the full data support further development, we will initiate a second Phase 3 clinical trial.

(Emphasis added).

70.     The foregoing statements in ¶¶ 54-57, 59-60, 62-63, and 65-69 were materially untrue and/or misleading because they misrepresented and/or failed to disclose adverse facts, as alleged herein. Specifically, these statements: (1) misled investors as to the clinical validation of DP2 antagonism by Novartis' fevipiprant product, with the implication that this would increase the likelihood of success for Gossamer's GB001 candidate; and (2) misrepresented that Gossamer intended to (i) release the results of its first half 2020 interim analysis of the Phase 2b LEDA

22

study for GB001 and (ii) would immediately launch a Phase 3 trial for GB001 should that interim analysis be successful.

## POST-IPO FALSE AND MISLEADING STATEMENTS

71.    On March 22, 2019, Gossamer filed its 2018 Annual Report on Form 10-K (the "2018 10-K") with the SEC. The 2018 10-K contained substantially similar representations regarding GB001 and Novartis' Phase 2 clinical trial as those in the Form S-1 Registration Statement and Prospectus as set forth above. Specifically, the 2018 10-K provided that:

> DP2 antagonism has been clinically validated by Novartis' oral DP2 antagonist, fevipiprant, in a Phase 2 clinical trial. In this trial, both the 150 mg once-daily and 75 mg twice-daily doses demonstrated statistically significant improvements in $FEV_1$ compared to placebo in adult patients with asthma inadequately controlled with ICS. In addition, post hoc analyses of Phase 2 safety data related to asthma worsening, including exacerbations, appeared to demonstrate a reduction in the number of subjects experiencing an asthma event on fevipiprant compared to placebo.

72.    The 2018 10-K also provided: "[w]e commenced a Phase 2b clinical trial in moderate-to-severe eosinophilic asthma in October 2018 and expect to conduct an interim analysis in the first half of 2020. If the interim analysis is positive, we plan on initiating a Phase 3 clinical trial thereafter."

73.    These statements in the 2018 10-K: (1) misled investors as to the clinical validation of DP2 antagonism by Novartis' fevipiprant product, with the implication that this would increase the likelihood of success for Gossamer's GB001 candidate; and (2) misrepresented that Gossamer intended to (i) release the

23

results of its first half 2020 interim analysis of the Phase 2b LEDA study for GB001 and (ii) would immediately launch a Phase 3 trial for GB001 should that interim analysis be successful.

74. The Management Defendants signed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX"), which were appended to the 2018 10-K as exhibits. These certifications attested that "[t]he information contained in the [2018 10-K] fairly presents, in all material respects, the financial condition and results of operations of the Company."

75. On May 14, 2019, Gossamer issued its financial results for the First Quarter of 2019. In the Form 10-Q Gossamer filed with the SEC, the Company stated: "[w]e commenced a Phase 2b clinical trial for our most advanced product candidate, GB001, in moderate-to-severe eosinophilic asthma in October 2018 and expect to conduct an interim analysis in the first half of 2020. If the interim analysis is positive, we plan on initiating a Phase 3 clinical trial thereafter."

76. This statement misrepresented that Gossamer intended to (i) release the results of its first half 2020 interim analysis of the Phase 2b LEDA study for GB001 and (ii) would immediately launch a Phase 3 trial for GB001 should that interim analysis be successful.

77. The Management Defendants signed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX"), which were appended to the First Quarter 2019 10-Q as exhibits. These certifications attested that "[t]he information

contained in the [First Quarter 2019 10-Q] fairly presents, in all material respects, the financial condition and results of operations of the Company."

78.    On May 14, 2019, the Company held an earnings call with analysts to discuss its First Quarter 2019 financial results. On this call, Defendant Gujrathi stated:

> Let us start with our most advanced clinical stage product candidate GB001, an oral DP2 antagonist, which is being developed for eosinophilic asthma and other allergic conditions, including chronic rhinositis (sic) [rhinosinusitis], both with and without nasal polyps, and chronic spontaneous urticaria.
>
> As we had previously announced, our Phase IIb trial in moderate to severe eosinophilic asthma known as the LEDA study is currently enrolling patients and we remain on track to trigger an interim analysis in the first half of 2020. The LEDA study is testing 3 once daily doses of GB001, 20, 40 and 60 milligrams against placebo in a 24-week study.
>
> All patients will remain on background therapy throughout the study and the primary endpoint is a composite measure known as asthma worsening.
>
> If the interim analysis of the study in the first half of 2020 is positive, we plan to begin the first of 2 safety trials designed to support NDA registration with the FDA.
>
> In February at this [AAAAI] meeting in San Francisco, Dr. Hector Ortega, who is leading the development of GB001 at Gossamer, presented results of a post hoc analysis of a GB001 study in patients with mild to moderate, partly controlled atopic asthma. Findings presented suggested that fractional exhaled nitric oxide, also known as FeNO, could serve as a useful prognostic marker for treatment response to GB001 in addition to elevated eosinophil, which is the marker we're currently using to unveil the LEDA study.
>
> In the analysis, we found marked reductions in FeNO levels as well as greater numeric improvements in lung function and asthma control,

where also to placebo in patients with high baseline FeNO as compared to patients with low baseline FeNO. We are excited about these results and the potential implications for future development of GB001.

