Jacob A. Walker (CA Bar # 271217)
Jeffrey C. Block (admitted *pro hac vice*)
Stephen J. Teti (admitted *pro hac vice*)
**BLOCK & LEVITON LLP**
260 Franklin St., Suite 1860
Boston, MA 02110
Tel.: (617) 398-5600
Fax: (617) 507-6020

Whitney E. Street (CA Bar # 223870)
**BLOCK & LEVITON LLP**
100 Pine Street, Suite 1250
San Francisco, CA 94111
Tel.: (415) 968-1852
Fax: (617) 507-6020

*Attorneys for Lead Plaintiff and the Proposed Class*

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SCOTT KUHNE, individually and on behalf of all others similarly situated,<br><br>        Plaintiff,<br><br>    v.<br><br>GOSSAMER BIO, INC., SHEILA GUJRATHI, M.D., BRYAN GIRAUDO, FAHEEM HASNAIN, JOSHUA H. BILENKER, M.D., KRISTINA BUROW, RUSSELL COX, THOMAS DANIEL, M.D., RENEE GALA, OTELLO STAMPACCHIA, Ph.D., MERRILL LYNCH, PIERCE, FENNER & SMITH INCORPORATED, SVB LEERINK LLC, BARCLAYS CAPITAL INC., and EVERCORE GROUP L.L.C.,<br><br>        Defendants. | Case No. 3:20-cv-00649-DMS-DEB<br><br>**MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS SECOND AMENDED COMPLAINT**<br><br>Hearing Date:  April 2, 2021<br>Time:              1:30 p.m.<br>Courtroom:     13A<br>Judge:           Hon. Dana M. Sabraw |

i

# **TABLE OF CONTENTS**

I.     INTRODUCTION ..................................................................................................1

II.    STATEMENT OF FACTS ....................................................................................3

III.   PLEADING STANDARD .....................................................................................6

IV.    ARGUMENT .........................................................................................................6

    A.    Plaintiff adequately pleads that the Offering Materials contained three misstatements. ...........................................................................................7

        1.    Plaintiff has adequately alleged that Gossamer's statements about the clinical validation of Novartis' fevipiprant candidate were misleading and omitted material information. ..........................................................7

        2.    Plaintiff has adequately alleged that Gossamer's statements about releasing its interim analysis of GB001 in the first half of 2020 were misleading and omitted material information. .......................................13

        3.    Plaintiff has adequately alleged that Gossamer's statements about immediately launching a Phase 3 trial of GB001 upon a successful interim analysis were misleading and omitted material information......14

    B.    Lead Plaintiff alleges claims based on statements of then-present fact, and not based on "fraud-by-hindsight" as Defendants posit............................16

    C.    Defendants fail to make the "stringent showing" required for protection under the "bespeaks caution" doctrine for the misstatements concerning the LEDA study.........................................................................................17

    D.    Defendants have not met their "heavy burden" of proving negative loss causation and Lead Plaintiff adequately alleges Section 11 damages. ......19

    E.    Section 15 claims.....................................................................................22

    F.    Underwriter Defendants ...........................................................................22

V.    CONCLUSION....................................................................................................22

# TABLE OF AUTHORITIES

**Cases**

*Angelos v. Tokai Pharmaceuticals, Inc.*,
__ F. Supp. 3d __, 2020 WL 5995598 (D. Mass. Oct. 9, 2020). ........................... 12

*Backe v. Novatel Wireless, Inc.*,
642 F. Supp. 2d 1169 (S.D. Cal. 2009) ................................................................ 11

*Batwin v. Occam Networks, Inc.*,
No. 07-cv-2750, 2008 WL 2676364 (C.D. Cal. July 1, 2008) ............................... 14

*Beecher v. Able*,
435 F. Supp. 397 (S.D.N.Y. 1975) ...................................................................... 21

*Berson v. Applied Signal Tech., Inc.*,
527 F.3d 982 (9th Cir. 2008) ............................................................................... 12

*Compton v. Ignite Rest. Grp., Inc.*,
No. 12-cv-2196, 2014 WL 61199 (S.D. Tex. Jan. 7, 2014) ................................... 22

*Employers Teamsters Local Nos. 175 & 505 Pension Trust Fund v. Clorox Co.*,
353 F.3d 1125 (9th Cir. 2004) .............................................................................. 18

*Fed. Housing Fin. Agency v. Nomura Holding Am., Inc.*,
68 F. Supp. 3d 486 (S.D.N.Y. 2014) .................................................................... 21

*Feyko v. Yuhe Int'l, Inc.*,
No. 11-cv-5511, 2013 WL 816409 (C.D. Cal. Mar. 5, 2013) ................................ 20

*Gray v. First Winthrop Corp.*,
82 F.3d 877 (9th Cir. 1996) ................................................................................. 19

*Herman & MacLean v. Huddleston*,
459 U.S. 375 (1983)................................................................................................2

*Hildes v. Arthur Andersen LLP*,
734 F.3d 854 (9th Cir. 2013) ................................................................... 6, 9, 16, 20

*Hsu v. Puma Biotechnology, Inc.*,
No. 15-cv-0865, 2016 WL 5859000 (C.D. Cal. Sep. 30, 2016).............................. 7

*In re Aldus Sec. Litig.*,
No. 92-cv-0885, 1993 WL 121478 (W.D. Wash. Mar. 1, 1993) ..........................13

*In re Apple Computer Sec. Litig.*,
886 F. 2d 1109 (9th Cir. 1989) ...............................................................................9

*In re Atossa Genetics Inc. Sec. Litig.*,
868 F.3d 784 (9th Cir. 2017) ................................................................................17

*In re Barclays Bank PLC Sec. Litig.*,
No. , 2016 WL 3235290 (S.D.N.Y. 2016) .............................................................21

*In re Countrywide Fin. Corp. Sec. Litig.*,
588 F. Supp. 2d 1132 (C.D. Cal. Dec. 1, 2008) ...................................................20

*In re Dropbox Sec. Litig.*,
No. 19-cv-6348, 2020 WL 6161502 (N.D. Cal. Oct. 21, 2020)............................10

*In re Facebook, Inc. IPO Sec. & Deriv. Litig.*,
986 F. Supp. 2d 487 (S.D.N.Y. 2013). .................................................................10

*In re Immune Response Sec. Litig.*,
375 F. Supp. 2d 983 (S.D. Cal. 2005) ........................................................9, 17, 18

*In re ISO Ray, Inc. Sec. Litig.*,
189 F. Supp. 3d 1057 (E.D. Wash. 2016)...........................................................8, 11

*In re Metro. Sec. Litig.*,
532 F. Supp. 2d 1260 (W.D. Wash. 2007) .......................................................14, 17

*In re Nw. Biotherapeutics Inc. Sec. Litig.*,
No. 07-cv-1254, 2008 WL 6822401 (W.D. Wash. July 2, 2008) ..........................10

*In re Restoration Robotics, Inc. Sec. Litig.*,
417 F.3d 1242 (N.D. Cal. 2019).............................................................................10

*In re Salix Pharms., Ltd.*,
No. 14-cv-8925, 2016 WL 1629341 (S.D.N.Y. Apr. 22, 2016)........................11, 14

