LATHAM & WATKINS LLP
Colleen C. Smith (SBN 231216)
  colleen.smith@lw.com
Melanie J. Grindle (SBN 311047)
  melanie.grindle@lw.com
12670 High Bluff Drive
San Diego, CA 92130
858.523.5400 / 858.523.5450 (fax)

Michele D. Johnson (SBN 198298)
  michele.johnson@lw.com
650 Town Center Drive, 20th Floor
Costa Mesa, CA 92626
714.540.1235 / 714.755.8290 (fax)

Susan E. Engel (*pro hac vice*)
  susan.engel@lw.com
555 Eleventh Street NW, Suite 1000
Washington, DC 20004
202.637.2200 / 202.637.2201 (fax)

*Attorneys for Gossamer Bio, Inc., Sheila Gujrathi, M.D., Bryan Giraudo, Faheem Hasnain, Joshua H. Bilenker, M.D., Kristina Burow, Russell Cox, Thomas Daniel, M.D., Renee Gala, and Otello Stampacchia, Ph.D.*

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SCOTT KUHNE, Individually and on Behalf of All Others Similarly Situated, | CASE NO. 3:20-cv-00649-DMS-DEB |
| Plaintiff, | **REPLY IN SUPPORT OF GOSSAMER DEFENDANTS' MOTION TO DISMISS SECOND AMENDED COMPLAINT** |
| v. | |
| GOSSAMER BIO, INC.; SHEILA GUJRATHI, M.D.; BRYAN GIRAUDO; FAHEEM HASNAIN; JOSHUA H. BILENKER, M.D.; KRISTINA BUROW; RUSSELL COX; THOMAS DANIEL, M.D.; RENEE GALA; OTELLO STAMPACCHIA, Ph.D.; MERRILL LYNCH, PIERCE, FENNER & SMITH INCORPORATED; SVB LEERINK LLC; BARCLAYS CAPITAL INC.; AND EVERCORE GROUP L.L.C., | Hearing Date: April 2, 2021<br>Time: 1:30 p.m.<br>Courtroom: 13A<br>Judge: Hon. Dana M. Sabraw |
| Defendants. | |

US-DOCS\121752681

## I.   INTRODUCTION

Plaintiff may be disappointed that Novartis did not report better Phase 3 trial results for its fevipiprant drug candidate, and that Gossamer's own GB001 remains in Phase 2.  But *new clinical-trial developments* post-dating Gossamer's IPO do not mean the facts provided to investors in the IPO offering documents were false or misleading.  They were not, and there are several reasons the Court should not permit Plaintiff to get past the starting gate on allegations that essentially fault Gossamer for failing to predict the future.

*First*, Plaintiff's falsity theory with respect to Defendants' statements regarding the Novartis Phase 2 trial results is based on his mischaracterization of them.  Plaintiff concedes that the Novartis Phase 2 trial took place and that it had successful results, but takes issue with Gossamer's reporting of those results as having "clinically validated" the DP2 antagonist *for purposes of that study*.  Gossamer's statements did not pertain to Novartis's subsequent Phase 3 trials, much less Gossamer's own ongoing Phase 2 LEDA study.  And Gossamer neither said nor implied anything about how future studies might turn out, specifically cautioning that the "results from preclinical studies or clinical trials of a product candidate may not predict the results of later clinical trials of the product candidate" (Ex. 1 at 15), and that despite promising clinical results, "any product candidate can unexpectedly fail at any stage of preclinical or clinical development. The historical failure rate for product candidates in our industry is high" (*id.*).[1]  No reasonable investor would conclude from these statements that Gossamer was guaranteeing success in the Novartis Phase 3 trials, or in its own studies.

*Second*, Plaintiff argues that Gossamer's statements regarding its ongoing Phase 2b LEDA study misled the market as to whether (1) interim results would be made publicly available and (2) a Phase 3 trial would be immediately initiated after

---

[1] Exhibit citations are to the Declaration of Colleen C. Smith in support of the Motion to Dismiss (Dkt. 32-3, Exs. 1-8), or the Reply Smith Declaration (Ex. 9).