We have also started to execute our strategy to develop GB001 in other allergic conditions driven by Type 2 cytokine biology, where the GB001 could potentially be first in class.

79.   On this same May 14, 2019 call, an analyst from Bank of America Merrill Lynch asked: "all investors are looking forward to the results from Novartis on the first batch of clinical data from Phase III trials for fevipiprant. So can you talk about the read-through? If it's positive, what does that mean for GB001, which is obvious I guess? And then, which is negative, how should we think about any comparative advantage your compound GB001 may have against fevipiprant here?" Defendant Gujrathi responded:

So let's start with the Novartis study [fevipiprant] program. We are also very much looking forward to their Phase III data readouts. Just to remind everyone, they have a large Phase III program actually consisting of 6 Phase III trials within asthma. 4 of those safety trials are reading out later this year.

In terms of their recent guidance, that is still on track and so we are anticipating they have 2 exacerbation trials that will be reading out in September and December time frame and then 2 FEV1 or lung function trials reading out in around November. So these are LUSTER and the ZEAL trials that will be reading out.

And so if that -- those trials are positive in the moderate-to-severe asthmatic population including a subgroup eosinophils high patients, with that, it is a very much a validation of the mechanism of DP2 antagonism and so I think that will be positive to read through to our program because of a similar mechanism of action that we -- both the program share. So we are very much looking forward to that.

26

[Now they're] going into a broad moderate to severe eosinophilic asthma population, but their primary endpoint is on the subgroup of high eosinophils or Th2 high subgroups. And we do know that they have stated that, that is their base case in terms of where they think they would see positive data, which is very consistent with the way we view the biologic relevance and activity both DP2 antagonism and for GB001.

Now we do have some points of differentiation to fevipiprant. We have a very potent selective molecule which is GB001 and that we have high binding affinity to the DP2 receptor. We also have prolonged receptor residence time, which is greater than what has been observed with fevipiprant. We have about an 18- to 20-minute receptor residence time, but Novartis publishes around 12 minutes and we do think that's very important for the mechanism of action here as we inhibit PGD2 internalization of the DP2 receptor in a very effective manner.

And also very importantly, we have, we say, greater PK characteristics for GB001 and that is different. It has to go up to 150 and 450 milligrams to really reach their exposure that they think are clinically efficacious. And we are able to achieve that with much lower dosing and we think actually better coverage over a 24-hour period than those dose levels. So there is a potential that we could show really potentially better efficacy in the clinic in the case that fevipiprant doesn't meet their mark.

So those are very important characteristics for us for GB001. We will be watching closely to see what the clinical efficacy and safety profile is coming out of the fevipiprant Phase III trials and of course we are greatly anticipating seeing our interim data in the first half of 2020 followed by the full data readouts later that year.

80.    Also on May 14, 2019, Defendants Gujrathi and Giraudo participated in the Bank of America Merrill Lynch Health Care Conference. Defendant Gujrathi stated:

[T]he first program GB001 is an oral small molecule taken once a day. It's a DP2 antagonist that we've taken forward for moderate to severe asthma, specifically eosinophilic asthma as well as 2 other

AMENDED COMPLAINT
CASE NO. 3:20-CV-00649-DMS-DEB

allergic indications: chronic rhinosinusitis with nasal polyps and without nasal polyps; and chronic spontaneous urticaria. And we are on track actually to -- or in terms of executing on all 3 of these clinical trials. So the first trial we've named LEDA. We started that trial in October of last year. We are very much on track to having an interim data readout in the first half of 2020, and this is, again, going into moderate to severe eosinophilic asthma patients.

In terms of really important news that will be coming out for the asthma population, for many of you who know there is another molecule in the class. Novartis has a drug called fevipiprant which they'll be reading out on 4 Phase III trials in the fourth quarter this year. So we're very excited to see that data readout. They have 2 trails going on in exacerbations and 2 trials looking at lung function. The exacerbation trial is in what we call moderate to severe [geno step] 4 and 5. The lung function trials are actually in step 3, 4 and 5, so they've expanded that population. And so that'll be a very important set of data for ourselves. And then, again, we will be reading out shortly thereafter, and hopefully -- hoping to initiate our first clinical trial in the Phase III setting, which will be a registration-directed study.