*In re Snap Inc. Sec. Litig.*,
No. 17-cv-3679, 2018 WL 3616764 (C.D. Cal. Aug. 8, 2018).......................21, 22

*In re STEC Inc. Sec. Litig.*,
 No. 09-cv-1304, 2011 WL 2669217 (C.D. Cal. June 17, 2011) .....................11, 14

*In re Surebeam Corp. Sec. Litig.*,
No. 03-cv-1721, 2005 WL 5036360 (S.D. Cal. Jan. 3, 2005) ................................... 6

*In re WRT Energy Sec. Litig.*,
No. 96-cv-3610, 2005 WL 2088406 (S.D.N.Y. Aug. 30, 2005) ............................ 20

*Khoja v. Orexigen Therapeutics, Inc.*,
899 F.3d 988 (9th Cir. 2018) ................................................................................. 9

*Livid Holdings Ltd. v. Salomon Smith Barney, Inc.*,
416 F.3d 940 (9th Cir. 2005) ............................................................................... 17

*Marsh v. San Diego Cty.*,
432 F. Supp. 2d 1035 (S.D. Cal. 2006) ................................................................. 8

*Miller v. Thane Int'l, Inc.*,
519 F.3d 879 (9th Cir. 2008) ........................................................................... 9, 11

*NECA-IBEW Health & Welfare Fund v. Goldman Sachs & Co.*,
693 F.3d 145 (2d Cir. 2012) ................................................................................. 21

*New Jersey Carpenters Health Fund v. Royal Bank of Scotland Grp., PLC*,
709 F.3d 109 (2d Cir. 2013) ................................................................................. 12

*Omnicare, Inc. v. Laborers Dist. Council Constr. Ind. Pension Fund*,
575 U.S. 175, 183 (2015). .................................................................................... 15

*Pirani v. Slack Techs., Inc.*,
445 F. Supp. 3d 367 (N.D. Cal. 2020) ................................................................... 9

*Plumbers Union Local No. 12 Pension Fund v. Ambassador's Grp.*,
717 F. Supp. 2d 1170 (E.D. Wash. 2010) .............................................................. 7

*Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*,
759 F.3d 1051 (9th Cir. 2014) .............................................................................. 18

*Rafton v. Rydex Series Funds*,
No. 10-cv-1173, 2011 WL 31114 (N.D. Cal. Jan. 5, 2011) .................................... 6

*S.E.C. v. Todd*,
642 F.3d 1207 (9th Cir. 2011) ............................................................................... 7

*Todd v. STAAR Surgical Co.*,
No. 14-cv-5263, 2016 WL 6699284 (C.D. Cal. Apr. 12, 2016) ........................... 11

*TSC Indus., Inc. v. Northway, Inc.*,
426 U.S. 438 (1976)..................................................................................................14

*Virginia Bankshares, Inc. v. Sandberg*,
501 U.S. 1083 (1991)...............................................................................................17

*Warshaw v. Xoma Corp.*,
74 F.3d 955 (9th Cir. 1996) ..............................................................................7, 19

*Wu v. Tokai Pharms., Inc.*,
No. SU-CV20163725BLS2, 2019 WL 938924 (Mass. Super., Suffolk Cty., Jan. 9, 2019) ......................................................................................................................12

*Yanek v. STAAR Surgical Co.*,
388 F. Supp. 2d 1110 (C.D. Cal. 2005)...................................................................19

## I.    INTRODUCTION

On February 8, 2019, Defendant Gossamer Bio, Inc. ("Gossamer") offered nearly 20 million shares to the public through an initial public offering for $16.00 each, raising $317.4 million. Proceeds to Gossamer, net of underwriting discounts and commissions, were $256.68 million. By April 2020, when this lawsuit was initiated, Gossamer's stock price was just $10.19 per share, wiping out over $100 million in shareholder investments.

As alleged in the Second Amended Class Action Complaint ("SAC"), the Offering Materials accompanying the IPO contained untrue statements of material fact and omitted material information that was required to be stated therein concerning Gossamer's lead drug candidate, GB001. Defendants therefore violated Sections 11 and 15 of the Securities Act of 1933 (the "Securities Act").[1]

Specifically, in the Offering Materials, Gossamer misled investors as to: (1) the purported clinical validation of DP2 antagonism by an earlier study performed by Novartis on its competing development drug candidate (fevipiprant); (2) that Gossamer would release the results of its first half 2020 interim analysis of the Phase 2b LEDA study for GB001; and (3) that Gossamer would immediately launch the first of two planned Phase 3 studies for GB001 should that interim analysis be successful. Read both individually and in combination, these statements implied an increased likelihood of success for Gossamer's GB001 candidate. The Offering Materials misled investors.

The truth was gradually revealed in the months following Gossamer's IPO. First, by October 2019, Novartis' fevipiprant had failed two Phase 3 trials. This directly contradicts the statement from the Offering Materials that Novartis' earlier study had "clinically validated" DP2 antagonism. Indeed, one analyst wrote that

---

[1] Lead Plaintiff alleges Section 11 claims only with respect to the Underwriter Defendants, Merrill Lynch, Pierce, Fenner & Smith Incorporated, SVB Leerink LLC, Barclays Capital Inc., and Evercore Group L.L.C.

Gossamer's registration statement boast "now looks premature." ¶ 84.[2] Then on December 16, 2019, Novartis announced that it was terminating the development of fevipiprant for asthma. Novartis never stated, before or after Gossamer's IPO, that its fevipiprant product "clinically validated" DP2 antagonism; only Gossamer did. Financial analysts concluded that Gossamer's "credibility suffered a major sentiment knock-back." ¶ 91. Gossamer's Offering Materials therefore mischaracterized the results of Novartis' earlier fevipiprant trial.

Second, on November 12, 2019, Gossamer announced that it would not release any of the data associated with its purported interim analysis of the Phase 2b LEDA study in the first half of 2020, and would only indicate whether the Company felt the data supported moving into the "planning and initiation" phase of a Phase 3 trial. This contradicted the statements in the Offering Materials that data from the interim analysis would "be available," and that if that interim analysis was positive, that Gossamer would initiate its first Phase 3 clinical trial. In other words, the Offering Materials misled investors because Gossamer did not release the details of its interim analysis and did not immediately launch a Phase 3 study, as it had promised.

Gossamer's GB001 candidate ultimately failed its Phase 2b LEDA trial, as announced by the Company in October 2020. However, despite Defendants' attempts to contort Lead Plaintiff's allegations into a "fraud-by-hindsight" theory, that is not what this case is about. Indeed, fraud is not even an element here; the Securities Act imposes "virtually absolute" liability for even innocent misstatements made in the Offering Materials.[3]

Although the post-IPO events alleged in the SAC and detailed herein shed light on the misrepresentations in the Offering Materials, Lead Plaintiff alleges

---

[2] Citations to "¶ _" are to paragraphs of the SAC (ECF No. 30).
[3] *Herman & MacLean v. Huddleston*, 459 U.S. 375, 382 (1983).

MEMO OF POINTS & AUTHORITIES IN OPPOSITION
TO DEFENDANTS' MOTIONS TO DISMISS
CASE NO. 3:20-CV-00649-DMS-DEB

2

plausible claims that Defendants misled investors based on the statements of then-current fact. The Court should deny Defendants' Motion to Dismiss in its entirety.