US-DOCS\121752681

1

Case No. 3:20-cv-00649-DMS-DEB
Gossamer Defendants' Reply
ISO Motion to Dismiss 2d am. Compl.

positive interim results.  Yet again, these claims rest on Plaintiff's creative license with Gossamer's disclosures.  The supposedly pivotal phrases Plaintiff points to—that the interim results would be available *to the public* and a Phase 3 trial would start *immediately*—are nowhere to be found in Gossamer's actual statements.  And what Gossamer actually disclosed was entirely correct—its interim results were available in the first half of 2020, and its plans regarding when and whether to initiate Phase 3 trials would depend on whether those results were positive.

***Finally***, Plaintiff has no good answer to the problem that his own allegations disprove causation.  The securities laws are not intended "to provide investors with broad insurance against market losses, but to protect them against those economic losses that misrepresentations actually cause." *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 345 (2005).  Plaintiff points to no revelations that corrected anything Defendants said about Novartis's Phase 2 trial.  Plaintiff identifies no losses caused by the purported "revelation" that the Phase 2 LEDA trial interim data would not be made public.  And Plaintiff cannot (and he does not, in his complaint) rely on stock price declines that post-date the filing of this case.  These flaws are fatal.

## II.    ARGUMENT

### A.    Plaintiff Cannot Plead Falsity by Mischaracterizing Gossamer's Statements Regarding Novartis's Phase 2 Clinical Trial

Gossamer's motion detailed the defects in Plaintiff's theory that Gossamer somehow misled the market as to the results of Novartis's Phase 2 trial.  Dkt. 32-1 ("Mot.") at 13-17.  Plaintiff now admits Gossamer's statements had nothing to do with the later-disclosed Novartis Phase 3 trial (Dkt. 35 ("Opp.") at 10), and contends only that it was misleading for Gossamer to use the specific phrase "clinically validated" in referring to the Novartis Phase 2 trial.  Plaintiff's theory ignores both the context in which these words were used and their plain meaning.

The full context of this statement matters.  *See, e.g.*, *Mallen v. Alphatec Holdings, Inc.*, 2013 WL 1294640, *8 (S.D. Cal. Mar. 28, 2013) (Benitez, J.)

US-DOCS\121752681

2

CASE NO. 3:20-CV-00649-DMS-DEB
GOSSAMER DEFENDANTS' REPLY
ISO MOTION TO DISMISS 2D AM. COMPL.

("This statement has to be read in conjunction with the surrounding language, not in a vacuum."), *aff'd sub nom. Fresno Cty. Emps' Ret. Ass'n v. Alphatec Holdings*, 607 F. App'x 694 (9th Cir. 2015).  Gossamer did not say that fevipiprant clinically validated DP2 antagonism, once and for all, as Plaintiff suggests.  Instead, the complete statement referred very specifically to Novartis's Phase 2 trial results.  Not only did Gossamer refer to those (public) results, it described them in detail:

> DP2 antagonism has been clinically validated by Novartis' oral DP2 antagonist, fevipiprant, *in a Phase 2 clinical trial*.  In this trial, both the 150 mg once-daily and 75 mg twice-daily doses demonstrated statistically significant improvements in $FEV_1$ compared to placebo in adult patients with asthma inadequately controlled with ICS.  In addition, post hoc analyses . . . appeared to demonstrate a reduction in the number of subjects experiencing an asthma event on fevipiprant compared to placebo.

SAC ¶ 57 (emphasis added).[2]  Gossamer's accompanying statements also made clear that Novartis was conducting ongoing Phase 3 trials, and that notwithstanding the promising results of Novartis's Phase 2 trial, Gossamer (like everyone else) had no idea how those Phase 3 trials would turn out.  *See* Mot. at 16 (citing SAC ¶¶ 57, 76) ("We will be watching closely to see what the clinical efficacy and safety profile is coming out of the fevipiprant Phase III trials.").  No reasonable investor could have been misled by these statements to believe that Gossamer was guaranteeing a particular outcome for the Novartis Phase 3 trials.  *See Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175, 190-91

---

[2] Plaintiff also disputes the import of the public availability of Novartis' Phase 2 trial results.  Opp. at 9.  Plaintiff's cited authorities involve omissions that did not specifically refer to the relevant public information.  *See Miller v. Thane Int'l, Inc.*, 519 F.3d 879, 887 (9th Cir. 2008); *In re Apple Comput. Sec. Litig.*, 886 F.2d 1109, 1114 (9th Cir. 1989); *Pirani v. Slack Techs., Inc.*, 445 F. Supp. 3d 367, 386-87 (N.D. Cal. 2020).  In contrast, here, Gossamer's statements pointed to a readily available public source, *and* specifically identified the study it was referencing.  *See, e.g.*, *Tadros v. Celladon Corp.*, 738 F. App'x 448, 448-49 (9th Cir. 2018) (statements regarding pharmaceutical drug studies were not materially misleading when the "alleged flaws underlying the study and the sensitivity analysis" were previously disclosed in a "publicly accessible journal article years before").