81.    An analyst from Bank of America Merrill Lynch asked on this call: "[s]ince GB001 is the program in the clinic, maybe you can talk about the status enrollment. For example, there are a lot of development programs for asthma today. There's also the biologics that are available today in the market. Do you see competition for enrollment for GB001 in the Phase IIb program?" Defendant Gujrathi responded:

We do in the sense that there are other programs enrolling. But I have to say there are not that many orals. And so that's really been the differentiation here that we want to be, again, that oral treatment of choice. And Novartis has actually finished enrolling their large Phase III program, they had several Phase III programs, actually 6 going on. And so that's been very helpful for us. And there is a lot of excitement, actually, in the investigator community. Our team just did a roadshow in Europe led by Dr. Hector Ortega, who is our medical

lead. And I just mention him because he actually was very pivotal in defining eosinophilic asthma, working at GSK and getting the first anti-IL-5 approved, mepolizumab or Nucala. And so he's been out on the road talking to our investigators, so we think that they're pretty excited about DP2 antagonism. And so we've seen a nice uptick in our enrollment. So we look at enrollment curves and we like to see how we're tracking. And so we're very much on track in terms of where we need to be at this time to be delivering on an interim readout in the first half of '20. So I think that's going very well.

82.     The same analyst followed up with another question about GB001: "[a]nd then you licensed GB001, which actually had a failed Phase II trial. So we frequently get questions from the investors about, okay, why did that trial fail? And what do you think your Phase IIb would actually succeed in that context?" Defendant Gujrathi responded:

> Then of course, Novartis had positive Phase II data looking at lung function, and then they had a positive mechanistic study where they saw a robust reduction in speed of eosinophils. And they recently reported seeing really nice effects on airway epithelial cells or smooth muscle cells. So when we look at the totality of the data, we do know we have a very potent selective molecule and then just look the way we're going after moderate to severe asthmatics with high eosinophils, and potentially high FeNO that will be in Phase III, I think we feel like we have a fair amount of clinical validation for the program.

83.     These May 14, 2019 statements: (1) misled investors as to the clinical validation of DP2 antagonism by Novartis' fevipiprant product, with the implication that this would increase the likelihood of success for Gossamer's GB001 candidate; and (2) misrepresented that Gossamer intended to (i) release the results of its first half 2020 interim analysis of the Phase 2b LEDA study for

GB001 and (ii) would immediately launch a Phase 3 trial for GB001 should that interim analysis be successful.

84.    On August 8, 2019, Gossamer issued its financial results for the Second Quarter of 2019. In the Form 10-Q Gossamer filed with the SEC, the Company stated: "[w]e commenced a Phase 2b clinical trial for our most advanced product candidate, GB001, in moderate-to-severe eosinophilic asthma in October 2018 and expect to conduct an interim analysis in the first half of 2020. If the interim analysis is positive, we plan on initiating a Phase 3 clinical trial thereafter."

85.    The Management Defendants signed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX"), which were appended to the Second Quarter 2019 10-Q as exhibits. These certifications attested that "[t]he information contained in the [Second Quarter 2019 10-Q] fairly presents, in all material respects, the financial condition and results of operations of the Company."

86.    On August 8, 2019, Gossamer held an earnings call with analysts to discuss its Second Quarter 2019 financial results. On this call, Defendant Gujrathi reiterated that "our Phase IIb trial in moderate to severe eosinophilic asthma, known as the LEDA study, began enrolling patients in October of 2018. LEDA is a global Phase IIb study, testing once-daily dosing regimen of GB001 over a 24-week treatment period. . . . We are happy to reaffirm that enrollment in the study remains on track to trigger an interim analysis in the first half of 2020. After this

AMENDED COMPLAINT
CASE NO. 3:20-CV-00649-DMS-DEB

interim analysis, we expect full top line Phase IIb results to read out in the second half of 2020."

87. On this call, an analyst from SVB Leerink asked: "I was wondering if I could get your thoughts on how you interpret Novartis' delay of their Phase III data for fevipiprant and how, if at all, it will impact your strategy?" Defendant Gujrathi responded:

> Yes. So earlier this year, Novartis did announce a delay in terms of -- originally they had outlined they will be reading out top line data from 4 of their clinical Phase III trials that they are conducting with currently, the fevipiprant by the end of this year. They revised that guidance to state that 2 of their Phase III trials would be reading out by the end of this year and 2 would be reading out in the first quarter of 2020, namely there are 2 trials that are really characterizing lung function and a more moderate asthma population, ZEAL 1 and 2, will be reading out in the year; and LUSTER-1 and 2, which are really their exacerbation trials, will be reading out in the first quarter 2020.

> So we don't really view this as a significant impact to our program, and that is very much in the similar time frame. I think they just wanted to get all of their data together and be able to report out simultaneously from what we understand from the earnings call. And I think what's most critical to relay to our investors is really the differences in the trials is that ZEAL 1 and 2 are lung function trials going into less severe patient population. And really, we're very focused on the readout for LUSTER-1 and 2 since those are a very similar trial population as to what we're enrolling in LEDA. So just to remind everyone, LUSTER-1 and 2 are enrolling moderate to severe eosinophilic asthmatic patients as well as noneosinophilic asthmatic patients with a GINA severity of steps 4 and 5, which is the same population that we're enrolling in terms of the disease severity in LEDA. So I think we're really focused on the outcomes of LUSTER-1 and 2, which will hopefully be happening at the beginning of next year. But really all eyes are looking forward. We're very focused on execution of the LEDA trials we've discussed and very excited about the progress of the program.