## II.   STATEMENT OF FACTS

Gossamer is a clinical-stage biopharmaceutical company focused on discovering, acquiring, developing, and commercializing therapeutics in the areas of immunology, inflammation, and oncology. ¶ 50. At the time of the IPO, Gossamer's lead and most advanced drug candidate was GB001, an oral antagonist of prostaglandin D2 receptor 2, or DP2, then in development for the treatment of moderate-to-severe eosinophilic asthma and other allergic conditions. *Id.*

Gossamer acquired GB001 pursuant to a merger agreement with AA Biopharma in January 2018. ¶ 51. The Company commenced a Phase 2b clinical LEDA trial for GB001 in October 2018. ¶ 52. Prior to Gossamer's Phase 2b LEDA trial, in a 248-subject Phase 2 clinical trial, GB001 failed to achieve the primary endpoint of improvement. ¶ 56. The Company cast aside this failure as having been "primarily related to study design and execution issues related to patient selection" as well as "disease severity." *Id.*

Two months after the commencement of the Phase 2b LEDA trial for GB001, Gossamer filed a Form S-1 Registration Statement with the SEC (the "Registration Statement"),[4] beginning the process that would lead to the Company's February 2019 IPO. ¶ 55.

In the Offering Materials, Gossamer wrote unequivocally: "DP2 antagonism *has been clinically validated* by Novartis' oral DP2 antagonist, fevipiprant, in a Phase 2 clinical trial." ¶¶ 57, 68. Yet this is not how Novartis itself characterized the results of its own Phase 2 trial. Rather, Novartis described its Phase 2 trial results as

---

[4] As used herein "Offering Materials" refers to the Registration Statement, the two Form S-1/A Amendments to the Registration Statement filed by Gossamer with the SEC on January 23, 2019 and January 30, 2019, the Company's final Prospectus filed on Form 424B4 on February 8, 2019, and all materials incorporated by reference in these specified materials.

having "achieved its primary endpoint in demonstrating a clinically and statistically significant effect on trough FEV1 at 12 weeks over placebo . . . ." *See infra* at 7-9; Defs' Ex. 7 at 408, ECF No. 32-10. ***Nowhere*** did Novartis describe its results as having validated, clinically or otherwise, DP2 antagonism.

Gossamer further stated in the Offering Materials, of its Phase 2b clinical trial of GB001: "[w]e have designed this trial to efficiently assess proof-of-principle and help enable rapid transition to Phase 3 clinical trials and we have held a Type C meeting with the FDA to inform our trial design and endpoints." ¶ 70. Gossamer also stated:

> We plan to conduct an interim analysis after approximately 320 patients complete the 24-week treatment period, and we expect the results of this interim analysis to be available in the first half of 2020. If the results obtained in the interim analysis support further development, ***we plan on initiating our first Phase 3 clinical trial thereafter. We expect to report full data from the Phase 2b clinical trial in the second half of 2020***.

¶ 70. On February 8, 2019, Gossamer completed its IPO – 17.25 million shares of Gossamer common stock at $16.00 per share for proceeds, after underwriting discounts and commissions, but before expenses, of approximately $256.68 million to Gossamer. ¶ 66. Subsequently, the Company announced that the Underwriter Defendants had exercised in full their option to purchase an additional 2,587,500 shares. This brought the total IPO proceeds to $317.4 million on the sale of 19,837,500 shares, before deducting underwriting discounts, commissions, and other expenses.[5]

Just six months after the IPO, the truth began to emerge. First, in October 2019, Novartis announced that its fevipiprant product failed to improve lung function in two Phase 3 trials. ¶ 84. Analysts immediately recognized that this failure could have negative implications for Gossamer, who "said Novartis' fevipiprant

---

[5] https://ir.gossamerbio.com/news-releases/news-release-details/gossamer-bio-announces-closing-initial-public-offering-and-full (last visited on Feb. 18, 2021).

phase 2 had clinically validated DP2 antagonism. ***That statement now looks premature, particularly when viewed in light of the failures of other DP2 drugs.*** *Id.* (emphasis added).

Next, in a call on November 12, 2019 with analysts, Defendant Gujrathi was asked, concerning the Phase 2b LEDA study, "what data should we expect to be release at the interim analysis?" ¶ 88. Although Gossamer had promised in the Offering Materials that these results would "be available in the first half of 2020," (¶ 70), Gujrathi switched course, stating: "[j]ust to be clear, we will not be releasing any of this data . . . but we will be indicating whether we think the data's in support of moving forward into Phase III, planning and initiation purposes. And so that's the level of disclosure we'll be providing." ¶ 88. In other words, instead of making the Phase 2b interim analysis "available" to the public and sticking with the promise made in the Offering Materials to immediately launch a Phase 3 trial should that interim analysis be positive, Gossamer was now indicating that it would hide and delay.

Third, on December 16, 2019, Novartis announced that it was terminating the development of its fevipiprant product for asthma after it failed another pair of Phase 3 clinical trials. ¶ 90. Analysts noted that this development meant that after "Gossamer had pulled off a highly successful" IPO, the Company's "credibility suffered a major sentiment knock-back . . . ." ¶ 91.

Fourth, on May 12, 2020, Gossamer announced that it was not going to immediately launch the Phase 3 study for GB001, but rather, would proceed only with "initial Phase 3 planning and supportive activities." ¶ 95. The Company noted that "[t]he final decision to proceed to Phase 3" would not be made until Gossamer had "the final data from the LEDA study." *Id.* Moreover, Gossamer failed to share any specifics of its interim analysis of the Phase 2b study of GB001. *Id.*

Finally, on October 13, 2020, Gossamer announced the final topline results for the Phase 2b LEDA trial: it failed to meet its primary endpoints. ¶ 96.

### III.    PLEADING STANDARD

Plaintiff's claims arise under Sections 11 and 15 of the Securities Act of 1933, 15 U.S.C. §§ 77k and 77o, respectively. "To establish a *prima facie* § 11 claim, a plaintiff need only show [1] that he bought the security and [2] that there was a material misstatement or omission." *Hildes v. Arthur Andersen LLP*, 734 F.3d 854, 860 (9th Cir. 2013) (quotation marks and citation omitted). Section 15 imposes secondary liability on those who "control[] any person liable under [Section 11]." Pursuant to Fed. R. Civ. P. 8, only a "short and plain statement of the claim showing that the pleader is entitled to relief" is required.[6] Plaintiff need not plead scienter, reliance, or loss causation. *Hildes*, 734 F.3d at 859. The SAC readily satisfies these standards.

### IV.    ARGUMENT

"The Supreme Court has recognized that Section 11 'places a relatively ***minimal burden*** on a plaintiff.' . . . '***Liability against the issuer of a security is virtually absolute, even for innocent misstatements.***'" *Hildes*, 734 F.3d at 859. Moreover, adequacy of disclosures is a "***factual question***,"[7] which is only suitable for resolution at the motion to dismiss stage where the defendant has met the "***stringent showing***"[8] that cautionary language is "***sufficient as a matter of law***."

Defendants fall far short of this rigorous standard. The Court should therefore deny the Motion to Dismiss in its entirety.