(2015) ("[T]he investor takes into account the customs and practices of the relevant industry.  So an omission that renders misleading a statement of opinion when viewed in a vacuum may not do so once that statement is considered, as is appropriate, in a broader frame."); *In re Intel Corp. Sec. Litig.*, 2019 WL 1427660, *10 (N.D. Cal. Mar. 29, 2019) (rejecting challenge to statement that processors were "vulnerability-resistant" because "reasonable investors understand that a 'vulnerability-resistant' product is not guaranteed to be immune from any and all" issues); *see also In re ProShares Tr. Sec. Litig.*, 728 F.3d 96, 103 (2d Cir. 2013) ("Plaintiffs' efforts to find a meaningful distinction between 'diverge significantly' and 'actual loss' strains the plain meaning of the former phrase").

Plaintiff now pivots to a semantic quibble, asserting that Gossamer's statements were false because no derivation of the term "validate" appears in the two documents reporting Novartis's Phase 2 trial results.  Opp. at 8.  Apparently, in Plaintiff's view, Gossamer was confined to use the precise words Novartis opted for in disclosing its own results.  But the securities laws do not require the use of magic words, and they certainly don't support strict liability when a company uses a synonym.  *See, e.g.*, *Rubke v. Cap. Bancorp Ltd.*, 551 F.3d 1156, 1163 (9th Cir. 2009) (affirming dismissal of "allegation [that] merely squabble[d] about the adverbs used in the registration statement, and fail[ed] to indicate that the language used was false"); *Belodoff v. Netlist, Inc.*, 2009 WL 1293690, *8 (C.D. Cal. Apr. 17, 2009) ("Netlist was under no particular obligation to characterize the facts in a particular manner, and Plaintiffs cite to no case law suggesting otherwise."). Novartis reported that its trial "demonstrat[ed] a ***clinically and statistically significant effect*** on trough FEV1 at 12 weeks over placebo."  Ex. 7 at 408 (emphasis added).  Likewise, the European Respiratory Journal article on the study reported that the trial "confirm[ed] the ***efficacy*** of the oral DP2 receptor antagonist, fevipiprant, in achieving sustained improvement in pre-dose FEV1 in patients with allergic asthma who remain uncontrolled despite low-dose ICS therapy."  Ex. 8 at

419 (emphasis added). How a "clinically . . . significant effect" and "confirm[ed] . . . efficacy" differ from "clinical validation," Plaintiff does not explain. Of course, he can't because they don't differ, and Gossamer's description of Novartis's Phase 2 trial results just reflected the previously disclosed outcome.

Gossamer's opening briefing pointed to *Angelos v. Tokai Pharmaceuticals, Inc.*, 2020 WL 5995598, *6-7 (D. Mass. Oct. 9, 2020), *appeal dismissed*, No. 20-2090 (1st Cir. Feb. 18, 2021), where the plaintiff there had challenged statements regarding published studies. The court found that the statements about the studies were not misleading because they were publicly available and Tokai disclosed the relevant risk. *Id.* Plaintiff endeavors to distinguish *Tokai* on the basis that it was "not a class action" and that a separate class action was pending in state court. Opp. at 12. Plaintiff does not explain why those arbitrary distinctions would matter—particularly given that *Tokai* involved Section 11 claims. Plaintiff also relies on an earlier opinion from the state court class action as somehow undercutting Defendants' citation to the more recent federal court opinion. Opp. at 12 (citing *Wu v. Tokai Pharms., Inc.*, 2019 WL 938924, *3 (Mass. Super. Ct. Jan. 9, 2019)). Yet the discussion in that state court opinion is not about Tokai's statements characterizing the takeaways from competitor studies, but rather the public availability of information regarding the number of patients enrolled in trials comparable to Tokai's. *Wu*, 2019 WL 938924 (considering public availability of information regarding the "number of patients enrolled in those other trials").