31

88.    On September 12, 2019, Gossamer announced that Defendant Stampacchia had resigned from the Company's Board of Directors.

89.    The statements in ¶¶ 71-72, 74-75, 77-82, and 84-87, as well as those in the IPO materials, were materially false and misleading and omitted to disclose material information. Specifically, Defendants misrepresented and/or failed to disclose to investors: (1) the purported clinical validation of Novartis' oral DP2 antagonist; (2) that Gossamer did not plan to release the details of its interim analysis of the Phase 2b LEDA study and did not plan to launch a Phase 3 trial for GB001 upon such analysis; and (3) as a result of the foregoing, Defendants' public statements were materially false and misleading at all relevant times.

90.    Defendants knew, or in reckless disregard for the truth should have known, that at the time the statements in ¶¶ 71-72, 74-75, 77-82, and 84-87, as well as those in the IPO materials, were made, they were false and/or misleading, and/or failed to disclose material information to investors.

## THE TRUTH BEGINS TO EMERGE AND DEFENDANTS MAKE ADDITIONAL MISSTATEMENTS

91.    In October 2019, Novartis announced that its fevipiprant product had failed to improve long function in two Phase 3 trials, as measured by FEV1, over placebo. This was after similar DP2 drugs developed by AstraZeneca and Amgen failed in clinical trials. Analysts recognized that this failure "could have negative implications for Gossamer Bio, which has a DP2 antagonist in phase 2b. *When Gossamer raised $276 million in an IPO earlier in the year, it said Novartis'*

*fevipiprant phase 2 had clinically validated DP2 antagonism. That statement now looks premature, particularly when viewed in light of the failures of other DP2 drugs.*"[6]

92.     On November 12, 2019, Gossamer issued its financial results for the Third Quarter of 2019. In the Form 10-Q Gossamer filed with the SEC, the Company stated: "[w]e commenced our LEDA Phase 2b clinical trial for our most advanced product candidate, GB001, in moderate-to-severe eosinophilic asthma in October 2018. We expect to conduct an interim analysis in the first half of 2020, with full results from the study expected in the second half of 2020. If the interim analysis is positive, we plan on initiating a Phase 3 clinical trial thereafter."

93.     This statement misrepresented that Gossamer intended to (i) release the results of its first half 2020 interim analysis of the Phase 2b LEDA study for GB001 and (ii) would immediately launch a Phase 3 trial for GB001 should that interim analysis be successful.

94.     The Management Defendants signed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX"), which were appended to the Third Quarter 2019 10-Q as exhibits. These certifications attested that "[t]he information contained in the [Third Quarter 2019 10-Q] fairly presents, in all material respects, the financial condition and results of operations of the Company."

_____

[6] https://www.fiercebiotech.com/biotech/novartis-asthma-drug-fails-phase-3-raising-doubts-about-gossamer-s-prospects (emphasis added) (last visited on August 30, 2020).

95.     On November 12, 2019, Gossamer held an earnings call with analysts to discuss its Third Quarter 2019 financial results. On this call, Defendant Gujrathi again reiterated that the GB001 LEDA "study is on track to trigger an interim analysis in the first half of 2020, once approximately 2/3 of the patients have completed the trial. In the second half of 2020, we expect to read out full top line Phase IIb result [sic] for this 400-patient trial."

96.     In addition, Defendant Gujrathi discussed that at the American College of Allergy, Asthma, Immunology Annual Scientific Meeting in Houston, TX, Gossamer "presented 2 posters related to asthma and GB001. The first contained detailed results from the previously discussed proof-of-concept Phase II study run by our partner, Teijin Pharma, in a 158 mild-to-moderate Japanese asthmatics. The study met its primary endpoint of change in morning peak expiratory flow from baseline versus placebo. Additionally, in the poster, we showed that treatment with 20 milligrams of GB001 led to a 71% reduction in the risk of asthma worsening in the overall population, and an 84% reduction in the elevated eosinophilic population. These data reinforce our belief that baseline blood eosinophils are a potential useful marker for response to GB001."

97.     On this same call, an analyst from Joh. Berenberg, Gossler & Co. KG asked "[f]irst, on GB001. Just a follow-up on the LEDA program. Can you tell us what data should we expect to be released at the interim analysis?" Defendant Gujrathi responded:

AMENDED COMPLAINT
CASE NO. 3:20-CV-00649-DMS-DEB

So at the time of the interim analysis, that's again, with about 2/3 of patients have reached 24 weeks and with the primary endpoint. We will be looking at the primary endpoint, which is a composite. We'll be looking at the 5 subcomponents of the composite to ensure consistency and what we're really looking -- be looking at the rate of worsened events. And so that's really the key endpoint that we'll be looking for at the study. We'll also look, of course, at lung function, and we'll be looking at safety and tolerability as well. ***Just to be clear, we will not be releasing any of this data since this will be an ongoing study, but we will be indicating whether we think the data's in support of moving forward into Phase III, planning and initiation purposes.*** And so that's what the level of disclosure we'll be providing. But really what we'll be looking for is very robust data on the composite endpoint, consistency across all the subcomponents of the composite and, of course, consistency with the secondary endpoint.