---

[6] Fed. R. Civ. P. 8(a)(2). The heightened pleading standards of Rule 9(b) do not apply, as Plaintiff's claims do not sound in fraud. ¶ 19. Defendants do not argue otherwise.

[7] *In re Surebeam Corp. Sec. Litig.*, No. 03-cv-1721, 2005 WL 5036360, at *13 (S.D. Cal. Jan. 3, 2005) ("Adequacy of disclosure under Item 303 is a factual question and 'adequacy of disclosure is normally a jury question.'").

[8] *Rafton v. Rydex Series Funds*, No. 10-cv-1173, 2011 WL 31114, at *8-9 (N.D. Cal. Jan. 5, 2011) ("Defendants have not satisfied the 'stringent showing' required to establish that their disclosures and cautionary language were sufficient as a matter of law.").

### A. Plaintiff adequately pleads that the Offering Materials contained three misstatements.

The Offering Materials contained materially untrue statements and failed to disclose facts necessary to make the statements made therein not misleading. Again, these fall into three categories, that: (1) the purported clinical validation of DP2 antagonism by Novartis' fevipiprant candidate, with the implication that this would increase the likelihood of success for Gossamer's GB001; (2) Gossamer would release the results of its first half 2020 interim analysis of the Phase 2b LEDA study for GB001; and (3) Gossamer would immediately launch the first of two planned Phase 3 studies for GB001 should that interim analysis be successful.

As a general rule, "[w]hether a public statement is misleading, or whether adverse facts were adequately disclosed, is a mixed question to be decided by the trier of fact." *Plumbers Union Local No. 12 Pension Fund v. Ambassador's Grp.*, 717 F. Supp. 2d 1170, 1176 (E.D. Wash. 2010); *see also S.E.C. v. Todd*, 642 F.3d 1207, 1220 (9th Cir. 2011). As the Ninth Circuit has explained, "only if 'reasonable minds' could not disagree that the challenged statements were not misleading should the district court dismiss under 12(b)(6)." *Warshaw v. Xoma Corp.*, 74 F.3d 955, 959 (9th Cir. 1996); *S.E.C. v. Todd*, 642 F.3d at 1220-21. A plaintiff need not prove falsity at the pleading stage, but instead only "allege[] why each of the[] statements . . . could be false or at least misleading." *Hsu v. Puma Biotechnology, Inc.*, No. 15-cv-0865, 2016 WL 5859000, at *8 (C.D. Cal. Sep. 30, 2016).

#### 1. Plaintiff has adequately alleged that Gossamer's statements about the clinical validation of Novartis' fevipiprant candidate were misleading and omitted material information.

Gossamer's Offering Materials provided that "DP2 antagonism has been clinically validated by Novartis' oral DP2 antagonist, fevipiprant, in a Phase 2 clinical trial." ¶¶ 57, 68. Contrary to Defendants' assertions, this is not what Novartis said of its own Phase 2 study. Rather, Novartis said that the "study achieved its

primary endpoint in demonstrating a clinically and statistically significant effect on trough FEV1 at 12 weeks over placebo . . . ." Defs' Ex. 7 at 408. Nowhere in the document that Defendants themselves invoke did Novartis say anything about its fevipiprant product validating DP2 antagonism. Indeed, no derivation of the word "validate" even appears in that document. The same is true of the European Respiratory Journal Article also cited by Defendants. *See* Defs' Ex. 8. Rather than supporting the claim that Novartis' Phase 2 trial "clinically validated" DP2 antagonism as Gossamer's Offering Materials provided, this Journal Article provided that the study "confirm[ed] the efficacy of the oral $DP_2$ receptor antagonist, fevipiprant, in achieving sustained improvement in pre-dose $FEV_1$ in patients with allergic asthma . . . ." *Id.* at 419. There is no discussion of clinical validation. "Defendants could have chosen to say nothing, but because they went ahead and said something [to investors], they were obliged to make fully accurate disclosures about the Study results." *In re ISO Ray, Inc. Sec. Litig.*, 189 F. Supp. 3d 1057, 1074-75 (E.D. Wash. 2016). Here, Gossamer's Offering Materials described the results of Novartis' Phase 2 trial using different, misleading terminology.

Citing Exhibits 7 and 8 attached to their request for judicial notice, Defendants argue that the public availability of Novartis' Phase 2 trial results at the time of the IPO defeats Lead Plaintiff's claims. *See* Defs' Mem. at 14-15.[9] Defendants are incorrect. In addition to the other reasons detailed herein, the Ninth Circuit has been emphatic for decades that "investors are not generally required to look beyond a

[9] Lead Plaintiff does not contest Gossamer's Request for Incorporation by Reference and/or Judicial Notice (ECF No. 32-2). However, Lead Plaintiff notes that while "[a] court may take judicial notice of the existence of matters of public record . . . but not the truth of the facts cited therein." *Marsh v. San Diego Cty.*, 432 F. Supp. 2d 1035, 1043 (S.D. Cal. 2006). Defendants acknowledge this limitation. *See* ECF No. 32-2 at 6. Moreover, the Ninth Circuit has highly discouraged and cautioned against defendants' increased and improper attempts to use exhibits through judicial notice to defeat plaintiffs' adequately pleaded claims. *See Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 998 (9th Cir. 2018) (recognizing a "concerning pattern in securities cases" where defendants attempt to exploit judicial notice "procedures improperly to defeat what would otherwise constituted adequately stated claims at the pleadings stage.").

given document to discover what is true and what is not." *Miller v. Thane Int'l, Inc.*, 519 F.3d 879, 887 (9th Cir. 2008), citing *In re Apple Computer Sec. Litig.*, 886 F. 2d 1109, 1114 (9th Cir. 1989) ("[o]rdinarily, omissions by corporate insiders are not rendered immaterial by the fact that the omitted facts are otherwise available to the public"). Courts routinely deny arguments like Defendants make here. *See, e.g.*, *Pirani v. Slack Techs., Inc.*, 445 F. Supp. 3d 367, 386-87 (N.D. Cal. 2020). The Offering Materials described Novartis' Phase 2 as having "clinically validated" DP2 antagonism. ¶¶ 57, 68. This is Gossamer's own depiction of Novartis' trial results.

While Gossamer may not have intended to mislead as to the results of the Novartis' Phase 2 study, liability under Section 11 "is virtually absolute, even for innocent misstatements." *Hildes*, 734 F.3d at 859. Lead Plaintiff alleges a plausible theory that Gossamer's statement that Novartis' study "clinically validated" DP2 antagonism implied an increased likelihood of success for Gossamer's GB001 candidate. ¶ 71.[10] To be clear, Lead Plaintiff alleges that Gossamer's depiction of Novartis' Phase 2 trial results as having "clinically validated" DP2 antagonism is misleading and materially different from Novartis' own description of its study. On these facts, it cannot be said at this preliminary stage that Gossamer's description of Novartis' Phase 2 trial results would have been immaterial to investors. *In re Immune Response Sec. Litig.*, 375 F. Supp. 2d 983, 1021 (S.D. Cal. 2005) ("[a]t a later stage, the issue of the reasonableness of Defendants' belief in their statements [concerning a scientific dispute] may be more appropriately raised.").