Plaintiff's reference to two cherry-picked analyst reports (Opp. at 10-11) does nothing to save his claim. One analyst wrote that Gossamer's statement "*now looks premature, particularly when viewed in light of the failures of other DP2 drugs.*" SAC ¶ 14, 84 (emphasis added). In other words, that analyst plainly took into account subsequent developments in assessing Gossamer's prior statements. The other analyst report does not even refer to Gossamer's statements in its offering documents regarding the Novartis Phase 2 trials, but rather referenced

5

other statements Gossamer made in October 2019 that are not at issue in this case. *Id.* ¶ 91 ("[O]ne reason investors stuck with the company in October is that it itself had indicated that the [Novartis Phase 3] Zeal trials [ ] would likely fail.  Today, that credibility suffered a major sentiment knock-back . . .").  These analyst sentiments are nothing like those taken into account in Plaintiff's cited cases.  *See* Opp. at 11 (citing *In re STEC Inc. Sec. Litig.*, 2011 WL 2669217, *8 (C.D. Cal. June 17, 2011) (weighing analyst changes to their estimates of future revenues based on disclosure of significant contract); *In re Salix Pharms, Ltd.*, 2016 WL 1629341, *12 n.10 (S.D.N.Y. Apr. 22, 2016) (noting analysts' understanding of company's inventory levels did not reflect knowledge of channel stuffing)).

Finally, Plaintiff also argues that, even if literally true, Gossamer's statements regarding Novartis Phase 2 trial were misleading because they implied an increased likelihood of success for GB001.  Opp. at 11-12.  But Gossamer said no such thing, instead informing investors that "the results of preclinical studies and early clinical results are not necessarily predictive of future results" and "[d]espite promising preclinical or clinical results, any product candidate can unexpectedly fail at any stage of preclinical or clinical development."  Ex. 1 at 8, 15.  The allegations here are entirely unlike Plaintiff's cited cases where the plaintiffs pointed to contemporaneous omissions that *directly contradicted* the implications of the defendants' statements.  *See Thane*, 519 F.3d at 886 (finding literally true statements that company was approved to be listed on NASDAQ after merger created a false impression when defendants did not intend to list the shares on NASDAQ after the merger); *Todd v. STAAR Surgical Co.*, 2016 WL 6699284, *10 (C.D. Cal. Apr. 12, 2016) (finding literally true statements expressing optimism about FDA approval created a false impression given multiple violations observed by the FDA); *In re Iso Ray, Inc. Sec. Litig.*, 189 F. Supp. 3d 1057, 1068 (E.D. Wash. 2016) (finding literally true statements created a false impression where defendants omitted specific existing contradictory information).

US-DOCS\121752681

6

CASE NO. 3:20-CV-00649-DMS-DEB
GOSSAMER DEFENDANTS' REPLY
ISO MOTION TO DISMISS 2D AM. COMPL.

**B.      Plaintiff Cannot Plead Falsity by Mischaracterizing Statements Concerning Gossamer's Clinical Trials**

The Phase 2 LEDA Trial Interim Results.  Plaintiff's challenge to Gossamer's statements concerning the interim Phase 2 LEDA trial readout fares no better.  In its offering documents, Gossamer stated that it "expect[ed] the results of [its] interim analysis to be available in the first half of 2020."  Ex. 2 at 248; SAC ¶ 70.  Plaintiff's falsity theory is that in saying the data would "be available," Gossamer meant it would necessarily be released *to the public*.  Opp. at 13.  But that is not what Gossamer said, and the Court need not "'accept as true allegations that are merely . . . unreasonable inferences.'"  *In re Gilead Scis. Sec. Litig.*, 536 F. 3d 1049, 1055 (9th Cir. 2008) (quoting *Sprewell v. Golden State Warriors*, 266 F.3d 979, 988 (9th Cir. 2001)).  Gossamer did not state that it would publicly release those interim results, and the Court should reject Plaintiff's endeavor to adorn Gossamer's statements with additional untoward meaning after-the-fact. *See, e.g.*, *Wochos v. Tesla, Inc.*, 985 F.3d 1180, 1194 (9th Cir. 2021) (rejecting Plaintiffs' argument that the "phrase 'production car'" meant that the cars "had been made on an *automated* assembly line," and affirming dismissal because "Plaintiffs had to plead sufficient facts to establish that the actual term used had the distinctive, and false, meaning that Plaintiffs claim").