(Emphasis added).

98.     The same analyst then asked: "A follow-up question on Novartis at the Phase III program. So based on your discussions with the FDA and the 0 trial failure. Do you think that the FDA would require you to run a similar Phase III trial in moderate asthma patient population with the lung function endpoint? Or is it possible that the study could be avoided in your pivotal program?" Defendant Gujrathi responded:

We have had conversations with the FDA, where they were very interested in characterizing the efficacy in a broader population beyond moderate-to-severe eosinophilic asthma patients. We definitely wanted to have that as our patient population for the Phase IIb LEDA study because we think that's where the highest scientific rationale lies in terms of the underlying biology for those patients, and the potential therapeutic effects for DP2 antagonism as well as any TH2-related mechanism. But we do know that they are interested in that characterization.

AMENDED COMPLAINT
CASE NO. 3:20-CV-00649-DMS-DEB

And Novartis has done quite a bit now to generate data in the moderate asthmatics in the mild-to-moderate setting as well as looking at to all-comers in the LUSTER trial. So our plan is to continue to have regulatory dialogue, and to talk about that plan. We're ready to see what the data from, again, our own LEDA study. Of course, we will look at the LUSTER-1 and 2, our data sets when they become available and take all that back to the regulatory authorities to discuss and finalize our Phase III plan.

I will say that we're seeing clear benefits in the mild-to-severe eosinophilic asthma setting, really not a lot of benefit in those other patient populations. We will try to streamline our Phase III program. We think that's the right thing to do for patients. And we also think that's the best use of the adopting revenue sources as well. So those will be some of our intention.

99.    On December 16, 2019, Novartis announced that it was terminating the development of its DP2 antagonist fevipiprant for asthma after it failed another pair of Phase 3 clinical trials. Analysts noted that, "[f]or Gossamer, detailed data from fevipiprant would likely weight heavily on GB001, its lead drug in the same class."[7]

100.    Another analyst commented that "Gossamer had pulled off a highly successful $276m Nasdaq flotation in February, and one reason investors stuck with the company in October is that it itself had indicated that the Zeal trials [by Novartis, who announced their failure in October 2019] would likely fail. ***Today***

---

[7] https://www.biopharmadive.com/news/novartis-fevipiprant-discontinue-asthma-gossamer/569149/ (last visited on August 30, 2020).

AMENDED COMPLAINT
CASE NO. 3:20-CV-00649-DMS-DEB

*that credibility suffered a major sentiment knock-back*, and Gossamer bulls and other DP2 inhibitor developers alike would do well to take note."[8]

101.   On this news, *Gossamer's stock price plummeted by over 37% in one day*, from a December 13, 2019 close of $25.37 to a December 16, 2019 close of $15.96 per share.[9]

102.   As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of Gossamer's securities, Lead Plaintiff and other members of the Class have suffered significant losses and damages.

103.   Shares of Gossamer common stock were sold at $16.00 per share in the IPO.

104.   The facts regarding the IPO materials began to emerge after the IPO, as detailed herein. On April 3, 2020, the date the initial complaint in this action was filed (ECF No. 1), Gossamer's stock price closed at just $10.19 per share, down from a class period high of $27.15 per share.

## POST-CLASS PERIOD DEVELOPMENTS

105.   On March 24, 2020, Gossamer filed 2019 Annual Report on Form 10-K (the "2019 10-K") with the SEC.

106.   In its 2019 10-K, Gossamer acknowledged that:

The results from preclinical studies or clinical trials of a product candidate or a competitor's product candidate in the same class may

---

[8] https://www.evaluate.com/vantage/articles/news/trial-results/other-shoe-drops-gossamers-gb001 (last visited on August 30, 2020).
[9] This reflects one trading day, as the weekend fell over December 14-15, 2019.