Relatedly, at the time of the IPO, GB001 was Gossamer's lead and most advanced drug candidate. ¶ 3. Defendants spoke on the subject of GB001 frequently, both in the Offering Materials and after the IPO. "Given the importance that the [defendants] attached to this information, it is hard for them now to protest at the

---

[10] "Plaintiffs may establish falsity by alleging facts demonstrating that the statements failed to reflect the [drug's] true condition at the time the statements were made . . . ."). *Immune Response*, 375 F. Supp. 2d at 1020.

motion to dismiss stage that no reasonable investor could have found it material." *In re Facebook, Inc. IPO Sec. & Deriv. Litig.*, 986 F. Supp. 2d 487, 520 (S.D.N.Y. 2013). Furthermore, "[m]ateriality of information . . . is ordinarily a jury question [and] a complaint may ***not*** be properly dismissed pursuant to Rule 12(b)(6) on the grounds that the alleged misstatements or omissions are not material unless they are 'so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance.'" *In re Nw. Biotherapeutics Inc. Sec. Litig.*, No. 07-cv-1254, 2008 WL 6822401, at *4 (W.D. Wash. July 2, 2008).

To be clear, and contrary to Defendants' assertions, this lawsuit is not about Novartis' Phase 3 trial results. Rather, Lead Plaintiff's allegations concerning those results demonstrate that Gossamer's Offering Materials contained a material misstatement concerning Novartis' Phase 2 trial results and reinforces that fevipiprant did not "clinically validate" DP2 antagonism.[11] Significantly, when Novartis' fevipiprant later failed the Phase 3 trials, analysts expressly flagged that Gossamer had mischaracterized Novartis' Phase 2 trial results. *See* ¶ 84 ("[w]hen Gossamer raised $276 million in an IPO earlier in the year, it said Novartis' fevipiprant phase 2 had clinically validated DP2 antagonism. ***That statement now looks premature, particularly when viewed in light of the failures of other DP2 drugs.***); ¶ 91 ("Gossamer had pulled off a highly successful $276m Nasdaq flotation in February, and one reason investors stuck with the company in October is that it

---

[11] Defendants incorrectly cite to a handful of cases in support of their argument that "there are no alleged facts that contradict Gossamer's statements about the Novartis Phase 2 trial, and Gossamer said nothing about the Novartis Phase 3 trial results, which did not even exist at the time of the IPO." Defs' Mem. at 14. In *In re Dropbox Sec. Litig.*, No. 19-cv-6348, 2020 WL 6161502, at *5 (N.D. Cal. Oct. 21, 2020), the Court found that the plaintiffs failed to make any allegations whatsoever about the allegedly omitted fact. This is a far cry from Lead Plaintiff's well-pled allegations concerning the Offering Materials' misstatements concerning Novartis' Phase 2 trial results. Defendants also cite throughout their motion *In re Restoration Robotics, Inc. Sec. Litig.*, 417 F.3d 1242 (N.D. Cal. 2019). Although Defendants misleadingly imply that this was a complete dismissal, the Court there granted in part *and denied in part* the motion to dismiss, sustaining certain of the Securities Act claims.

itself and indicated that the Zeal trials [by Novartis] . . . would likely fail. ***Today that credibility suffered a major sentiment knock-back . . . .***").

Financial analysts' response to Gossamer's statements in the Offering Materials, as well as the revelation of the truth, underscores the fact that Defendants' statements misled investors. *See, e.g.*, *In re STEC Inc. Sec. Litig.*, No. 09-cv-1304, 2011 WL 2669217, at *8 (C.D. Cal. June 17, 2011) ("Particular statements made by analysts underscore the plausibility and reasonableness of the false impression that Plaintiffs allege Defendants' statements conveyed."); *In re Salix Pharms., Ltd.*, No. 14-cv-8925, 2016 WL 1629341, at *12, n.10 (S.D.N.Y. Apr. 22, 2016) (finding statements misleading where they "did mislead a number of reasonable investors as evidenced by the comments of analysts"); *Backe v. Novatel Wireless, Inc.*, 642 F. Supp. 2d 1169, 1183 (S.D. Cal. 2009) ("significance of this information is illustrated by," *inter alia*, "the market reaction to the alleged disclosures").

Defendants repeatedly contend that their statements in the Offering Materials about Novartis' Phase 2 trial results were not inaccurate and that the truth was already on the market. Defs' Mem. at 13-16. Not only is this contention incorrect, but the "disclosure required by the securities laws is ***not*** measured by the literal truth, but by the ability of the material to accurately inform rather than mislead prospective buyers." *Miller v. Thane Int'l, Inc.*, 519 F.3d 879, 886 (9th Cir. 2008). Numerous courts have recognized this. *See, e.g.*, *Todd v. STAAR Surgical Co.*, No. 14-cv-5263, 2016 WL 6699284, at *10 (C.D. Cal. Apr. 12, 2016) (declining to dismiss claim based on literally true statement that nonetheless created false impression); *In re Iso Ray, Inc. Sec. Litig.*, 189 F. Supp. 3d 1057, 1069 (E.D. Wash. 2016) (finding it reasonable to infer that a press release implied a comparison that was not literally made when viewed in the context of surrounding statements and subheading).

In the Offering Materials, Gossamer described Novartis' Phase 2 trial results as having "clinically validated" DP2 antagonism. ¶¶ 57, 68. This represents, at a minimum, Gossamer's recharacterization of the results from Novartis' Phase 2 trial,

and is inconsistent with the terminology Novartis used. This is not an attempt to plead fraud by hindsight as Defendants suggest. Defs' Mem. at 12, 16. Rather, Lead Plaintiff alleges that Gossamer mischaracterized Novartis' study and the result thereof. Gossamer's statement that Novartis' Phase 2 trial "clinically validated" DP2 antagonism implied an increased likelihood of success for Gossamer's GB001 candidate. By discussing the "clinical validation" in Novartis' Phase 2 trial of DP2 antagonism, Defendants were "bound to do so in a manner that wouldn't mislead investors." *Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982, 987 (9th Cir. 2008).

In support of their argument here, Defendants rely heavily on the out-of-jurisdiction *Angelos v. Tokai Pharmaceuticals, Inc.*, __ F. Supp. 3d __, 2020 WL 5995598 (D. Mass. Oct. 9, 2020), *appeal filed*, No. 20-cv-2090 (1st Cir. 2020). The *Tokai* decision cited by Defendants ***was not a class action***. Indeed, as the Court noted, a class action was filed in Massachusetts state court. *Id.* at *4. On remand, the state court ***denied*** the defendants' motion to dismiss. *Wu v. Tokai Pharms., Inc.*, No. SU-CV20163725BLS2, 2019 WL 938924 (Mass. Super., Suffolk Cty., Jan. 9, 2019). In that decision, the state court rejected many of the same arguments Defendants make here. For example, the state court noted "that information was merely available as opposed to widely known would be sufficient to excuse a corporate defendant from disclosing the information to prospective investors." *Id.* at *3, citing *New Jersey Carpenters Health Fund v. Royal Bank of Scotland Grp., PLC*, 709 F.3d 109, 127 (2d Cir. 2013). The state court further rejected the defendants' argument that plaintiffs' allegations were an attempt to plead fraud by hindsight. *Id.*

The Offering Materials described Novartis' Phase 2 trial as having "clinically validated" DP2 antagonism, even though Novartis itself never described its own results in that manner. Lead Plaintiff alleges that this statement was misleading, and therefore, adequately states a Section 11 claim.