Plaintiff's cited cases on this point (Opp. at 13-14) are not relevant.  The issue in *In re Aldus Sec. Litig.*, 1993 WL 121478, *6 (W.D. Wash. Mar. 1, 1993), is whether other public materials were sufficient to inform investors of the alleged omitted fact.  The issue in *Batwin v. Occam Networks, Inc.*, 2008 WL 2676364, *22 (C.D. Cal. July 1, 208), was whether restated revenue was material.  And to the extent Plaintiff relies on a single analyst's question from a November 2019 call as to "what data" they could "expect," (Opp. at 13), Dr. Gujrathi's response clarifying that Gossamer would not be releasing the interim data "since this will be an ongoing study" put doubts (if there were any) to rest with no accompanying

US-DOCS\121752681

7

material stock decline and certainly none below the offering price. *See infra.* II.C.

Initiation of a Phase 3 Trial. Next, Plaintiff turns to its other inferential theory regarding the LEDA trial—namely, that Gossamer disclosed that it would "immediately" initiate a Phase 3 trial upon any positive interim results. Opp. at 14. Yet Plaintiff fails to address the fact that the word "immediately" is nowhere to be found in Gossamer's challenged disclosures. Rather, to reach this interpretation, Plaintiff commingles Gossamer's statements regarding the design of the Phase 2 clinical trial and its plans for a Phase 3 trial. More specifically, Gossamer disclosed that had "*designed* [the LEDA] trial to efficiently assess proof-of-principle and help *enable* rapid transition to Phase 3 clinical trials." SAC ¶ 70 (emphasis added). It also shared its "plan" to initiate a "Phase 3 clinical trial *thereafter*" if the interim analysis was positive. *Id.* ¶ 69 (emphasis added). Notably, Plaintiff fails to allege that either of those statements was false: he does not allege the trial was not designed to enable rapid transition to Phase 3, or that Gossamer had no plans to initiate a Phase 3 trial *if* the interim data were sufficiently positive. But neither of Gossamer's statements promised *whether* or *when* a Phase 3 trial would begin, as Plaintiff insinuates.

Furthermore, both of the statements Plaintiff challenges concerning the timing of a Phase 3 trial were forward-looking and well within the ambit of the bespeaks caution doctrine. *See* Mot. at 21-22. Plaintiff does not dispute that Gossamer's statements were forward-looking but rather responds that the risk disclosures were not specific enough. Opp. at 17. Plucking out one risk disclosure in isolation, Plaintiff argues that no cautionary language warned "that Gossamer might not release any data from its interim analysis of the Phase 2b LEDA study" or "that even if the results of that interim analysis were positive, the Company might nonetheless delay the initiation of a Phase 3 clinical trial." *Id.* at 18. In fact, Gossamer specifically advised that it could not "guarantee that any clinical trials will be conducted as planned or completed on schedule, if at all," and that it did

US-DOCS\121752681

8

CASE NO. 3:20-CV-00649-DMS-DEB
GOSSAMER DEFENDANTS' REPLY
ISO MOTION TO DISMISS 2D AM. COMPL.

"not know whether [its] planned trials will begin on time or be completed on schedule, if at all." Ex. 1 at 15, 16. That, amid Gossamer's sundry other risk disclosures (*see* Mot. at 21-22), was sufficient to warn of the risk that Plaintiff now claims came to fruition. *See, e.g.*, *Hackel v. AVEO Pharms., Inc.*, 474 F. Supp. 3d 468, 479-80 (D. Mass. 2020) (finding adequate cautionary language "identif[ying] the expected timeline of topline results as uncertain," warning that "clinical trial results were beyond its control," and that there is no "guarantee that any clinical trials will be conducted as planned or completed on schedule, if at all"); *Crihfield v. CytRx Corp.*, 2017 WL 2819834, *13-14 (C.D. Cal. June 14, 2017) (similar).