AMENDED COMPLAINT
CASE NO. 3:20-CV-00649-DMS-DEB

not predict the results of later clinical trials of our product candidates, and interim results of a clinical trial are not necessarily indicative of final results. Product candidates in later stages of clinical trials may fail to show the desired safety and efficacy characteristics despite having progressed through preclinical studies and initial clinical trials. In particular, while two Phase 2 clinical trials of GB001 had been conducted prior to our acquisition of GB001, we do not know how GB001 will perform in future clinical trials, including as a result of any differences from targeting a population of more severe asthma subjects with elevated eosinophil counts, as well as other differences in our planned trial design. Further, GB001 did not meet its primary efficacy endpoint of improvement in FEV1 over 10 weeks in the first Phase 2 clinical trial conducted by Pulmagen Therapeutics (Asthma) Limited, or Pulmagen, and the second Phase 2 clinical trial conducted by Pulmagen and its partner, Teijin, was limited to only Japanese patients. While we have designed our ongoing Phase 2b trial in a manner intended to address what we believe to be the shortcomings of the first Pulmagen Phase 2 clinical trial, we cannot be certain that such failure was not due to GB001 itself or that the results of our ongoing Phase 2b trial will otherwise be successful in a broader patient population. In addition, in October 2019, Novartis announced that its oral DP2 antagonist, fevipiprant, failed to improve lung function in a pair of Phase 3 clinical trials of patients with moderate asthma, and in December 2019, Novartis announced that the pooled analysis from a pair of pivotal Phase 3 clinical trials of patients with moderate-to-severe asthma did not meet the clinically relevant threshold for reduction in rate of moderate-to-severe exacerbation and that the results did not support further development of fevipiprant in asthma. It is not uncommon to observe results in clinical trials that are unexpected based on preclinical studies and early clinical trials, and many product candidates fail in clinical trials despite very promising early results.

107.   After the markets closed on May 12, 2020, Gossamer issued a press release accompanying its First Quarter 2020 financial results. In this release, Gossamer announced that, contrary to its prior assertions, it was not going to immediately launch the Phase 3 study for GB001. In addition, Gossamer did not share any specifics of its interim analysis of the Phase 2b study of GB001:

[R]ecently completed a pre-specified interim analysis of LEDA, its Phase 2b clinical study of GB001 in moderate-to-severe eosinophilic asthma. The interim analysis was based on approximately the first two thirds (~320) of patients who either completed or withdrew from the study. The Independent Data Monitoring Committee (IDMC) reviewed results from the interim analysis and recommended continuation of the study to its completion without modification. Based on the results of the interim analysis and the IDMC recommendation, Gossamer has commenced initial Phase 3 planning and supportive activities in anticipation of the completion of the study and final analysis of the study data. The final decision to proceed to Phase 3 will be made based on the totality of the final data from the LEDA study, as well as discussions with global regulatory authorities. Topline results from LEDA continue to be expected in the second half of 2020.

## INSIDER SALES

108.   On August 28, 2019, Gossamer's Chief Scientific Officer, Luisa Salter-Cid, sold 50,000 shares at the artificially-inflated price of $19.88 per share, for total proceeds of just under $1 million.

109.   Then between September 5 and September 20, 2019, Omega Fund V, L.P., sold 400,000 shares at artificially-inflated prices ranging from between $21.22 and $21.96, as set forth in the following chart:

AMENDED COMPLAINT
CASE NO. 3:20-CV-00649-DMS-DEB

| Date | Number of Shares Sold | Price Per Share | Total Proceeds |
|---|---|---|---|
| September 5, 2019 | 21,404 | $21.56 | $461,537 |
| September 10, 2019 | 112,776 | $21.22 | $2,393,494 |
| September 16, 2019 | 82,213 | $21.75 | $1,787,758 |
| September 20, 2019 | 183,607 | $21.96 | $4,032,560 |
| **TOTAL** | 400,000 | N/A | **$8,675,349** |

110.   Importantly, the shares traded by Omega Fund V, L.P. "may be deemed to be beneficially owned by each of Omega Fund V GP, L.P. . . . as the general partner of Omega V and Omega Fund V GP Manager, Ltd. . . . as the general partner of Omega V GP. [Defendant] Otello Stampacchia, Richard Lim, Anne-Mari Paster and Claudio Nessi . . . are all the shareholders and directors of Omega V GP Manager and have shared voting and investment power over the shares held by Omega V."

111.   In other words, Defendant Stampacchia, having invested in Gossamer and having assumed a directorship on the Board in the lead up to the IPO, was cashing out a substantial portion of Omega Fund's shares immediately after the lock-up expired on the IPO, and before any negative news hit.

112.   Defendant Stampacchia resigned from Gossamer's Board of Directors on September 12, 2019, in the midst of Omega Fund V's massive selling spree.

40

# CLASS ACTION ALLEGATIONS

113.   Lead Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of a class of all persons and entities who purchased or otherwise acquired Gossamer common stock between February 8, 2019 and December 13, 2019, inclusive, and/or who acquired Gossamer shares pursuant or traceable to Gossamer's Registration Statement and Prospectus in connection with its IPO, seeking to recover damages caused by Defendants' violations of the federal securities laws and to pursue remedies under §§ 11 and 15 of the Securities Act and under §§ 10(b) and 20(a) of the Exchange Act and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. § 240.10b-5. Excluded from the Class are Defendants, directors and officers of the Company, as well as their families and affiliates.

114.   This action is properly maintainable as a class action.

115.   The members of the Class are so numerous that joinder of all members is impracticable. The disposition of their claims in a class action will provide substantial benefits to the parties and the Court.