**2. Plaintiff has adequately alleged that Gossamer's statements about releasing its interim analysis of GB001 in the first half of 2020 were misleading and omitted material information.**

In their motion to dismiss, Defendants conveniently gloss over the fact that in the Offering Materials, Gossamer wrote that it expected the "results of this interim analysis ***to be available in the first half of 2020.***" ¶ 70 (emphasis added). Indeed, in their recitation of Lead Plaintiff's three alleged misstatements, Defendants literally use an ellipsis to skip over the "be available" language. Defs' Mem. at 11. Contrary to Defendants' assertions, Lead Plaintiff and analysts understood this statement from the Offering Materials to mean that Gossamer would be making those results "available" to the public. *See* ¶ 88 (analyst asking "just a follow-up on the LEDA program. Can you tell us what data should we expect to be released at the interim analysis?").

Gossamer contends that when Defendant Gujrathi said in November 2020 that Gossamer "would not be releasing any of this [Phase 2b LEDA interim] data . . . ," that she was repeating this information. Defs' Mem. at 19. But this is simply not the case, and indeed, Defendant Gujrathi's statement here was made in response to an analyst asking what data from the interim analysis would be made public *because he understood Gossamer's Offering Materials to have promised the release of some data.* In any event, "[w]hether the market was aware, as defendants claim [of the true facts] are clearly questions of facts to be determined at a later stage of this litigation." *In re Aldus Sec. Litig.*, No. 92-cv-0885, 1993 WL 121478, at *6 (W.D. Wash. Mar. 1, 1993).

As noted above, the fact that a financial analyst who had been tracking Gossamer was under the impression that Gossamer would in fact be releasing at least some data from its interim analysis of the LEDA Phase 2b study in the first half of 2020 supports Lead Plaintiff's allegation that this was a misrepresentation in the Offering Materials. *See, e.g.*, *In re STEC Inc. Sec. Litig.*, 2011 WL 2669217, at *8;

*In re Salix Pharms., Ltd.*, 2016 WL 1629341, at \*12, n.10. In other words, an analyst who was knowledgeable about the Company understood the language in the Offering Materials that the "results of this interim analysis to be available in the first half of 2020" to imply that Gossamer would release data from that analysis. Since the phrase is, at worst, subject to multiple interpretations, it would be inappropriate to dismiss this allegation at the pleadings stage. *See, e.g.*, *Batwin v. Occam Networks, Inc.*, No. 07-cv-2750, 2008 WL 2676364, at \*22 (C.D. Cal. July 1, 2008) ("materiality of a statement is a mixed question of fact and law that requires 'delicate assessments of the inferences a 'reasonable shareholder' would draw from a given set of facts and the significance of those inferences to him, and these assessments are peculiarly ones for the trier of fact," citing *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976)); *In re Metro. Sec. Litig.*, 532 F. Supp. 2d 1260, 1290 (W.D. Wash. 2007) (same).

### 3. Plaintiff has adequately alleged that Gossamer's statements about immediately launching a Phase 3 trial of GB001 upon a successful interim analysis were misleading and omitted material information.

In their Motion, Defendants appear to concede that the Offering Materials provided that Gossamer would proceed with a Phase 3 trial of GB001 if the results of the Company's interim analysis were positive. *See* Defs' Mem. at 6 ("Gossamer explained that it planned to initiate a Phase 3 trial if the interim data from the Phase 2b LEDA trial were positive . . . ."); *see also* ¶ 70. The Offering Materials further provided that Gossamer "ha[d] designed this [Phase 2b] trial to efficiently assess proof-of-principle and help *enable rapid transition* to Phase 3 clinical trials, and we have held a Type C meeting with the FDA to inform our trial design and endpoints." *Id.* (emphasis added).

Defendants could have written that they would wait to see the full results of the Phase 2b trial before they decided whether to initiate the first Phase 3 clinical trial, but they did not. The Offering Materials therefore imply that after review of

the interim analysis, if it found that analysis to be positive, Gossamer would launch the Phase 3 clinical trial. Gossamer did indeed conclude that the unreleased results of the interim analysis were sufficiently positive to warrant "continuation of the study to its completion without modification" and to "commence[] initial Phase 3 planning and supportive activities . . . ." ¶ 95. Yet instead of launching the actual Phase 3 study, Gossamer changed course and stated that it would make "[t]he final decision to proceed to Phase 3" after it received "the final data from the LEDA study." *Id.*

Defendants assert that "it would make little sense for Gossamer to commit to a costly Phase 3 trial without first evaluating the Phase 2b data." Defs' Mem. at 20. But this only serves to underscore that it was misleading for the Offering Materials to provide that if the interim results supported further development, that Gossamer would immediately initiate the first Phase trial. Put differently, a reasonable investor could easily infer from the language of the Offering Materials that Gossamer was so confident in its GB001 product – in light of the purported "clinical validation" of DP2 antagonism by Novartis' study and Gossamer's stated plans to publicly release data from the results of its interim analysis of the LEDA study – that Gossamer was ready to launch its Phase 3 study even before seeing the full results of the Phase 2b trial.[12]

---

[12] Defendants argue that the two misstatements concerning Gossamer's Phase 2b LEDA trial "also fail to meet *Omnicare*'s standard for opinion statements." Defs' Mem. at 20, n.3. Lead Plaintiff does not allege that these statements about Gossamer's expectations are opinions, but are statements of fact. "[A] statement of fact ('the coffee is hot') expresses certainty about a thing, whereas a statement of opinion ('I think the coffee is hot') does not." *Omnicare, Inc. v. Laborers Dist. Council Constr. Ind. Pension Fund*, 575 U.S. 175, 183 (2015). The misleading statements from the Offering Materials represent the then-current state of affairs at Gossamer. *See* ¶ 70 ("we expect the results of this interim analysis to be available in the first half of 2020"); ("[i]f the results obtained in the interim analysis support further development, we plan on initiating our first Phase 3 clinical trial thereafter."). Any reasonable investor would read these statements – and indeed, analysts did – "to affirm not only the speakers' state of mind . . . but also an underlying fact." *Id.*; *see also Fed. Housing Fin. Agency v. Nomura Holding Am. Inc.*, 104 F. Supp. 3d 441, 565 (S.D.N.Y. 2015) ("the use of the word 'believed' does not transform defendants' representation regarding Fremont's compliance with its underwriting

**B. Lead Plaintiff alleges claims based on statements of then-present fact, and not based on "fraud-by-hindsight" as Defendants posit.**

Defendants repeatedly suggest that Lead Plaintiff's claims rely on "hindsight pleading." *See* Defs' Mem. at 3, 12, 16, 23. Not so. Lead Plaintiff alleges a cogent theory of liability based on the three misstatements contained in the Offering Materials. Lead Plaintiff neither alleges that the Offering Materials failed to predict the results of Novartis' Phase 3 trial, nor the results of Gossamer's Phase 2b LEDA study. Rather, Lead Plaintiff alleges that the Offering Materials mischaracterized the results of Novartis' earlier Phase 2 fevipiprant study, and misled as to the Company's plans for releasing data from its interim analysis of the Phase 2b LEDA study and launching a Phase 3 trial.[13]

In the Offering Materials, Defendants spoke in unequivocal terms about their plan – they would release data from the interim analysis of the Phase 2b LEDA study in the first half of 2020. They unequivocally stated that if that interim analysis was positive, Gossamer would proceed to a Phase 3 trial. Yet Defendants did not follow through: they did not release any of the purportedly positive data, and did not proceed to the Phase 3 trial. Under the Securities Act, it is irrelevant whether Defendants knew at the time of the IPO that they did not intend to release data from the interim analysis or proceed to the Phase 3 study. Scienter is not an element of Section 11 or 15 claims. *See, e.g.*, *Hildes*, 734 F.3d at 859.