## C.    Negative Causation Is Established on the Face of the Complaint

Plaintiff's claims should also be dismissed for the independent reason that the facts alleged establish negative causation. "Although loss causation is not an element of a Section 11 cause of action, defendants are nevertheless afforded an affirmative defense to avoid liability if they can show that, on the face of the complaint, the absence of loss causation is apparent." *Brown v. Ambow Educ. Holding Ltd.*, 2014 WL 523166, *14 (C.D. Cal. Feb. 6, 2014) (granting motion to dismiss Section 11 claims based on negative causation); *see also, e.g.*, *In re McKesson HBOC, Inc. Sec. Litig.*, 126 F. Supp. 2d 1248, 1262 (N.D. Cal. 2000) ("[T]he complaint reveals that the Section 11 defendants have an absolute 'negative causation' defense"). This is one such case.

In opposition, Plaintiff says the disclosures that purportedly revealed the true facts were (1) the October 2019 revelation that Novartis's Phase 3 trial failed, and (2) that Gossamer was not going to publicly release interim data from the Phase 2b LEDA trial. Opp. at 20. Neither could possibly overcome negative causation.

First, the Novartis disclosure in October 2019 pertained to its Phase 3 trials, which had nothing whatsoever to do the earlier Phase 2 results that Gossamer referenced. Gossamer did not say a single thing about Novartis's Phase 3 clinical trial results. So the release of Novartis's Phase 3 results and Novartis's later

decision to end its research program (which Gossamer likewise said nothing about), could not possibly bear on Gossamer's statements about a completely different clinical trial.  Because Plaintiff does not point to any new information about the Novartis Phase 2 trial that was ever released to the market, no alleged facts could establish that Gossamer's statements about that trial caused any investor loss.  *See Brown*, 2014 WL 523166, *16; *In re Shoretel Inc. Sec. Litig.*, 2009 WL 248326, *5 (N.D. Cal. Feb. 2, 2009) (granting motion to dismiss Section 11 claims on causation grounds where the disclosure "reveal[ed] nothing about what was allegedly misrepresented in or omitted").

Second, while Plaintiff is wrong that Gossamer ever said it would publicly release the interim data from its Phase 2b LEDA trial, any doubts on that score were erased on November 12, 2019, when Dr. Gujrathi explained "[j]ust to be clear, we will not be releasing any of this data . . . ."  SAC ¶ 88.  Plaintiff does not allege any material stock price decline in response to this statement (nor could he), and in any event Gossamer's stock price closed at $21.83 the next day, substantially *above* the $16.00 per share offering price.  Ex. 9.

Plaintiff's arguments regarding his ability to recover for stock price declines after the date his complaint was first-filed, April 3, 2020 (Opp. at 21-22), are a red herring.  His complaint does not actually claim losses for any stock price declines after that date.  *See* SAC ¶¶ 97-99.  And even if he had sought recovery on post-April 3, 2020 losses, they would be precluded by Section 11(e).  15 U.S.C. § 77k(e) (plaintiff's recovery is limited by the "value of [the security] as of the time such suit was brought"); *see also In re Broderbund/Learning Co. Sec. Litig.*, 294 F.3d 1201, 1204 (9th Cir. 2002) (holding that "damages must be 'measured by the difference between the amount paid for the security and its price at either the time it was sold or the date the Section 11 claim was filed'"); *In re Wash. Mut., Inc. Sec., Deriv. & ERISA Litig.*, 2010 WL 4272567, *12 (W.D. Wash. Oct. 12, 2010) (quoting *Broderbund* as "binding" authority for computing § 11 damages).

US-DOCS\121752681

10

CASE NO. 3:20-CV-00649-DMS-DEB
GOSSAMER DEFENDANTS' REPLY
ISO MOTION TO DISMISS 2D AM. COMPL.

## III.   CONCLUSION

Defendants respectfully request that the Court dismiss the Second Amended Complaint, in its entirety with prejudice.

Dated:  March 22, 2021                    LATHAM & WATKINS LLP


                                          By: */s/ Colleen C. Smith*
                                          Colleen C. Smith
                                          *Attorneys for the Gossamer Defendants*

US-DOCS\121752681

11

CASE NO. 3:20-CV-00649-DMS-DEB
GOSSAMER DEFENDANTS' REPLY
ISO MOTION TO DISMISS 2D AM. COMPL.