116.   There is a well-defined community of interest in the questions of law and fact involved in this case. Questions of law and fact common to the members of the Class which predominate over questions which may affect individual Class members include:

a.  Whether the Securities Act and/or the Exchange Act were violated by Defendants;

b.  Whether Defendants omitted and/or misrepresented material facts;

c.  Whether the IPO materials contained untrue statements of material fact;

d.  Whether the Individual Defendants signed the Registration Statement;

e.  Whether the Underwriter Defendants acted as underwriters;

f.  Whether Defendants' statements omitted material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading;

g.  Whether Defendants knew or recklessly disregarded that their statements were false and misleading;

h.  Whether the price of the Company's stock was artificially inflated; and

i.  The extent of damage sustained by Class members and the appropriate measure of damages.

117.  Lead Plaintiff's claims are typical of those of the Class because Lead Plaintiff and the Class sustained damages from Defendants' wrongful conduct alleged herein.

118.   Lead Plaintiff will adequately protect the interests of the Class and have retained counsel who are experienced in class action securities litigation. Lead Plaintiff has no interests that conflict with those of the Class.

119.   The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual members of the Class, which would establish incompatible standards of conduct for Defendants; or adjudications with respect to individual members of the Class would, as a practical matter, be dispositive of the interest of other members or substantially impair or impede their ability to protect their interests.

120.   There will be no difficulty in the management of this litigation.

121.   A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

122.   Defendants have acted on grounds generally applicable to the Class with respect to the matters complained of herein, thereby making appropriate the relief sought herein with respect to the Class as a whole.

## FRAUD ON THE MARKET

123.   Lead Plaintiff will rely upon the presumption of reliance established by the fraud-on- the-market doctrine that, among other things:

a.   Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

b.   The omissions and misrepresentations were material;

c. The Company's common stock traded in efficient markets;

d. The misrepresentations alleged herein would tend to induce a reasonable investor to misjudge the value of the Company's common stock; and

e. Lead Plaintiff and other members of the class purchased the common stock between the time Defendants misrepresented or failed to disclose material facts.

124. At all relevant times, the markets for the Company's stock were efficient for the following reasons, among others: (i) the Company filed periodic public reports with the SEC; and (ii) the Company regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the major news wire services and through other wide-ranging public disclosures such as communications with the financial press, securities analysts, and other similar reporting services. Lead Plaintiff and the Class relied on the price of the Company's common stock, which reflected all information in the market, including the misstatements by Defendants.

125. Only the Exchange Act claims asserted herein sound in fraud. The Securities Act claims asserted herein are purely strict liability and negligence claims and do not sound in fraud.

AMENDED COMPLAINT
CASE NO. 3:20-CV-00649-DMS-DEB

## NO SAFE HARBOR

126.   The statutory safe harbor provided for forward-looking statements under certain conditions does not apply to any of the allegedly false statements pleaded in this Complaint. The specific statements pleaded herein were not identified as forward-looking statements when made.

127.   To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.

## SCIENTER ALLEGATIONS

128.   As alleged herein, Defendants acted with scienter since Defendants knew that the public documents and statements issued or disseminated in the name of the Company were materially false and/or misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. As set forth elsewhere herein in detail, the Individual Defendants, by virtue of their receipt of information reflecting the true facts regarding Gossamer, their control over, and/or receipt and/or modification of Gossamer's allegedly materially misleading misstatements and/or their associations with the

45

Company which made them privy to confidential proprietary information concerning Gossamer, participated in the fraudulent scheme alleged herein.

129.   Again, only the Exchange Act claims asserted herein sound in fraud. The Securities Act claims asserted herein are purely strict liability and negligence claims and do not sound in fraud.

## LOSS CAUSATION

130.   On December 16, 2019, Novartis announced that it was terminating the development of its DP2 antagonist fevipiprant for asthma after it failed another pair of Phase 3 clinical trials. On this news, Gossamer common stock plummeted from a December 13, 2019 closing price of $25.37 per share to $15.96 per share, a one day drop of $9.41 or over 37%.

## CAUSES OF ACTION

## COUNT ONE
### Violations of § 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder
### Against Gossamer and the Management Defendants

131.   Lead Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

132.   During the Class Period, Defendants disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose the material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading.

133.   Defendants violated § 10(b) of the Exchange Act and Rule 10b-5 in that they: (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon those who purchased or otherwise acquired the Company's securities during the class period.

134.   Lead Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for the Company's common stock. Lead Plaintiff and the Class would not have purchased the Company's common stock at the price paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by Defendants' misleading statements.

### COUNT TWO
**Violations of § 20(a) of the Exchange Act**
**(Against the Management Defendants)**

135.   Lead Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

136.   The Management Defendants acted as controlling persons of the Company within the meaning of § 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions at the Company, the Management Defendants had the power and authority to cause or prevent the Company from engaging in the wrongful conduct complained of herein. The Management Defendants were

47

provided with or had unlimited access to the documents described above which contained statements alleged by Lead Plaintiff to be false or misleading both prior to and immediately after their publication, and had the ability to prevent the issuance of those materials or to cause them to be corrected so as not to be misleading.