Lead Plaintiff relies on the post-IPO events alleged in the SAC because they shed light on the misrepresentations contained within the Offering Materials. Just as a plaintiff cannot plead securities violations by hindsight, Defendants cannot use

---

guidelines into a statement of opinion[.]"). These misstatements are therefore actionable.

[13] Defendants posit that Lead Plaintiff's "allegations are exactly the type of fraud-by-hindsight pleading that courts routinely reject." Defs' Mem. at 16. Of course, setting aside the other aspersions with this argument that Lead Plaintiff dispels, these Securities Act claims do not sound in fraud. *See* ¶ 19. Defendants do not actually argue to the contrary, but apparently seek to muddy the waters.

subsequent negative developments as insulation from Lead Plaintiff's well-pled securities violations.

### C. Defendants fail to make the "stringent showing" required for protection under the "bespeaks caution" doctrine for the misstatements concerning the LEDA study.

"[T]he Ninth Circuit has consistently held that dismissal of a complaint on the basis of the bespeaks caution doctrine is only appropriate when there is sufficient cautionary language or risk disclosure [such] that reasonable minds could not agree that the challenged statements were not misleading." *In re Metro. Sec. Litig.*, 532 F. Supp. 2d 1260, 1291 (W.D. Wash. 2007), citing *Livid Holdings Ltd. v. Salomon Smith Barney, Inc.*, 416 F.3d 940, 947 (9th Cir. 2005) (internal quotation marks omitted). Indeed, "[d]ismissal on the pleadings under the bespeaks caution doctrine . . . *requires a stringent showing*." *In re Atossa Genetics Inc. Sec. Litig.*, 868 F.3d 784, 798 (9th Cir. 2017) (emphasis added). Moreover, the Ninth Circuit has held that the bespeaks caution doctrine should be applied narrowly, or "[p]ut differently, the cautionary statement must discredit the alleged misrepresentations to such an extent that 'the risk of real deception drops to nil.'" *In re Immune Response Sec. Litig.*, 375 F. Supp. 2d 983, 1033, 1036 (S.D. Cal. 2005), citing *Virginia Bankshares, Inc. v. Sandberg*, 501 U.S. 1083, 1097 (1991).

The bespeaks caution doctrine does not protect the misstatements in the Offering Materials concerning the public availability of the interim results from the LEDA study or the Company's plans to launch a Phase 3 trial should those results be satisfactory. The purportedly cautionary language cited by Defendants is too general and imprecise to warrant such protection; it is the very definition of "boilerplate." *See* Defs' Mem. at 7-8, 21 ("clinical drug development involves a lengthy and expensive process with an uncertain outcome, and the results of preclinical studies and early clinical trials are not necessary predictive of future results").

In the two Ninth Circuit decisions cited by Defendants that applied the bespeaks caution doctrine, the cautionary language was far stronger and much more precise than that invoked by Defendants here. First, in *Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*, 759 F.3d 1051, 1058 (9th Cir. 2014), the alleged misstatements were "classic growth and revenue projections, which are forward-looking on their face." There, on the very calls alleged to have contained misstatements, the defendants cautioned that "comments on today's call may be deemed to contain forward-looking statements. Actual results may differ materially from those expressed or implied . . . . These risks and uncertainties are described in detail in the company's [SEC] filings." *Id.* at 1059. The second case cited by Defendants, *Employers Teamsters Local Nos. 175 & 505 Pension Trust Fund v. Clorox Co.*, 353 F.3d 1125, 1132-34 (9th Cir. 2004), involved nearly identical alleged misstatements and cautionary language as *Intuitive Surgical*. The purportedly cautionary language asserted by Defendants here is a far cry from the much more specific language used in *Intuitive Surgical* and *Clorox*.

*No* cautionary language in the Offering Materials indicated that Gossamer might not release *any* data from its interim analysis of the Phase 2b LEDA study, and *none* indicated that even if the results of that interim analysis were positive, the Company might nonetheless delay the initiation of a Phase 3 clinical trial. No risk disclosure contradicts the statements that Gossamer planned to release data from its interim analysis of the Phase 2b LEDA trial, nor that if those interim results were successful, that the Company would launch a Phase 3 trial. None of the purportedly cautionary language invoked by Defendants "discredit[s] the alleged misrepresentations" such that "the risk of real deception drops to nil." *In re Immune Response Sec. Litig.*, 375 F. Supp. 2d at 1033.

A reasonable investor reading in the Offering Materials that the results of the interim analysis would "be available" could believe that at the time of the IPO, Gossamer intended to publicly release its interim LEDA results in the first half of

2020. Indeed, as Plaintiff alleges in the SAC, analysts *did* interpret this language to mean that the interim results *would be* released, unconditionally. *See* ¶ 88 ("Can you tell us what data should we expect to be released at the interim analysis?"). It was only after the IPO in November 2020 – and not Defendant Gujrathi "repeat[ing] this timing information" (Defs' Mem. at 19) – when Gossamer made express that "we will not be releasing any of this data . . . .") *Id.* Significantly, *none* of the purportedly cautionary language invoked by Defendants raises the possibility that Gossamer might elect not to release the results of its interim analysis.

The risk disclosures raised by Defendants are the exact type of boilerplate, generic risks that apply to all companies engaged in drug development, and therefore do not provide any protection. *See, e.g.*, *Warshaw*, 74 F.3d at 959 ("inclusion of some cautionary language in a company's disclosures is 'not enough to support a determination as a matter of law that defendant's statements were not misleading"); *Gray v. First Winthrop Corp.*, 82 F.3d 877, 884 (9th Cir. 1996) (holding that cautionary language is inadequate where plaintiffs alleged specific factual misrepresentations and disclosed risks were "so generalized in nature that a reasonable jury could nonetheless find the prospectus misleading"); *Yanek v. STAAR Surgical Co.*, 388 F. Supp. 2d 1110, 1123 (C.D. Cal. 2005) (to be effective, cautionary statements must be meaningfully specific to alert investors to the real risks associated with purchase of the securities).