### COUNT THREE
**Violations of § 11 of the Securities Act**
**(Against All Defendants)**

137.   Lead Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

138.   This Count does not sound in fraud. All of the preceding allegations of fraud or fraudulent conduct and/or motive are specifically excluded from this Count. Lead Plaintiff does not allege that any of the Defendants, other than Gossamer and the Management Defendants, had scienter or fraudulent intent with respect to this Court, insofar as scienter or fraudulent intent are not elements of a § 11 claim.

139.   The Registration Statement for the IPO was inaccurate and misleading, contained untrue statements of material facts, omitted to state other facts necessary to make the statements not misleading, and omitted to state material facts required to be stated therein.

140.   Gossamer is the registrant for the IPO. The other Defendants named herein were responsible for the contents and dissemination of the Registration Statement.

141.   As the issuer of the shares, Gossamer is strictly liable to Lead Plaintiff and the Class for any misstatements or omissions in the Registration Statement.

142.   None of the Defendants named herein made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Registration Statement were true, and/or without omissions of any material facts, were not misleading.

143.   By reason of the conduct alleged herein, each Defendant violated, and/or controlled a person who violated, § 11 of the Securities Act.

144.   Lead Plaintiff acquired Gossamer shares pursuant and/or traceable to the Registration Statement for the IPO.

145.   Lead Plaintiff and the Class have sustained damages. The value of Gossamer stock has declined substantially subsequent to and due to Defendants' violations.

146.   At the time of his purchase of Gossamer shares, Lead Plaintiff and the other members of the Class were without knowledge of the facts concerning the wrongful conduct alleged herein and could not have reasonably discovered those facts prior to within one year of bringing this lawsuit. Moreover, fewer than three

49

years elapsed between the time that the securities upon which this Count Three is brought were offered to the public and the time Lead Plaintiff filed this Complaint.

## COUNT FOUR
### Violations of § 15 of the Securities Act
### (Against All Defendants <u>Except</u> the Underwriter Defendants)

147.   Lead Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

148.   This Count is brought pursuant to § 15 of the Securities Act against Gossamer, Gujrathi, Giraudo, Hasnain, Bilenker, Burow, Cox, Daniel, Galá, and Stampacchia.

149.   This Count does not sound in fraud. All of the preceding allegations of fraud or fraudulent conduct and/or motive are specifically excluded from this Count. Lead Plaintiff does not allege that any of the Defendants, other than Gossamer and the Management Defendants, had scienter or fraudulent intent with respect to this Court, insofar as scienter or fraudulent intent are not elements of a § 15 claim.

150.   Gujrathi, Giraudo, Hasnain, Bilenker, Burow, Cox, Daniel, Galá, and Stampacchia each were control persons of Gossamer by virtue of their positions as director and/or senior officer of Gossamer. These Defendants each had a series of direct and/or indirect business and/or personal relationships with other directors and/or officers and/or major shareholders of Gossamer. Gossamer controlled these Defendants.

50

151.   Defendants each were culpable participants in the violations of § 11 of the Securities Act alleged in Count Three above, based on their having signed and/or authorized the signing of the Registration Statement and having otherwise participated in the process that allowed the IPO to be successfully completed.

## PRAYER FOR RELIEF

WHEREFORE, Lead Plaintiff prays for relief and judgment as follows:

a)  ordering that this action is a proper class action pursuant to Rule 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure on behalf of the Class as defined herein, and a certification of Lead Plaintiff as class representative pursuant to Rule 23 of the Federal Rules of Civil Procedure and appointment of Lead Plaintiff's counsel as Lead Counsel;

b)  awarding compensatory and punitive damages in favor of Lead Plaintiff and the other class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including pre-judgment and post-judgment interest thereon.

c)  awarding Lead Plaintiff and other members of the Class their costs and expenses in this litigation, including reasonable attorneys' fees and experts' fees and other costs and disbursements; and

51

d)  awarding Lead Plaintiff and the other Class members such other relief

as this Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Lead Plaintiff hereby demands a trial by jury in this action of all issues so

triable.


Dated: August 31, 2020                    Respectfully submitted,

                                          By: */s/ Jacob A. Walker*
                                          Jacob A. Walker (CA Bar No. 271217)
                                          Jeffrey C. Block (admitted *pro hac vice*)
                                          Stephen J. Teti (admitted *pro hac vice*)
                                          **BLOCK & LEVITON LLP**
                                          260 Franklin St., Suite 1860
                                          Boston, MA 02110
                                          Tel.: (617) 398-5600
                                          Fax: (617) 507-6020
                                          jake@blockleviton.com
                                          jeff@blockleviton.com
                                          steti@blockleviton.com

                                          Whitney E. Street (CA Bar No. 223870)
                                          **BLOCK & LEVITON LLP**
                                          100 Pine St., Suite 1250
                                          San Francisco, CA 94111
                                          Tel.: (415) 968-1852
                                          Fax: (617) 507-6020
                                          whitney@blockleviton.com

                                          *Counsel for Lead Plaintiff and the
                                          Proposed  Class*