**D. Defendants have not met their "heavy burden" of proving negative loss causation and Lead Plaintiff adequately alleges Section 11 damages.**

Lead Plaintiff does not need to plead or prove "loss causation" to prevail on his Securities Act claims. Rather, the burden is on Defendants to demonstrate entitlement to a "negative causation" defense. Defendants' attempt to raise the defense of negative causation fails. As the Ninth Circuit has noted, Defendants have "the burden of proof on this defense," and they bear a "heavy burden." *Hildes*, 734 F.3d at 860. To succeed with the negative causation defense, Defendants "must show

'that the depreciation in value' of a plaintiff's stock 'resulted from factors other than the alleged material misstatement.'" *Id.* Indeed, "[b]ecause an analysis of causation is often fact-intensive, negative causation is generally established by a defendant on a motion for summary judgment or at trial," and not at the pleadings stage. *In re Countrywide Fin. Corp. Sec. Litig.*, 588 F. Supp. 2d 1132, 1171 (C.D. Cal. Dec. 1, 2008); *see also Feyko v. Yuhe Int'l, Inc.*, No. 11-cv-5511, 2013 WL 816409, at *7 (C.D. Cal. Mar. 5, 2013) (noting "fact-intensive" nature of causation analysis and finding that the "negative causation" defense "usually must be established in summary judgment or trial, not a motion to dismiss"); *In re WRT Energy Sec. Litig.*, No. 96-cv-3610, 2005 WL 2088406, at *2 (S.D.N.Y. Aug. 30, 2005) ("[t]o conclude otherwise places a burden of pleading loss causation on the plaintiffs, and removes the burden of establishing negative causation from the defendants, where it properly lies."). "Overcoming a negative causation defense requires merely that 'the misrepresentation *touches upon* the *reasons* for an investment's decline in value." *Id.* at 861.

Ignoring their heavy burden, Defendants state in conclusory fashion that the truth was already on the market. Defs' Mem. at 24. Contrary to Defendants' assertions, when the truth was revealed to the market after the IPO, the price of Gossamer common stock plummeted. *See, e.g.*, ¶¶ 92, 98-99. Lead Plaintiff filed his complaint on April 3, 2020. By that time, but only after the IPO, it had become publicly known that: (a) Novartis' fevipiprant failed its Phase 3 trials and that the product did not, in fact, clinically validate DP2 antagonism (¶¶ 84, 90-91); and (b) Gossamer was not going to publicly release any of the data from its Phase 2b LEDA interim analysis (¶ 88). At a minimum, Lead Plaintiff alleges that Gossamer's misrepresentations "touch upon" the reasons for the decline in the value of Gossamer common stock. Importantly Defendants do not make even a token attempt to prove that any other factor caused the decline in the value of the Company's stock. *See*

Defs.' Mem. at 29. Indeed, Defendants do not offer any alternative factor or cause of the precipitous decline alleged by Lead Plaintiff.

Relatedly, Defendants argue that "Plaintiff can only recover in Section 11 for the decline in stock price through *April 3, 2020*, the date the first-filed complaint was brought." Defs.' Mem. at 30. However, Section 11 does ***not*** provide that stock drops following the first-filed complaint are irrelevant to damages. Rather, Section 11(e) provides for a measure of damages equal to the difference between the price at which the security was offered to the public [$16.00] and the "value thereof as of the time such suit was brought," or $10.19. *See* ¶¶ 98-99; 15 U.S.C. § 77k(e). The "overwhelming majority of the courts in this and other circuits analyzing the issue, including the only Court of Appeals to directly address the question, have held that 'value' and 'price' are not always identical." *In re Snap Inc. Sec. Litig.*, No. 17-cv-3679, 2018 WL 3616764, at *2 (C.D. Cal. Aug. 8, 2018).[14] Plaintiff alleges a "precipitous decline in the market value" of Gossamer's securities, and thus, Gossamer's share price on April 3, 2020 did not reflect the true *value* of the stock because the full extent of the Company's misrepresentations and omissions concerning GB001 were not yet public. ¶¶ 17, 97, 117. In any event, "[w]here the Plaintiff has alleged facts showing that the price of the stock is not an indicator of its value, the determination of value becomes a fact-intensive inquiry that cannot be resolved at the motion to dismiss stage." *Compton v. Ignite Rest. Grp., Inc.*, No. 12-

---

[14] The "only Court of Appeals" decision referred to in the *Snap* decision was written by the Second Circuit. In *NECA-IBEW Health & Welfare Fund v. Goldman Sachs & Co.*, 693 F.3d 145,165-66 (2d Cir. 2012), the Second Circuit wrote that "under § 11, the key is not . . . market price; the key is value." In support of their argument here, Defendants cite three S.D.N.Y. decisions: a *post-trial* decision from 1975 (*Beecher v. Able*, 435 F. Supp. 397 (S.D.N.Y. 1975)), one from the class certification stage, after the opportunity to present evidence (*In re Barclays Bank PLC Sec. Litig.*, No. , 2016 WL 3235290 (S.D.N.Y. 2016)), and one that was not a class case at all and which involved a motion *in limine* to prohibit the introduction of certain evidence relating to principal and interest payments made under different securities (*Fed. Housing Fin. Agency v. Nomura Holding Am., Inc.*, 68 F. Supp. 3d 486 (S.D.N.Y. 2014)).

cv-2196, 2014 WL 61199, at *5 (S.D. Tex. Jan. 7, 2014) (subsequent corrective disclosure showed market price was not a reliable indicator of value); *see also Snap*, 2018 WL 3616764, at *2-3.

Plaintiff has adequately alleged Section 11 damages. Defendants do not even offer any serious attempt to meet their heavy burden of proving negative causation. Defendants' additional arguments are unavailing.

### E. Section 15 claims.

Section 15 of the Securities Act imposes control person liability on those who control a primary violator under Section 11. Because Lead Plaintiff adequately alleges a Section 11 claim against Defendants, the Court should also sustain his Section 15 claim against Gossamer and the Individual Defendants.

### F. Underwriter Defendants

The Underwriter Defendants are also liable under Section 11 of the Securities Act for the false and misleading statements and omissions in the Offering Materials. ¶¶ 38-49. The Underwriter Defendants did not file a separate motion to dismiss, but rather, joined in the motion filed by the Gossamer Defendants. ECF No. 33. In their joinder, the Underwriter Defendants did not raise any new or different arguments in support of dismissal. Accordingly, for the same reasons as set forth with respect to the Gossamer Defendants, the Court should also sustain Plaintiff's claims against the Underwriter Defendants.

### V.    CONCLUSION

For the foregoing reasons, Lead Plaintiff respectfully submits that the Court should deny Defendants' motions to dismiss in their entirety.

Dated: February 18, 2021

Respectfully submitted,

By: */s/ Jacob A. Walker*
Jacob A. Walker (CA Bar No. 271217)
Jeffrey C. Block (admitted *pro hac vice*)
Stephen J. Teti (admitted *pro hac vice*)
**BLOCK & LEVITON LLP**
260 Franklin St., Suite 1860
Boston, MA 02110
Tel.: (617) 398-5600
Fax: (617) 507-6020
jake@blockleviton.com
jeff@blockleviton.com
steti@blockleviton.com

Whitney E. Street (CA Bar No. 223870)
**BLOCK & LEVITON LLP**
100 Pine St., Suite 1250
San Francisco, CA 94111
Tel.: (415) 968-1852
Fax: (617) 507-6020
whitney@blockleviton.com

*Counsel for Lead Plaintiff and the Proposed Class*