MATTHEW W. CLOSE (S.B. #188570)
BRITTANY ROGERS (S.B. #274432)
O'MELVENY & MYERS LLP
400 South Hope Street, 18th Floor
Los Angeles, California 90071-2899
Telephone:   +1 213 430 6000
Facsimile:   +1 213 430 6407

LEAH GODESKY (S.B. #336854)
O'MELVENY & MYERS LLP
1999 Avenue of the Stars
Los Angeles, California 90067
Telephone:   +1 310-246-8501
Facsimile:   +1 212 326 2061

*Attorneys for Defendants Merrill Lynch,
Pierce, Fenner & Smith Incorporated; SVB
Leerink LLC; Barclays Capital Inc.; and
Evercore Group L.L.C.*

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SCOTT KUHNE, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>GOSSAMER BIO, INC., SHEILA GUJRATHI, M.D., BRYAN GIRAUDO, FEHEEM HASNAIN, JOSHUA H. BILENKER, M.D., KRISTINA BUROW, RUSSELL COX, THOMAS DANIEL, M.D., RENEE GALA, OTELLO STAMPACCHIA, PH.D., MERRILL LYNCH, PIERCE, FENNER & SMITH INCORPORATED, SVB LEERINK LLC, BARCLAYS CAPITAL INC., AND EVERCORE GROUP L.L.C.,<br><br>Defendants. | Case No. 3:20-cv-00649-DMS-MDD<br><br>**UNDERWRITER DEFENDANTS' ANSWER TO PLAINTIFF'S SECOND AMENDED COMPLAINT FOR VIOLATIONS OF FEDERAL SECURITIES LAWS AND AFFIRMATIVE DEFENSES**<br><br>**DEMAND FOR JURY TRIAL**<br><br>Action Filed: April 3, 2020<br>Trial Date: N/A |

UNDERWRITERS' ANSWER TO SAC

Defendants Merrill Lynch, Pierce, Fenner & Smith Incorporated, SVB Leerink LLC, Barclays Capital Inc., and Evercore Group L.L.C., (the "Underwriter Defendants") for themselves and not for any other named or unnamed party, answer Plaintiff Scott Kuhne's ("Kuhne") Second Amended Complaint ("SAC") as follows. All allegations contained in headings, footnotes, or otherwise outside the numbered paragraphs, do not require a response and are denied to the extent they require a response.

On April 19, 2021, the Court dismissed Plaintiff's Section 11 claim based on (1) allegations that Gossamer "misled investors as to the clinical validation of DP2 antagonism by Novartis' fevipiprant product," and (2) that it "would immediately launch a Phase 3 trial for GB001" should the interim analysis be successful. (ECF No. 39.) The following Paragraphs of the SAC relate to portions of the Section 11 claim that the Court dismissed: 7, 8, 9, 11, 13, 14, 15, 16, 56, 57, 58, 61, 64, 68, 69, 72, 78, 79, 82, 84, 89, 90, 91, 92, 94, 96 (the "Dismissed Paragraphs"). The allegations in the Dismissed Paragraphs are no longer operative and no response is required. To the extent the Underwriter Defendants respond to any allegations in the Dismissed Paragraphs, the Underwriter Defendants do so without admitting that those allegations remain in the case or that the Dismissed Paragraphs are operative in any way.[1]

## I.    INTRODUCTION

> Lead Plaintiff, Scott Kuhne, ("Lead Plaintiff"), individually and on behalf of all others similarly situated, by and through his attorneys, alleges the following upon

[1] On May 17, 2021, the parties filed a joint stipulation setting June 1, 2021 as the deadline for Defendants to file a motion to strike certain allegations in Plaintiff's Second Amended Complaint, notwithstanding the earlier filing of Defendants' answers. *See* Dkt. No. 42. Consistent with that stipulation, in answering Plaintiff's operative complaint, the Underwriter Defendants do not waive, and expressly preserve, their right to move to strike now-dismissed allegations from the Second Amended Complaint.

UNDERWRITERS' ANSWER TO SAC

personal knowledge as to his own acts, and upon information and belief as to all other matters, based upon the investigation conducted by and through his attorneys, which included, among other things, a review of documents filed by Defendants (as defined below) with the United States Securities and Exchange Commission (the "SEC"), news reports, press releases issued by Defendants, and other publicly available documents. Lead Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

**ANSWER:** The Underwriter Defendants deny the allegations in the Introduction, except deny knowledge or information sufficient to form a belief as to the Plaintiff's personal knowledge, acts, or beliefs, including with regard to any "investigation" allegedly undertaken by Plaintiff's attorneys.

## II.   NATURE AND SUMMARY OF THE ACTION

1.     This is a federal securities class action on behalf of all investors who purchased or otherwise acquired Gossamer Bio, Inc. ("Gossamer" or the "Company") common stock pursuant or traceable to Gossamer's Registration Statement and Prospectus in connection with its February 8, 2019 Initial Public Offering (the "IPO"), seeking to recover damages caused by Defendants' violations of the federal securities laws and to pursue remedies under §§ 11 and 15 of the Securities Act of 1933 (the "Securities Act").

**ANSWER:** The Underwriter Defendants aver that Paragraph 1 states a legal conclusion to which no response is required. To the extent that a response is required, the Underwriter Defendants deny the allegations in Paragraph 1, except admit that Plaintiff purports to bring this action under Sections 11 and 15 of the Securities Act.

2.     The issuance of Gossamer common stock in connection with the IPO was registered under the Securities Act, as amended, pursuant to Gossamer's Registration Statement on Form S-1 (File No. 333-228984) declared effective on February 7, 2019. This case arises from untrue statements and omissions of material fact made in these IPO materials.

UNDERWRITERS' ANSWER TO SAC

**ANSWER:** The Underwriter Defendants deny the allegations in Paragraph 2, except admit that issuance of Gossamer common stock in connection with the IPO was registered under the Securities Act pursuant to Gossamer's Registration Statement on Form S-1 (File No. 333-228984) declared effective on February 7, 2019.

3.    Gossamer is a clinical-stage biopharmaceutical company focused on discovering, acquiring, developing, and commercializing therapeutics in the disease areas of immunology, inflammation, and oncology.    The Company's lead and most advanced drug candidate, GB001, is an oral antagonist of prostaglandin D2 receptor 2, or DP2, in development for the treatment of moderate-to-severe eosinophilic asthma and other allergic conditions.    Gossamer's GB001 product is in Phase 2 development for asthma and rhinosinusitis.

**ANSWER:** The Underwriter Defendants admit the allegations in Paragraph 3, and respectfully refer the Court to the Offering Materials for a more complete statement of Gossamer's business and operations at the time of Gossamer's IPO.

4.    In its IPO, Gossamer and the Underwriter Defendants sold 19,837,500 shares of common stock at an initial public offering price of $16.00 per share, for a total offering price of $317.4 million. Proceeds to the Company, net of underwriting discounts and commissions, were $256.68 million.

**ANSWER**: The Underwriter Defendants admit the allegations in Paragraph 4, and respectfully refer the Court to the Offering Materials for their complete contents.

5.    Defendants in this action consist of Gossamer, the Gossamer executives and directors who signed the Registration Statement, and the underwriters to the IPO (collectively, "Defendants").

**ANSWER:** Because Paragraph 5 contains no factual allegations, no responsive pleading is required.

6.    In violation of the Securities Act, Defendants issued untrue statements of material facts and omitted to state material facts required to be stated from the Registration

- 4 -                    UNDERWRITERS' ANSWER TO SAC

Statement and accompanying and incorporated offering materials that Gossamer filed with the SEC in support of the IPO. Specifically, Defendants misrepresented and/or misled investors, among other things, that: (1) Novartis, who had a product that would compete against GB001 in the works, had a successful Phase 2 trial that had clinically validated DP2 antagonism; and (2) upon the release of the results of a successful interim analysis of the Phase 2b LEDA study for GB001 in the first half of 2020, Gossamer would launch the first of two planned Phase 3 studies for GB001.

**ANSWER:** The Underwriter Defendants aver that Paragraph 6 states a legal conclusion to which no response is required. The Underwriter Defendants further aver that on April 19, 2021, the Court dismissed all claims except allegations relating to Gossamer's alleged misrepresentation that it intended to release the results of its interim analysis of the Phase 2b LEDA study. *Kuhne v. Gossamer Bio, Inc., et al.*, 2021 WL 1529934 (S.D. Cal. Apr. 19, 2021) (Dkt. No. 39). Therefore, no response is required to Plaintiff's allegations relating to the Novartis product or Gossamer's plans for Phase 3 GB001 studies. To the extent that a response is required to any non-dismissed allegations in Paragraph 6, the Underwriter Defendants deny these allegations.

7. Defendants are strictly liable for any material untrue statements or omissions in the IPO materials. Furthermore, because this case involves a Registration Statement, Defendants also had an independent, affirmative duty to provide adequate disclosures about adverse conditions, risks, and uncertainties. *See* Item 303 of SEC Reg. S-K, 17 C.F.R. § 229.303(a)(3)(ii) (requiring that the materials incorporated in a Registration Statement disclose all "known trends or uncertainties" reasonably expected to have a material unfavorable impact on the Company's operations); and Item 105 of SEC Reg. S-K, 17 C.F.R. § 229.105 (requiring the materials in a Registration Statement to disclose a "discussion of the most significant factors that make the offering speculative or risky").

**ANSWER:** The Underwriter Defendants aver that Paragraph 7 states a legal conclusion to which no response is required. To the extent that a response is required, the Underwriter Defendants deny the allegations in Paragraph 7.

- 5 -                    UNDERWRITERS' ANSWER TO SAC

8.     Thus, Defendants had an affirmative duty to ensure that the Registration Statement and the materials incorporated therein disclosed material trends and uncertainties that they knew or should have reasonably expected would have a materially adverse impact on Gossamer's business.  Defendants failed to fulfill this obligation.  Unfortunately for investors who purchased Gossamer's shares pursuant and/or traceable to the IPO, however, the truth did not begin to emerge until after the IPO was complete.

**ANSWER:**  The Underwriter Defendants aver that Paragraph 8 states a legal conclusion to which no response is required.  To the extent that a response is required, the Underwriter Defendants deny the allegations in Paragraph 8.

9.     Over the next several months, Gossamer continued to publicly state that "DP2 antagonism has been clinically validated by Novartis' oral DP2 antagonist, fevipiprant." Moreover, Gossamer continued to assure investors that upon the release of the results of a successful interim analysis of the Phase 2b LEDA study for GB001 in the first half of 2020, Gossamer would launch the first of two planned Phase 3 studies for GB001.  Based on these representations, Gossamer's stock price soared to a high of $27.15 per share.

**ANSWER:**  The Underwriter Defendants aver that on April 19, 2021, the Court dismissed all claims except allegations relating to Gossamer's alleged misrepresentation that it intended to release the results of its interim analysis of the Phase 2b LEDA study.  *Kuhne*, 2021 WL 1529934.  Therefore, no response is required to Plaintiff's allegations relating to the Novartis product or Gossamer's plans for Phase 3 GB001 studies.  To the extent that a response is required to any non-dismissed allegations in Paragraph 9, the Underwriter Defendants deny these allegations.

10.     In the materials accompanying the IPO, Defendants made materially false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operations, and compliance policies. Specifically, Defendants misrepresented and/or failed to disclose to investors: (1) the purported clinical validation of Novartis' oral DP2 antagonist; (2) that Gossamer did not plan to release the details of its interim analysis of the Phase 2b LEDA study and did not plan to launch a Phase 3

- 6 -                    UNDERWRITERS' ANSWER TO SAC

trial for GB001 upon such analysis; and (3) as a result of the foregoing, Defendants' public statements were materially false and misleading at all relevant times.

**ANSWER:** The Underwriter Defendants aver that Paragraph 10 states a legal conclusion to which no response is required. The Underwriter Defendants further aver that on April 19, 2021, the Court dismissed all claims except allegations relating to Gossamer's alleged misrepresentation that it intended to release the results of its interim analysis of the Phase 2b LEDA study. *Kuhne*, 2021 WL 1529934. Therefore, no response to is required to Plaintiff's allegations relating to the Novartis product or Gossamer's plans for Phase 3 GB001 studies. To the extent that a response is required to any non-dismissed allegations in Paragraph 10, the Underwriter Defendants deny these allegations.

11.   In October 2019, Novartis announced that its fevipiprant product had failed to improve long function in two Phase 3 trials, as measured by FEV1, over placebo.

**ANSWER:** The Underwriter Defendants aver that on April 19, 2021, the Court dismissed all claims except allegations relating to Gossamer's alleged misrepresentation that it intended to release the results of its interim analysis of the Phase 2b LEDA study. *Kuhne*, 2021 WL 1529934. Therefore, no response is required to Plaintiff's allegations relating to the Novartis product. To the extent that a response is required, the Underwriter Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 11.

12.   Then on November 12, 2019, Gossamer stated that it would not be releasing any of the data associated with its purported interim analysis of the Phase 2b LEDA study in the first half of 2020, but would only "be indicating whether we think the data's in support of moving forward into Phase III, planning and initiation purposes," and would not even disclose the Company's decision on whether to commence a Phase III trial.

**ANSWER:** The Underwriter Defendants aver on April 19, 2021, the Court

UNDERWRITERS' ANSWER TO SAC

dismissed all claims except allegations relating to Gossamer's alleged misrepresentation that it intended to release the results of its interim analysis of the Phase 2b LEDA study. *Kuhne*, 2021 WL 1529934.  Therefore, no response is required to Plaintiff's allegations relating to Gossamer's plans for Phase 3 GB001 studies.  To the extent that a response is required to any non-dismissed allegations in Paragraph 12, the Underwriter Defendants admit that the transcript of a November 12, 2019 earnings call contains the quoted language and attributes it to Defendant Gujrathi.  The Underwriter Defendants respectfully refer the Court to the transcript of the November 12, 2019 call for its complete contents.

13.     On December 16, 2019, Novartis announced that it was terminating the development of its DP2 antagonist fevipiprant for asthma after it failed another pair of Phase 3 clinical trials.

**ANSWER:**  The Underwriter Defendants aver that on April 19, 2021, the Court dismissed all claims except allegations relating to Gossamer's alleged misrepresentation that it intended to release the results of its interim analysis of the Phase 2b LEDA study. *Kuhne*, 2021 WL 1529934.  Therefore, no response is required to Plaintiff's allegations in Paragraph 13 relating to the Novartis product.

14.     Analysts noted that "[w]hen Gossamer raised $276 million in an IPO earlier in [2019], it said Novartis' fevipiprant phase 2 had been clinically validated DP2 antagonism.  *That statement now looks premature, particularly when viewed in light of the failures of other DP2 drugs.*"[2]

**ANSWER:**  The Underwriter Defendants aver that on April 19, 2021, the Court dismissed all claims except allegations relating to Gossamer's alleged misrepresentation that it intended to release the results of its interim analysis of the Phase 2b LEDA study. *Kuhne*, 2021 WL 1529934.  Therefore, no response is

---

[2] https://www.fiercebiotech.com/biotech/novartis-asthma-drug-fails-phase-3-raising-doubts-about-gossamer-s-prospects (last visited on August 30, 2020). All following footnotes are copied from the SAC.

- 8 -                    UNDERWRITERS' ANSWER TO SAC

required to Plaintiff's allegations in Paragraph 14 relating to the Novartis product.

15.     On this news, the stock plummeted from a December 13, 2019 closing price of $25.37 per share to $15.96 per share, a one day drop of $9.41 or over 37%.

**ANSWER:** The Underwriter Defendants aver that on April 19, 2021, the Court dismissed all claims except allegations relating to Gossamer's alleged misrepresentation that it intended to release the results of its interim analysis of the Phase 2b LEDA study. *Kuhne*, 2021 WL 1529934. Therefore, no response is required to Plaintiff's allegations in Paragraph 15 relating to news of the Novartis product. The Underwriter Defendants admit that (i) on December 12, 2019, Gossamer's stock price closed at $25.63, and (ii) on December 13, 2019, Gossamer's stock price closed at $25.37.

16.     Then on October 13, 2020, Gossamer announced the topline results for the Phase 2b LEDA trial of GB001 in eosinophilic asthma: the trial failed to meet its primary endpoints. Moreover, the Company announced that GB001 had failed to meet its primary or secondary endpoints in the Phase 2 TITAN trial for treatment of chronic rhinosinusitis.[3]

**ANSWER:** The Underwriter Defendants admit that on October 13, 2020, Gossamer issued a press release titled "Gossamer Bio Announces Topline Results for Phase 2 Trials of Oral GB001 in Asthma and Chronic Rhinosinusitis," and respectfully refer the Court to the statement for its complete contents.

17.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Lead Plaintiff and other Class members have suffered significant losses and damages.

**ANSWER:** The Underwriter Defendants aver that Paragraph 17 states a legal conclusion to which no response is required. To the extent that a response is required, the Underwriter Defendants deny the allegations in Paragraph 17.

18.     By this action, Lead Plaintiff, on behalf of himself and other Class Members who also acquired Gossamer's

---

[3] https://www.sec.gov/Archives/edgar/data/1728117/000156459020046250/goss-ex991_6.htm

UNDERWRITERS' ANSWER TO SAC

shares pursuant or traceable to the Offering, and now seeks to obtain a recovery for the damages suffered as a result of Defendants' violations of the Securities Act, as alleged herein.

**ANSWER:** The Underwriter Defendants aver that Paragraph 18 states a legal conclusion to which no response is required. To the extent that a response is required, the Underwriter Defendants deny the allegations in Paragraph 18.

19. The Securities Act claims asserted herein are purely strict liability and negligence claims and do not sound in fraud.

**ANSWER:** The Underwriter Defendants aver that Paragraph 19 states a legal conclusion to which no response is required.

### III. JURISDICTION AND VENUE

20. The federal law claims asserted herein arise under and pursuant to §§ 11 and 15 of the Securities Act (15 U.S.C. §§ 77k and 77o).

**ANSWER:** The Underwriter Defendants aver that Paragraph 20 states a legal conclusion to which no response is required. To the extent that a response is required, the Underwriter Defendants deny the allegations of Paragraph 20, except admit that Plaintiff purports to base jurisdiction over this matter on the cited statutes.

21. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §1331 and § 22 of the Securities Act.

**ANSWER:** The Underwriter Defendants aver that Paragraph 21 states a legal conclusion to which no response is required. To the extent that a response is required, the Underwriter Defendants deny the allegations in Paragraph 21, except admit that Plaintiff purports to base jurisdiction over this matter on the cited statutes.

22. This Court has jurisdiction over each Defendant named herein because each Defendant is an individual or corporation who has sufficient minimum contacts with this District so as to render the exercise of jurisdiction by the

UNDERWRITERS' ANSWER TO SAC

District Court permissible under traditional notions of fair play and substantial justice.

**ANSWER:** The Underwriter Defendants aver that Paragraph 22 states a legal conclusion to which no response is required.

23. This Court has personal jurisdiction over each of the Defendants, and venue is proper in this District. Gossamer is headquartered in this District.

**ANSWER:** The Underwriter Defendants aver that Paragraph 23 states a legal conclusion to which no response is required, except that the Underwriter Defendants admit that Gossamer is headquartered in this District.

24. In connection with the acts, omissions, conduct and other wrongs in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to the United States mail, interstate telephone communications and the facilities of the national securities exchange.

**ANSWER:** The Underwriter Defendants aver that Paragraph 24 states a legal conclusion to which no response is required. To the extent that a response is required, the Underwriter Defendants deny the allegations in Paragraph 24.

## IV. PARTIES

25. Lead Plaintiff Scott Kuhne, as reflected in his Certification (ECF No. 1-2), acquired shares of Gossamer common stock at artificially inflated prices, pursuant and/or traceable to the IPO, and has been damaged.

**ANSWER:** The Underwriter Defendants deny the allegations in Paragraph 25.

26. Defendant Gossamer Bio, Inc. is incorporated under the laws of Delaware, with its principal place of business at 3013 Science Park Road, San Diego, CA 92121. Its common stock trades on the Nasdaq stock exchange under the symbol GOSS.

**ANSWER:** The Underwriter Defendants aver that the allegations in Paragraph 26 are not directed to the Underwriter Defendants. Therefore, no response to Paragraph 26 is required. To the extent that a response is required, the

UNDERWRITERS' ANSWER TO SAC

Underwriter Defendants admit the allegations in Paragraph 26.

27.    Defendant Sheila Gujrathi, M.D., is the Co-Founder and Chief Executive Officer of Gossamer, and has served in those capacities at all times relevant hereto. Dr. Gujrathi signed the false and misleading Registration Statement.

**ANSWER:** The Underwriter Defendants aver that the allegations in Paragraph 27 (i) are not directed to the Underwriter Defendants, and (ii) state a legal conclusion. Therefore, no response to Paragraph 27 is required. To the extent that a response is required, the Underwriter Defendants admit that Defendant Sheila Gujrathi, M.D. is Gossamer's Co-Founder and Chief Executive Officer and deny the remaining allegations in Paragraph 27.

28.    Defendant Bryan Giraudo is Gossamer's Chief Financial Officer, and has served in that capacity at all times relevant hereto. Mr. Giraudo signed the false and misleading Registration Statement.

**ANSWER:** The Underwriter Defendants aver that the allegations in Paragraph 28 (i) are not directed to the Underwriter Defendants, and (ii) state a legal conclusion. Therefore, no response to Paragraph 28 is required. To the extent that a response is required, the Underwriter Defendants admit that Defendant Bryan Giraudo is Gossamer's Chief Financial Officer and denying the remaining allegations in Paragraph 28.

29.    Defendants Gujrathi and Giraudo are named as Defendants for violations of all counts asserted herein, and are sometimes referred to as the "Management Defendants." The Management Defendants, because of their positions with the Company, possessed the power and authority to control the contents of the Company's reports to the SEC, press releases and presentations to securities analysts, money and portfolio managers, and the investing public, i.e., the market. The Individual Defendants were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material, non-public information available to them, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from,

- 12 -                    UNDERWRITERS' ANSWER TO SAC

the public, and that the positive representations that were being made were then materially false and/or misleading. The Individual Defendants are therefore liable for the misstatements and omissions plead herein.

**ANSWER:** The Underwriter Defendants aver that the allegations in Paragraph 29 are not directed to the Underwriter Defendants. Therefore, no response to Paragraph 29 is required. To the extent that a response is required, the Underwriter Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 29.

30.    Defendant Faheem Hasnain is the Executive Chairman of the Board of Directors, and he signed the false and misleading Registration Statement.

**ANSWER:** The Underwriter Defendants aver that the allegations in Paragraph 30 (i) are not directed to the Underwriter Defendants, and (ii) state a legal conclusion. Therefore, no response to Paragraph 30 is required. To the extent that a response is required, the Underwriter Defendants admit that Defendant Faheem Hasnain is the Executive Chairman of the Board of Directors and deny the remaining allegations in Paragraph 30.

31.    Defendant Joshua H. Bilenker, M.D., is a Director on Gossamer's Board of Directors, and he signed the false and misleading Registration Statement.

**ANSWER:** The Underwriter Defendants aver that the allegations in Paragraph 31 (i) are or directed to the Underwriter Defendants, and (ii) state a legal conclusion. Therefore, no response to Paragraph 31 is required. To the extent that a response is required, the Underwriter Defendants admit that Defendant Joshua H. Bilenker, M.D., is a Director on Gossamer's Board of Directors and deny the remaining allegations in Paragraph 31.

32.    Defendant Kristina Burow is a Director on Gossamer's Board of Directors, and she signed the false and misleading Registration Statement.

**ANSWER:** The Underwriter Defendants aver that the allegations in Paragraph 32 (i) are not directed to the Underwriter Defendants, and (ii) state a

UNDERWRITERS' ANSWER TO SAC

legal conclusion.  Therefore, no response to Paragraph 32 is required.  To the extent that a response is required, the Underwriter Defendants admit that Defendant Kristina Burow is a Director on Gossamer's Board of Directors and deny the remaining allegations in Paragraph 32.

33.    Defendant Russell Cox is a Director on Gossamer's Board of Directors, and he signed the false and misleading Registration Statement.

**ANSWER:**  The Underwriter Defendants aver that the allegations in Paragraph 33 (i) are not directed to the Underwriter Defendants, and (ii) state a legal conclusion.  Therefore, no response to Paragraph 33 is required.  To the extent that a response is required, the Underwriter Defendants admit that Defendant Russell Cox is a Director on Gossamer's Board of Directors and deny the remaining allegations in Paragraph 33.

34.    Defendant Thomas Daniel, M.D., is a Director on Gossamer's Board of Directors, and he signed the false and misleading Registration Statement.

**ANSWER:**  The Underwriter Defendants aver that the allegations in Paragraph 34 are not directed to the Underwriter Defendants, and (ii) state a legal conclusion.  Therefore, no response to Paragraph 34 is required.  To the extent that a response is required, the Underwriter Defendants admit that Defendant Thomas Daniel, M.D., is a Director on Gossamer's Board of Directors and deny the remaining allegations in Paragraph 34.

35.    Defendant Renée Galá, is a Director on Gossamer's Board of Directors, and she signed the false and misleading Registration Statement.

**ANSWER:**  The Underwriter Defendants aver that the allegations in Paragraph 35 (i) are not directed to the Underwriter Defendants, and (ii) state a legal conclusion.  Therefore no response to Paragraph 35 is required.  To the extent that a response is required, the Underwriter Defendants admit that Defendant Renée Galá, is a Director on Gossamer's Board of Directors and deny the remaining allegations in Paragraph 35.

UNDERWRITERS' ANSWER TO SAC

36.     Defendant Otello Stampacchia, Ph.D., is a former Director on Gossamer's Board of Directors, and he signed the false and misleading Registration Statement. Defendant Stampacchia is the founder and managing director of Omega Funds, a company that invests in biopharma and medical device startups in the United States.

**ANSWER:** The Underwriter Defendants aver that the allegations in Paragraph 36 (i) are not directed to the Underwriter Defendants, and (ii) state a legal conclusion.  Therefore, no response to Paragraph 36 is required.  To the extent that a response is required, the Underwriter Defendants admit that Defendant Otello Stampacchia, Ph.D., is a former Director on Gossamer's Board of Directors and deny the remaining allegations in paragraph 36.

37.     Defendants Hasnain, Bilenker, Burow, Cox, Daniel, Galá, and Stampacchia are named as Defendants for violations of the Securities Act.

**ANSWER:** Because Paragraph 37 contains no factual allegations, no responsive pleading is required.

## V.     UNDERWRITER DEFENDANTS

38.     Defendant Merrill Lynch, Pierce, Fenner & Smith Incorporated ("Merrill Lynch") was an underwriter of Gossamer's IPO and assisted in the preparation and dissemination of Gossamer's IPO materials.

**ANSWER:** The Underwriter Defendants admit the allegations in Paragraph 38.

39.     Defendant SVB Leerink LLC ("Leerink") was an underwriter of Gossamer's IPO and assisted in the preparation and dissemination of Gossamer's IPO materials.

**ANSWER:** The Underwriter Defendants admit the allegations in Paragraph 39.

40.     Defendant Barclays Capital Inc. ("Barclays") was an underwriter of Gossamer's IPO and assisted in the preparation and dissemination of Gossamer's IPO materials.

UNDERWRITERS' ANSWER TO SAC

**ANSWER:** The Underwriter Defendants admit the allegations in Paragraph 40.

41.   Defendant Evercore Group L.L.C. ("Evercore") was an underwriter of Gossamer's IPO and assisted in the preparation and dissemination of Gossamer's IPO materials.

**ANSWER:** The Underwriter Defendants admit the allegations in Paragraph 41.

42.   Defendants Merrill Lynch, Leerink, Barclays, and Evercore are sometimes referred to herein as the "Underwriter Defendants," and are named as Defendants for violations of § 11 of the Securities Act.

**ANSWER:** Because Paragraph 42 contains no factual allegations, no responsive pleading is required.

43.   The Underwriter Defendants were instrumental in soliciting and making the stock offered in the IPO available to the investing public, as set forth in the following chart:

| Name | Number of Shares |
| --- | --- |
| Merrill Lynch | 5,175,000 |
| Leerink | 4,830,000 |
| Barclays | 3,795,000 |
| Evercore | 3,450,000 |

**ANSWER:** The Underwriter Defendants deny the allegations in Paragraph 43 except admit that the chart in Paragraph 43 accurately reflects the number of shares that each Underwriter Defendant agreed to sell in Gossamer's February 8, 2019 IPO. The Underwriter Defendants respectfully refer the Court to the Underwriting Agreement in the Offering Materials for its complete contents.

44.   Pursuant to the Securities Act, the Underwriter Defendants are liable for the false and misleading statements in the IPO materials. The Underwriter Defendants' failure to conduct adequate due diligence investigations was a substantial factor leading to the harm complained of herein.

**ANSWER:** The Underwriter Defendants aver that the allegations in

- 16 -                    UNDERWRITERS' ANSWER TO SAC

Paragraph 44 state a legal conclusion to which no response is required. To the extent that a response is required, the Underwriter Defendants deny the allegations in Paragraph 44.

45. The Underwriter Defendants are primarily investment banking houses that specialize in, among other things, underwriting public offerings of securities. As the underwriters of the IPO, the Underwriter Defendants earned lucrative underwriting fees as a result of their participation in the IPO.

**ANSWER:** The Underwriter Defendants deny the allegations in Paragraph 45, except admit that they (i) routinely underwrite public offerings of securities, and (ii) received underwriting fees for their work on Gossamer's IPO.

46. In addition, the Underwriter Defendants met with potential investors and presented highly favorable, but materially incorrect and/or materially misleading, information about Gossamer, its business, products, plans, and financial prospects, and/or omitted to disclose material information required to be disclosed under the federal securities laws and applicable regulations promulgated thereunder.

**ANSWER:** The Underwriter Defendants deny the allegations in Paragraph 46.

47. Representatives of the Underwriter Defendants also assisted Gossamer and the Individual Defendants in planning the IPO. They further purported to conduct an adequate and reasonable investigation into the business, operations, products, and plans of the Company, an undertaking known as a "due diligence" investigation. During their "due diligence," the Underwriter Defendants had continual access to confidential corporate information concerning Gossamer's business, financial condition, products, plans, and prospects.

**ANSWER:** The Underwriter Defendants deny the allegations in Paragraph 47, except admit that they (i) assisted Gossamer and the Individual Defendants in planning the IPO, (ii) performed due diligence in their role as underwriters, and (iii) had access during their due diligence to certain corporate documents and information concerning Gossamer.

UNDERWRITERS' ANSWER TO SAC

48.     In addition to having access to internal corporate documents, the Underwriter Defendants and/or their agents, including their counsel, had access to Gossamer's lawyers, management, directors, and top executives to determine: (1) the strategy to best accomplish the IPO; (2) the terms of the IPO, including the price at which Gossamer's common stock would be sold; (3) the language to be used in the Registration Statement and Prospectus; (4) what disclosures about Gossamer would be made in the Registration Statement and Prospectus; and (5) what responses would be made to the SEC in connection with its review of the Registration Statement.  As a result of those constant contacts and communications between the Underwriter Defendants' representatives and Gossamer's management and top executives, at a minimum, the Underwriter Defendants should have known of the undisclosed and/or misrepresented issues at Gossamer in the IPO materials as alleged herein.

**ANSWER:**  The Underwriter Defendants deny the allegations in Paragraph 48, except admit that to varying degrees the Underwriter Defendants (i) communicated with Gossamer's lawyers, management, and directors in the course of the Underwriter Defendants' due diligence, (ii) assisted in planning Gossamer's IPO, and (iii) participated in drafting and disseminating the Offering Materials in connection with the IPO.

49.     The Underwriter Defendants caused the Registration Statement to be filed with the SEC and declared effective in connection with offers and sales of Gossamer's shares pursuant and/or traceable to the IPO and relevant offering materials, including to Lead Plaintiff and the Class.

**ANSWER:**  The Underwriter Defendants aver that Paragraph 49 states a legal conclusion to which no response is required.  To the extent that a response is required, the Underwriter Defendants deny the allegations in Paragraph 49, except admit that the Registration Statement was filed with the SEC and declared effective in connection with offers and sales of Gossamer's shares.

## VI.    SUBSTANTIVE ALLEGATIONS

50.     Gossamer is a clinical-stage biopharmaceutical company focused on discovering, acquiring, developing, and commercializing therapeutics in the disease areas of immunology, inflammation, and oncology.  The Company's lead and most advanced drug candidate,

UNDERWRITERS' ANSWER TO SAC

GB001, is an oral antagonist of prostaglandin D2 receptor 2, or DP2, in development for the treatment of moderate-to-severe eosinophilic asthma and other allergic conditions. Gossamer's GB001 product is in Phase 2 development for asthma and rhinosinusitis.

**ANSWER:** The Underwriter Defendants admit the allegations in Paragraph 50, and respectfully refer the Court to the Offering Materials for a more complete statement of Gossamer's business and operations at the time of the IPO.

51. Gossamer "acquired GB001 pursuant to a merger agreement with AA Biopharma" in January 2018, "under which [the Company] issued to former AA Biopharma shareholders an aggregate of 20,000,000 shares of [Gossamer's] Series Seed convertible preferred stock and 1,101,278 shares of [Gossamer's] common stock."[4] Specifically, Gossamer acquired GB001 through an acquisition of Pulmagen Therapeutics (Asthma) Limited, or Pulmagen, a wholly-owned subsidiary of AA BioPharma, "after its partner, Teijin, completed a positive Phase 2 proof-of-concept clinical trial in Japanese patients."[5]

**ANSWER:** The Underwriter Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 51, except admit that Paragraph 51 contains an accurate quote from Gossamer's February 7, 2019 Form S-1 Registration Statement, and respectfully refer the Court to the Offering Materials for their complete contents.

52. Gossamer commenced a Phase 2b clinical trial for GB001 in October 2018.

**ANSWER:** The Underwriter Defendants admit the allegations in Paragraph 52.

53. According to the Company:
GB001 has been shown in preclinical studies to be a selective antagonist of the DP2 receptor. GB001 binds reversibly to human DP2 with an affinity, or Ki, of 1 to 2 nanomolar, significantly greater than its affinity for the other PGD2 receptors. No significant activity was

---

[4] https://www.sec.gov/Archives/edgar/data/1728117/000119312519032320/d626440d424b4.htm at 82.

[5] *Id.* at 95.

UNDERWRITERS' ANSWER TO SAC

demonstrated in a standard selectivity panel of 90 other receptors and enzymes. GB001 has also shown a slow rate of disassociation from DP2, with a receptor residence time of 19.8 minutes, as measured by half-life. Additionally, in an *in vitro* assay, GB001 inhibited PGD2 induced internalization of DP2. Combined with our observed human plasma half-life of 10 to 15 hours, we believe these measurements support the oral, once-daily dosing regimen of GB001.[6]

**ANSWER:** The Underwriter Defendants admit that Paragraph 53 contains an accurate quote from Gossamer's February 7, 2019 Form S-1 Registration Statement, and respectfully refer the Court to the Offering Materials for their complete contents.

## VII. DEFENDANTS' MISSTATEMENTS AND/OR OMISSIONS IN THE IPO MATERIALS

54. The IPO materials contained materially misleading misrepresentations and omitted information necessary to make the statements made therein not misleading, and omitted material facts required to be stated therein. Specifically, as alleged herein, the IPO materials and Gossamer's post-IPO statements misled investors with respect to: (1) the purported clinical validation of Novartis' oral DP2 antagonist; and (2) Gossamer's purported plan to release the results of its interim analysis of the Phase 2b LEDA study and to launch the first of two Phase 3 trials for GB001 upon such analysis.

**ANSWER:** The Underwriter Defendants aver that Paragraph 55 states a legal conclusion to which no response is required. The Underwriter Defendants further aver that on April 19, 2021, the Court dismissed all claims except allegations relating to Gossamer's alleged misrepresentation that it intended to release the results of its interim analysis of the Phase 2b LEDA study. *Kuhne*, 2021 WL 1529934. Therefore, no response is required to Plaintiff's allegations relating to the Novartis product or Gossamer's plans for Phase 3 GB001 studies. To the extent that a response is required to any non-dismissed allegations in Paragraph 54, the Underwriter Defendants deny these allegations.

---

[6] *Id.* at 93.

UNDERWRITERS' ANSWER TO SAC

55.    On or about December 21, 2018, Gossamer filed with the SEC a Form S-1 Registration Statement (File Number 333-228984), beginning the process toward what would lead to the Company's February 2019 IPO.

**ANSWER:** The Underwriter Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 55, except admit that on December 21, 2018, Gossamer filed with the SEC a Form S-1 Registration Statement (File Number 333-228984).

56.    The S-1 Registration Statement provided, in relevant part:

### GB001 (DP2 Antagonist)

GB001 is an oral antagonist of prostaglandin D2 receptor 2, or DP2, in development for the treatment of moderate-to-severe eosinophilic asthma and other allergic conditions. Eosinophilic asthma is caused by high levels of white blood cells known as eosinophils and is associated with more severe symptoms, late-onset disease and resistance to steroid treatment. We estimate that approximately 50% of severe asthma patients in the United States have eosinophilic asthma. Despite the availability of new biologic therapies for these patients, asthma exacerbations remain a significant healthcare problem and unmet medical need. As of December 15, 2018, GB001 had been studied in 409 subjects in total and was generally well tolerated. In a Phase 2 clinical trial conducted in Japan, GB001 showed a statistically significant improvement in time-to-first asthma exacerbation compared to placebo. In a separate 248 subject Phase 2 clinical trial, neither treatment group, GB001 nor montelukast, achieved the primary endpoint of improvement in forced expiratory volume in one second, or FEV1, as compared to placebo, which we believe was primarily related to study design and execution issues related to patient selection, including adherence to inhaled corticosteroid therapy, eosinophilic phenotype thresholds and disease severity. A single serious adverse event deemed by the investigator likely to be related to study drug was observed in a Japanese patient who had received a 160 mg dose of GB001 in a Phase 1 clinical trial conducted by Teijin Pharma Limited, or Teijin. The patient had GB001 levels approximately three to five times higher than the other patients receiving the 160 mg dose, and the dose was significantly higher than the highest dose of 60 mg currently being evaluated

UNDERWRITERS' ANSWER TO SAC

in our ongoing Phase 2b clinical trial.    We commenced a Phase 2b clinical trial in moderate-to-severe eosinophilic asthma in October 2018.

Furthermore, we believe that there are a number of indications along the allergic spectrum for which GB001 may provide benefit.  Accordingly, we plan to pursue the parallel development of GB001 in chronic rhinosinusitis with nasal polyps, or CRSwNP, and chronic spontaneous urticaria, or CSU.  We expect to initiate proof-of-concept Phase 2 clinical trials for these indications in 2019.  We retain worldwide rights to GB001, excluding Japan.

**ANSWER:**  The Underwriter Defendants admit that Paragraph 56 contains an accurate quote from Gossamer's February 7, 2019 Form S-1 Registration Statement, and respectfully refer the Court to the Offering Materials for their complete contents.

57.    The S-1 Registration Statement further provided, in relevant part:

> ***DP2 antagonism has been clinically validated by Novartis' oral DP2 antagonist, fevipiprant, in a Phase 2 clinical trial***.  In this trial, both the 150 mg once-daily and 75 mg twice-daily doses demonstrated statistically significant improvements in FEV1 compared to placebo in adult patients with asthma inadequately controlled with ICS.  In addition, post hoc analyses of Phase 2 safety data related to asthma worsening, including exacerbations, appeared to demonstrate a reduction in the number of subjects experiencing an asthma event on fevipiprant compared to placebo.  As of December 15, 2018, fevipiprant, at 150 mg once-daily and 450 mg once-daily doses, is being investigated by Novartis in six Phase 3 clinical trials in asthma patients.

(Emphasis added.)

**ANSWER:**  The Underwriter Defendants aver that on April 19, 2021, the Court dismissed all claims except allegations relating to Gossamer's alleged misrepresentation that it intended to release the results of its interim analysis of the Phase 2b LEDA study.  *Kuhne*, 2021 WL 1529934.  Therefore, no response is required to Plaintiff's allegations relating to the Novartis product.  To the extent that a response is required to any non-dismissed allegations in Paragraph 57, the

Underwriter Defendants admit that Paragraph 57 contains an accurate quote from Gossamer's February 7, 2019 Form S-1 Registration Statement, and respectfully refer the Court to the Offering Materials for their complete contents.

58.    The S-1 Registration Statement further provided, in relevant part: *Clinical Development History of GB001*

We acquired GB001 through our acquisition of Pulmagen Therapeutics (Asthma) Limited, or Pulmagen, a wholly-owned subsidiary of our AA BioPharma Inc. subsidiary, in January 2018, after its partner, Teijin, completed a positive Phase 2, proof-of-concept clinical trial in Japanese patients. We have rights outside of Japan to all of the data from the two Phase 2 clinical trials conducted by Pulmagen and Teijin described below. As of December 15, 2018, 409 subjects have received at least one dose of GB001.

*Summary of Completed Pulmagen Phase 2 Clinical Trial*

In December 2014, Pulmagen completed a Phase 2 clinical trial of GB001, the primary objectives of which were (1) to evaluate the safety and efficacy of 20 mg GB001 once daily compared to placebo and an active comparator, montelukast, over a 10-week treatment period and (2) to evaluate the effect of the co-administration of 10 mg montelukast once daily with GB001 treatment in a two-week extension. The primary endpoint was improvement in FEV1 over 10 weeks. The study enrolled 248 patients with mild to moderate asthma that were uncontrolled on low- or medium-dose ICS, randomized 1:1:1 to placebo, 20 mg GB001 once daily and 10 mg montelukast once daily. Patients were put on a standard medium-dose of ICS in a four week lead-in to the study, during which they were also removed from their LABA, if applicable.

GB001 was generally well tolerated with a treatment emergent adverse event, or TEAE, rate similar to placebo, but the study did not meet its primary endpoint. Notably, neither the active comparator, montelukast, nor GB001, showed statistically significant differences in FEV1 improvement as compared to placebo. We believe the lack of statistically significant differences between the active treatment arms and placebo was primarily related to study design and execution issues related to patient selection, including adherence to ICS therapy, eosinophilic phenotype thresholds and disease severity.

- 23 -                UNDERWRITERS' ANSWER TO SAC

**ANSWER:** The Underwriter Defendants admit that Paragraph 57 contains an accurate quote from Gossamer's February 7, 2019 Form S-1 Registration Statement, and respectfully refer the Court to the Offering Materials for their complete contents.

59. The S-1 Registration Statement was signed by Defendants Gujrathi, Giraudo, Hasnain, Bilenker, Burow, Cox, Daniel, Galá, and Stampacchia. This document also identified the Underwriter Defendants as the underwriters of the IPO.

**ANSWER:** The Underwriter Defendants admit the allegations in Paragraph 59.

60. On or about January 23, 2019, Gossamer filed with the SEC a Form S-1/A Registration Statement, which would later be utilized for the IPO, and which incorporated a prospectus to be used in connection with the offer and sale of Gossamer shares.

**ANSWER:** The Underwriter Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 60, except admit that on January 23, 2019, Gossamer filed with the SEC a Form S-1/A Registration Statement. The Underwriter Defendants respectfully refer the Court to the Offering Materials for their complete contents.

61. The January 23, 2019 Form S-1/A Registration Statement contained substantially similar representations regarding GB001 and Novartis' Phase 2 clinical trial as those in the Form S-1 Registration Statement set forth above.

**ANSWER:** The Underwriter Defendants aver that on April 19, 2021, the Court dismissed all claims except allegations relating to Gossamer's alleged misrepresentation that it intended to release the results of its interim analysis of the Phase 2b LEDA study. *Kuhne*, 2021 WL 1529934. Therefore, no response is required to Plaintiff's allegations relating to the Novartis product. To the extent that a response is required to any non-dismissed allegations in Paragraph 61, the Underwriter Defendants admit that the January 23, 2019 Form S-1/A Registration

UNDERWRITERS' ANSWER TO SAC

Statement contained statements regarding GB001, and respectfully refer the Court to the Offering Materials for their complete contents.

62.    The January 23, 2019 Form S-1/A Registration Statement was signed by Defendants Gujrathi, Giraudo, Hasnain, Bilenker, Burow, Cox, Daniel, Galá, and Stampacchia.    This document also identified the Underwriter Defendants as the underwriters of the IPO.

**ANSWER:** The Underwriter Defendants admit the allegations in Paragraph 62.

63.    On or about January 30, 2019, Gossamer filed with the SEC a Form S-1/A Registration Statement, which would later be utilized for the IPO, and which incorporated a prospectus to be used in connection with the offer and sale of Gossamer shares.

**ANSWER:** The Underwriter Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 63, except admit that on January 30, 2019, Gossamer filed with the SEC a Form S-1/A Registration Statement.  The Underwriter Defendants respectfully refer the Court to the Offering Materials for their complete contents.

64.    The January 30, 2019 Form S-1/A Registration Statement contained substantially similar representations regarding GB001 and Novartis' Phase 2 clinical trial as those in the Form S-1 Registration Statement set forth above.

**ANSWER:** The Underwriter Defendants aver that on April 19, 2021, the Court dismissed all claims except allegations relating to Gossamer's alleged misrepresentation that it intended to release the results of its interim analysis of the Phase 2b LEDA study.  *Kuhne*, 2021 WL 1529934.  Therefore, no response is required to Plaintiff's allegations relating to the Novartis product.  To the extent that a response is required to any non-dismissed allegations in Paragraph 64, the Underwriter Defendants admit that the January 23, 2019 Form S-1/A Registration Statement contained statements regarding GB001, and respectfully refer the Court to the Offering Materials for their complete contents.

UNDERWRITERS' ANSWER TO SAC

65. The January 30, 2019 Form S-1/A Registration Statement was signed by Defendants Gujrathi, Giraudo, Hasnain, Bilenker, Burow, Cox, Daniel, Galá, and Stampacchia. This document also identified the Underwriter Defendants as the underwriters of the IPO.

**ANSWER:** The Underwriter Defendants admit the allegations in Paragraph 65.

66. On or about February 8, 2019, Gossamer filed the final version of the public offering prospectus for the IPO with the SEC on Form 424(b)(4) (the "Prospectus"),[7] which forms part of the Registration Statement that became effective on February 7, 2019 (collectively, the "Offering Documents"). The Prospectus solicited investors for an IPO of 17.25 million shares of Gossamer common stock at a price of $16.00 per share, for proceeds – after underwriting discounts and commissions, but before expenses – to the Company of approximately $256.68 million.

**ANSWER:** The Underwriter Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 66, except admit that on or about February 8, 2019, Gossamer filed with the SEC a form 424(b)(4), which stated that Gossamer intended to sell 17.25 million shares of common stock at a price of $16.00 per share in its IPO.

67. According to the Prospectus, "[o]ur directors and executive officers and holders of substantially all of our outstanding securities have entered into lockup agreements with the underwriters pursuant to which they may not, with limited exceptions, for a period of 180 days from the date of this prospectus, offer, sell or otherwise transfer or dispose of any of our securities, without the prior written consent of" the Underwriter Defendants.

**ANSWER:** The Underwriter Defendants admit that the Prospectus contains the quoted language, and respectfully refer the Court to the Offering Materials for their complete contents.

68. The Prospectus further provided that:

DP2 antagonism has been clinically validated by Novartis' oral DP2 antagonist, fevipiprant, in a

---

[7] https://www.sec.gov/Archives/edgar/data/1728117/000119312519032320/d626440d424b4.htm

UNDERWRITERS' ANSWER TO SAC

Phase 2 clinical trial. In this trial, both the 150 mg once-daily and 75 mg twice-daily doses demonstrated statistically significant improvements in FEV1 compared to placebo in adult patients with asthma inadequately controlled with ICS. In addition, post hoc analyses of Phase 2 safety data related to asthma worsening, including exacerbations, appeared to demonstrate a reduction in the number of subjects experiencing an asthma event on fevipiprant compared to placebo. As of December 31, 2018, fevipiprant, at 150 mg once-daily and 450 mg once-daily doses, is being investigated by Novartis in six Phase 3 clinical trials in asthma patients.

GB001 has been shown in preclinical studies to be a selective antagonist of the DP2 receptor. GB001 binds reversibly to human DP2 with an affinity, or Ki, of 1 to 2 nanomolar, significantly greater than its affinity for the other PGD2 receptors. No significant activity was demonstrated in a standard selectivity panel of 90 other receptors and enzymes. GB001 has also shown a slow rate of disassociation from DP2, with a receptor residence time of 19.8 minutes, as measured by half-life. Additionally, in an *in vitro* assay, GB001 inhibited PGD2 induced internalization of DP2. Combined with our observed human plasma half-life of 10 to 15 hours, we believe these measurements support the oral, once-daily dosing regimen of GB001.

**ANSWER:** The Underwriter Defendants aver that on April 19, 2021, the Court dismissed all claims except allegations relating to Gossamer's alleged misrepresentation that it intended to release the results of its interim analysis of the Phase 2b LEDA study. *Kuhne*, 2021 WL 1529934. Therefore, no response is required to Plaintiff's allegations relating to the Novartis product. To the extent that a response is required to any non-dismissed allegations in Paragraph 68, the Underwriter Defendants admit that the Prospectus contains the quoted language, and respectfully refer the Court to the Offering Materials for their complete contents.

69. In the Prospectus, Gossamer stated that it "expect[ed] to conduct an interim analysis in the first half of 2020" on GB001, and that "[i]f the interim analysis is positive, we plan on initiating a Phase 3 clinical trial thereafter."

- 27 -                    UNDERWRITERS' ANSWER TO SAC

**ANSWER:** The Underwriter Defendants aver that on dated April 19, 2021, the Court dismissed all claims except allegations relating to Gossamer's alleged misrepresentation that it intended to release the results of its interim analysis of the Phase 2b LEDA study. *Kuhne*, 2021 WL 1529934. Therefore, no response is required to Plaintiff's allegations relating to Gossamer's plans for Phase 3 GB001 studies. To the extent that a response is required to any non-dismissed allegations in Paragraph 69, the Underwriter Defendants admit that the Prospectus contains the quoted language, and respectfully refer the Court to the Offering Materials for their complete contents.

70. In the Prospectus, Gossamer further stated:

> We commenced a Phase 2b clinical trial of GB001 in moderate-to-severe eosinophilic asthma in October 2018, and we expect to conduct an interim analysis of the results of this trial in the first half of 2020. We have designed this trial to efficiently assess proof-of-principle and help enable rapid transition to Phase 3 clinical trials, and we have held a Type C meeting with the FDA to inform our trial design and endpoints. We plan on enrolling 480 patients in the study in a 1:1:1:1 randomized to three GB001 dose arms of 20 mg, 40 mg and 60 mg per day and one placebo arm with once-daily dosing.

> We believe that we have designed our trial in a manner to address the potential shortcomings of the Pulmagen Phase 2 clinical trial, in that:

> - the study population will consist of more severe patients than those enrolled in the Pulmagen Phase 2 clinical trial;

> - enrollment inclusion criteria will be based on a history of asthma exacerbations within the last year;

> - enrolled patients will be required to have moderate-to-severe asthma with eosinophil counts greater than or equal to 250 cells/μL; and

> - enrolled patients will be closely monitored during the run-in period to help ensure that the lack of adherence to background therapy is not a contributing factor for their poorly controlled asthma.

- 28 -                    UNDERWRITERS' ANSWER TO SAC

The primary endpoint is reduction in asthma worsening from baseline, assessed at week 24, with an additional four weeks of follow-up. The parameters included in the asthma worsening composite primary endpoint include changes in $FEV_1$, AM PEF, rescue medication use and asthma control and severe asthma exacerbations. We will also assess $FEV_1$ independently as a secondary efficacy measure.

We plan to conduct an interim analysis after approximately 320 patients complete the 24-week treatment period, and we expect the results of this interim analysis to be available in the first half of 2020. If the results obtained in the interim analysis support further development, we plan on initiating our first Phase 3 clinical trial thereafter. We expect to report full data from the Phase 2b clinical trial in the second half of 2020. If the full data support further development, we will initiate a second Phase 3 clinical trial.

(Emphasis added).

**ANSWER:** The Underwriter Defendants aver that on April 19, 2021, the Court dismissed all claims except allegations relating to Gossamer's alleged misrepresentation that it intended to release the results of its interim analysis of the Phase 2b LEDA study. *Kuhne*, 2021 WL 1529934. Therefore, no response to Paragraph 70 is required to Plaintiff's allegations relating to Gossamer's plans for Phase 3 GB001 studies. To the extent that a response is required, the Underwriter Defendants admit that the Prospectus contains the quoted language, and respectfully refer the Court to the Offering Materials for their complete contents.

71. The foregoing statements in ¶¶ 54-59, 61-62, and 64-65, and 67-70 were materially untrue and/or misleading because they misrepresented and/or failed to disclose adverse facts, as alleged herein. Specifically, these statements: (1) misled investors as to the clinical validation of DP2 antagonism by Novartis' fevipiprant product, with the implication that this would increase the likelihood of success for Gossamer's GB001 candidate; and (2) misrepresented that Gossamer intended to (i) release the results of its first half 2020 interim analysis of the Phase 2b LEDA study for GB001 and (ii) would immediately launch a Phase 3 trial for GB001 should that interim analysis be successful.

**ANSWER:** The Underwriter Defendants aver that Paragraph 71 states a

- 29 -     UNDERWRITERS' ANSWER TO SAC

legal conclusion to which no response is required.  The Underwriter Defendants further aver that on April 19, 2021, the Court dismissed all claims except allegations relating to Gossamer's alleged misrepresentation that it intended to release the results of its interim analysis of the Phase 2b LEDA study.  *Kuhne*, 2021 WL 1529934.  Therefore, no response is required to Plaintiff's allegations relating to the Novartis product or Gossamer's plans for Phase 3 GB001 studies.  To the extent that a response is required to any non-dismissed allegations in Paragraph 71, the Underwriter Defendants deny these allegations.

## VIII.  POST-IPO DEVELOPMENTS

72.    On March 22, 2019, Gossamer filed its 2018 Annual Report on Form 10-K (the "2018 10-K") with the SEC.  The 2018 10-K reiterated that:

> DP2 antagonism has been clinically validated by Novartis' oral DP2 antagonist, fevipiprant, in a Phase 2 clinical trial.  In this trial, both the 150 mg once-daily and 75 mg twice-daily doses demonstrated statistically significant improvements in $FEV_1$ compared to placebo in adult patients with asthma14 inadequately controlled with ICS.  In addition, post hoc analyses of Phase 2 safety data related to asthma worsening, including exacerbations, appeared to demonstrate a reduction in the number of subjects experiencing an asthma event on fevipiprant compared to placebo.

**ANSWER:** The Underwriter Defendants aver that on April 19, 2021, the Court dismissed all claims except allegations relating to Gossamer's alleged misrepresentation that it intended to release the results of its interim analysis of the Phase 2b LEDA study.  *Kuhne*, 2021 WL 1529934.  Therefore, no response is required to Plaintiff's allegations relating to the Novartis product.  To the extent that a response is required to any non-dismissed allegations in Paragraph 72, the Underwriter Defendants admit that Paragraph 72 contains an accurate quote from the 2018 10-K, and respectfully refer the Court to the Offering Materials for their complete contents.

UNDERWRITERS' ANSWER TO SAC

73.     The 2018 10-K also provided: "[w]e commenced a Phase 2b clinical trial in moderate-to-severe eosinophilic asthma in October 2018 and expect to conduct an interim analysis in the first half of 2020.  If the interim analysis is positive, we plan on initiating a Phase 3 clinical trial thereafter."

**ANSWER:**  The Underwriter Defendants aver that on dated April 19, 2021, the Court dismissed all claims except allegations relating to Gossamer's alleged misrepresentation that it intended to release the results of its interim analysis of the Phase 2b LEDA study.  *Kuhne*, 2021 WL 1529934.  Therefore, no response is required to Plaintiff's allegations relating to Gossamer's plans for Phase 3 GB001 studies.  To the extent that a response is required to any non-dismissed allegations in Paragraph 73, the Underwriter Defendants admit that Paragraph 73 contains an accurate quote from the 2018 10-K, and respectfully refer the Court to the Offering Materials for their complete contents.

74.     On May 14, 2019, Gossamer issued its financial results for the First Quarter of 2019.  In the Form 10-Q Gossamer filed with the SEC, the Company stated: "[w]e commenced a Phase 2b clinical trial for our most advanced product candidate, GB001, in moderate-to-severe eosinophilic asthma in October 2018 and expect to conduct an interim analysis in the first half of 2020.  If the interim analysis is positive, we plan on initiating a Phase 3 clinical trial thereafter."

**ANSWER:**  The Underwriter Defendants aver that on April 19, 2021, the Court dismissed all claims except allegations relating to Gossamer's alleged misrepresentation that it intended to release the results of its interim analysis of the Phase 2b LEDA study.  *Kuhne*, 2021 WL 1529934.  Therefore, no response is required to Plaintiff's allegations relating to Gossamer's plans for Phase 3 GB001 studies.  To the extent that a response is required to any non-dismissed allegations in Paragraph 74, the Underwriter Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations, except admit that Paragraph 74 contains an accurate quote from the May 14, 2019 Form 10-Q, and respectfully refer the Court to the Offering Materials for their complete contents.

75.    On May 14, 2019, the Company held an earnings call with analysts to discuss its First Quarter 2019 financial results.  On this call, Defendant Gujrathi stated:

> Let us start with our most advanced clinical stage product candidate GB001, an oral DP2 antagonist, which is being developed for eosinophilic asthma and other allergic conditions, including chronic rhinositis (sic) [rhinosinusitis], both with and without nasal polyps, and chronic spontaneous urticaria.
>
> As we had previously announced, our Phase IIb trial in moderate to severe eosinophilic asthma known as the LEDA study is currently enrolling patients and we remain on track to trigger an interim analysis in the first half of 2020.  The LEDA study is testing 3 once daily doses of GB001, 20, 40 and 60 milligrams against placebo in a 24-week study.
>
> All patients will remain on background therapy throughout the study and the primary endpoint is a composite measure known as asthma worsening.
>
> If the interim analysis of the study in the first half of 2020 is positive, we plan to begin the first of 2 safety trials designed to support NDA registration with the FDA.
>
> In February at this [AAAAI] meeting in San Francisco, Dr. Hector Ortega, who is leading the development of GB001 at Gossamer, presented results of a post hoc analysis of a GB001 study in patients with mild to moderate, partly controlled atopic asthma.  Findings presented suggested that fractional exhaled nitric oxide, also known as FeNO, could serve as a useful prognostic marker for treatment response to GB001 in addition to elevated eosinophil, which is the marker we're currently using to unveil the LEDA study.
>
> In the analysis, we found marked reductions in FeNO levels as well as greater numeric improvements in lung function and asthma control, where also to placebo in patients with high baseline FeNO as compared to patients with low baseline FeNO.  We are excited about these results and the potential implications for future development of GB001.
>
> We have also started to execute our strategy to develop GB001 in other allergic conditions driven by Type 2 cytokine biology, where the GB001 could potentially be first in class.

UNDERWRITERS' ANSWER TO SAC

**ANSWER:** The Underwriter Defendants aver that on April 19, 2021, the Court dismissed all claims except allegations relating to Gossamer's alleged misrepresentation that it intended to release the results of its interim analysis of the Phase 2b LEDA study. *Kuhne*, 2021 WL 1529934. Therefore, no response is required to Plaintiff's allegations relating to Gossamer's plans for Phase 3 GB001 studies. To the extent that a response is required to any non-dismissed allegations in Paragraph 75, the Underwriter Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations, except admit that the transcript of a May 14, 2019 earnings call contains the quoted language and attributes it to Defendant Gujrathi. The Underwriter Defendants respectfully refer the Court to the transcript of the May 14, 2019 call for its complete contents.

76. On this same May 14, 2019 call, an analyst from Bank of America Merrill Lynch asked: "all investors are looking forward to the results from Novartis on the first batch of clinical data from Phase III trials for fevipiprant. So can you talk about the read-through? If it's positive, what does that mean for GB001, which is obvious I guess? And then, which is negative, how should we think about any comparative advantage your compound GB001 may have against fevipiprant here?" Defendant Gujrathi responded:

So let's start with the Novartis study [fevipiprant] program. We are also very much looking forward to their Phase III data readouts. Just to remind everyone, they have a large Phase III program actually consisting of 6 Phase III trials within asthma. 4 of those safety trials are reading out later this year.

In terms of their recent guidance, that is still on track and so we are anticipating they have 2 exacerbation trials that will be reading out in September and December time frame and then 2 FEV1 or lung function trials reading out in around November. So these are LUSTER and the ZEAL trials that will be reading out.

And so if that -- those trials are positive in the moderate-to-severe asthmatic population including a subgroup eosinophils high patients, with that, it is a very much a validation of the mechanism of DP2 antagonism and so I think that will be positive to read through to our program because of a similar

UNDERWRITERS' ANSWER TO SAC

mechanism of action that we -- both the program share. So we are very much looking forward to that.

[Now they're] going into a broad moderate to severe eosinophilic asthma population, but their primary endpoint is on the subgroup of high eosinophils or Th2 high subgroups. And we do know that they have stated that, that is their base case in terms of where they think they would see positive data, which is very consistent with the way we view the biologic relevance and activity both DP2 antagonism and for GB001.

Now we do have some points of differentiation to fevipiprant. We have a very potent selective molecule which is GB001 and that we have high binding affinity to the DP2 receptor. We also have prolonged receptor residence time, which is greater than what has been observed with fevipiprant. We have about an 18- to 20-minute receptor residence time, but Novartis publishes around 12 minutes and we do think that's very important for the mechanism of action here as we inhibit PGD2 internalization of the DP2 receptor in a very effective manner.

And also very importantly, we have, we say, greater PK characteristics for GB001 and that is different. It has to go up to 150 and 450 milligrams to really reach their exposure that they think are clinically efficacious. And we are able to achieve that with much lower dosing and we think actually better coverage over a 24-hour period than those dose levels. So there is a potential that we could show really potentially better efficacy in the clinic in the case that fevipiprant doesn't meet their mark.

So those are very important characteristics for us for GB001. We will be watching closely to see what the clinical efficacy and safety profile is coming out of the fevipiprant Phase III trials and of course we are greatly anticipating seeing our interim data in the first half of 2020 followed by the full data readouts later that year.

**ANSWER:** The Underwriter Defendants aver that on April 19, 2021, the Court dismissed all claims except allegations relating to Gossamer's alleged misrepresentation that it intended to release the results of its interim analysis of the Phase 2b LEDA study. *Kuhne*, 2021 WL 1529934. Therefore, no response is required to Plaintiff's allegations relating to the Novartis product or Gossamer's

- 34 -                    UNDERWRITERS' ANSWER TO SAC

plans for Phase 3 GB001 studies. To the extent that a response is required to any non-dismissed allegations in Paragraph 76, the Underwriter Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations, except admit that on the transcript of a May 14, 2019 earnings call contains the quoted language and attributes it to a Bank of America Merrill Lynch analyst and Defendant Gujrathi, respectively. The Underwriter Defendants respectfully refer the Court to the transcript of the May 14, 2019 call for its complete contents.

77. Also on May 14, 2019, Defendants Gujrathi and Giraudo participated in the Bank of America Merrill Lynch Health Care Conference. Defendant Gujrathi stated:

> [T]he first program GB001 is an oral small molecule taken once a day. It's a DP2 antagonist that we've taken forward for moderate to severe asthma, specifically eosinophilic asthma as well as 2 other allergic indications: chronic rhinosinusitis with nasal polyps and without nasal polyps; and chronic spontaneous urticaria. And we are on track actually to -- or in terms of executing on all 3 of these clinical trials. So the first trial we've named LEDA. We started that trial in October of last year. We are very much on track to having an interim data readout in the first half of 2020, and this is, again, going into moderate to severe eosinophilic asthma patients.
>
> In terms of really important news that will be coming out for the asthma population, for many of you who know there is another molecule in the class. Novartis has a drug called fevipiprant which they'll be reading out on 4 Phase III trials in the fourth quarter this year. So we're very excited to see that data readout. They have 2 trails going on in exacerbations and 2 trials looking at lung function. The exacerbation trial is in what we call moderate to severe [geno step] 4 and 5. The lung function trials are actually in step 3, 4 and 5, so they've expanded that population. And so that'll be a very important set of data for ourselves. And then, again, we will be reading out shortly thereafter, and hopefully -- hoping to initiate our first clinical trial in the Phase III setting, which will be a registration-directed study.

**ANSWER:** The Underwriter Defendants aver that on April 19, 2021, the

UNDERWRITERS' ANSWER TO SAC

Court dismissed all claims except allegations relating to Gossamer's alleged misrepresentation that it intended to release the results of its interim analysis of the Phase 2b LEDA study. *Kuhne*, 2021 WL 1529934. Therefore, no response is required to Plaintiff's allegations relating to the Novartis product or Gossamer's plans for Phase 3 GB001 studies. To the extent that a response is required to any non-dismissed allegations in Paragraph 77, the Underwriter Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations, except admit that the transcript of a May 14, 2019 earnings call contains the quoted language and attributes it to Defendant Gujrathi. The Underwriter Defendants respectfully refer the Court to the transcript of the May 14, 2019 conference call for its complete contents.

> 78.    An analyst from Bank of America Merrill Lynch asked on this call: "[s]ince GB001 is the program in the clinic, maybe you can talk about the status enrollment. For example, there are a lot of development programs for asthma today. There's also the biologics that are available today in the market. Do you see competition for enrollment for GB001 in the Phase IIb program?" Defendant Gujrathi responded:
>
> > We do in the sense that there are other programs enrolling. But I have to say there are not that many orals. And so that's really been the differentiation here that we want to be, again, that oral treatment of choice. And Novartis has actually finished enrolling their large Phase III program, they had several Phase III programs, actually 6 going on. And so that's been very helpful for us. And there is a lot of excitement, actually, in the investigator community. Our team just did a roadshow in Europe led by Dr. Hector Ortega, who is our medical lead. And I just mention him because he actually was very pivotal in defining eosinophilic asthma, working at GSK and getting the first anti-IL-5 approved, mepolizumab or Nucala. And so he's been out on the road talking to our investigators, so we think that they're pretty excited about DP2 antagonism. And so we've seen a nice uptick in our enrollment. So we look at enrollment curves and we like to see how we're tracking. And so we're very much on track in terms of where we need to be at this time to be delivering on an interim readout in the first half of '20. So I think that's going very well.

- 36 -                    UNDERWRITERS' ANSWER TO SAC

**ANSWER:** The Underwriter Defendants aver that on April 19, 2021, the Court dismissed all claims except allegations relating to Gossamer's alleged misrepresentation that it intended to release the results of its interim analysis of the Phase 2b LEDA study. *Kuhne*, 2021 WL 1529934. Therefore, no response is required to Plaintiff's allegations relating to the Novartis product. To the extent that a response is required to any non-dismissed allegations in Paragraph 78, the Underwriter Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations, except admit that the transcript of a May 14, 2019 earnings call contains the quoted language and attributes it to a Bank of America Merrill Lynch analyst and Defendant Gujrathi, respectively. The Underwriter Defendants respectfully refer the Court to the transcript of the May 14, 2019 conference call for its complete contents.

79.    The same analyst followed up with another question about GB001: "[a]nd then you licensed GB001, which actually had a failed Phase II trial. So we frequently get questions from the investors about, okay, why did that trial fail? And what do you think your Phase IIb would actually succeed in that context?" Defendant Gujrathi responded:

Then of course, Novartis had positive Phase II data looking at lung function, and then they had a positive mechanistic study where they saw a robust reduction in speed of eosinophils. And they recently reported seeing really nice effects on airway epithelial cells or smooth muscle cells. So when we look at the totality of the data, we do know we have a very potent selective molecule and then just look the way we're going after moderate to severe asthmatics with high eosinophils, and potentially high FeNO that will be in Phase III, I think we feel like we have a fair amount of clinical validation for the program.

**ANSWER:** The Underwriter Defendants aver that on April 19, 2021, the Court dismissed all claims except allegations relating to Gossamer's alleged misrepresentation that it intended to release the results of its interim analysis of the Phase 2b LEDA study. *Kuhne*, 2021 WL 1529934. Therefore, no response is required to Plaintiff's allegations relating to the Novartis product. To the extent

that a response is required to any non-dismissed allegations in Paragraph 79, the Underwriter Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations, except admit that the transcript of a May 14, 2019 earnings call contains the quoted language and attributes it to a Bank of America Merrill Lynch analyst and  Defendant Gujrathi, respectively.  The Underwriter Defendants respectfully refer the Court to the transcript of the May 14, 2019 conference call for its complete contents.

> 80.    On August 8, 2019, Gossamer issued its financial results for the Second Quarter of 2019.  In the Form 10-Q Gossamer filed with the SEC, the Company stated: "[w]e commenced a Phase 2b clinical trial for our most advanced product candidate, GB001, in moderate-to-severe eosinophilic asthma in October 2018 and expect to conduct an interim analysis in the first half of 2020.  If the interim analysis is positive, we plan on initiating a Phase 3 clinical trial thereafter."

**ANSWER:** The Underwriter Defendants aver that on April 19, 2021, the Court dismissed all claims except allegations relating to Gossamer's alleged misrepresentation that it intended to release the results of its interim analysis of the Phase 2b LEDA study.  *Kuhne*, 2021 WL 1529934.  Therefore, no response is required to Plaintiff's allegations relating to Gossamer's plans for Phase 3 GB001 studies.  To the extent that a response is required to any non-dismissed allegations in Paragraph 80, the Underwriter Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations, except admit that Paragraph 80 contains an accurate quote from the August 8, 2019 Form 10-Q, and respectfully refer the Court to the Offering Materials for their complete contents.

> 81.    On August 8, 2019, Gossamer held an earnings call with analysts to discuss its Second Quarter 2019 financial results.  On this call, Defendant Gujrathi reiterated that "our Phase IIb trial in moderate to severe eosinophilic asthma, known as the LEDA study, began enrolling patients in October of 2018.  LEDA is a global Phase IIb study, testing once-daily dosing regimen of GB001 over a 24-week treatment period.  . . . We are happy to reaffirm that enrollment in the study remains on track to trigger an interim analysis in the first half of 2020.  After this interim

UNDERWRITERS' ANSWER TO SAC

analysis, we expect full top line Phase IIb results to read out in the second half of 2020."

**ANSWER:** The Underwriter Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 81, except admit that the transcript of a August 8, 2019 earnings call contains the quoted language and attributes it to Defendant Gujrathi. The Underwriter Defendants respectfully refer the Court to the transcript of the August 8, 2019 call for its complete contents.

82. On this call, an analyst from SVB Leerink asked: "I was wondering if I could get your thoughts on how you interpret Novartis' delay of their Phase III data for fevipiprant and how, if at all, it will impact your strategy?" Defendant Gujrathi responded:

> Yes. So earlier this year, Novartis did announce a delay in terms of -- originally they had outlined they will be reading out top line data from 4 of their clinical Phase III trials that they are conducting with currently, the fevipiprant by the end of this year. They revised that guidance to state that 2 of their Phase III trials would be reading out by the end of this year and 2 would be reading out in the first quarter of 2020, namely there are 2 trials that are really characterizing lung function and a more moderate asthma population, ZEAL 1 and 2, will be reading out in the year; and LUSTER-1 and 2, which are really their exacerbation trials, will be reading out in the first quarter 2020.
>
> So we don't really view this as a significant impact to our program, and that is very much in the similar time frame. I think they just wanted to get all of their data together and be able to report out simultaneously from what we understand from the earnings call. And I think what's most critical to relay to our investors is really the differences in the trials is that ZEAL 1 and 2 are lung function trials going into less severe patient population. And really, we're very focused on the readout for LUSTER-1 and 2 since those are a very similar trial population as to what we're enrolling in LEDA. So just to remind everyone, LUSTER-1 and 2 are enrolling moderate to severe eosinophilic asthmatic patients as well as noneosinophilic asthmatic patients with a GINA severity of steps 4 and 5, which is the same population that we're enrolling in terms of the disease severity in LEDA. So I think

- 39 -                    UNDERWRITERS' ANSWER TO SAC

we're really focused on the outcomes of LUSTER-1 and 2, which will hopefully be happening at the beginning of next year. But really all eyes are looking forward. We're very focused on execution of the LEDA trials we've discussed and very excited about the progress of the program.

**ANSWER:** The Underwriter Defendants aver that on April 19, 2021, the Court dismissed all claims except allegations relating to Gossamer's alleged misrepresentation that it intended to release the results of its interim analysis of the Phase 2b LEDA study. *Kuhne*, 2021 WL 1529934. Therefore, no response is required to Plaintiff's allegations relating to the Novartis product. To the extent that a response is required to any non-dismissed allegations in Paragraph 82, the Underwriter Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations, except admit that the transcript of an August 8, 2019 earnings call contains the quoted language and attributes it to a SVB Leerink analyst and Defendant Gujrathi, respectively. The Underwriter Defendants respectfully refer the Court to the transcript of the August 8, 2019 call for its complete contents.

83. On September 12, 2019, Gossamer announced that Defendant Stampacchia had resigned from the Company's Board of Directors.

**ANSWER:** The Underwriter Defendants deny the allegations in Paragraph 83.

## IX. THE TRUTH BEGINS TO EMERGE

84. In October 2019, Novartis announced that its fevipiprant product had failed to improve long function in two Phase 3 trials, as measured by FEV1, over placebo. This was after similar DP2 drugs developed by AstraZeneca and Amgen failed in clinical trials. Analysts recognized that this failure "could have negative implications for Gossamer Bio, which has a DP2 antagonist in phase 2b. *When Gossamer raised $276 million in an IPO earlier in the year, it said Novartis' fevipiprant phase 2 had clinically validated DP2 antagonism. That statement now looks premature,*

UNDERWRITERS' ANSWER TO SAC

> *particularly when viewed in light of the failures of other DP2 drugs*."[8]

**ANSWER:**  The Underwriter Defendants aver that on April 19, 2021, the Court dismissed all claims except allegations relating to Gossamer's alleged misrepresentation that it intended to release the results of its interim analysis of the Phase 2b LEDA study.  *Kuhne*, 2021 WL 1529934.  Therefore, no response is required to Plaintiff's allegations relating to the Novartis product.  To the extent that a response is required to any non-dismissed allegations in Paragraph 84, the Underwriter Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 84, except admit that the cited article contains the quoted language, and attributes this language to an analyst.  The Underwriter Defendants respectfully refer the Court to the cited article for its complete contents.

> 85.    On November 12, 2019, Gossamer issued its financial results for the Third Quarter of 2019.  In the Form 10-Q Gossamer filed with the SEC, the Company stated: "[w]e commenced our LEDA Phase 2b clinical trial for our most advanced product candidate, GB001, in moderate-to-severe eosinophilic asthma in October 2018.  We expect to conduct an interim analysis in the first half of 2020, with full results from the study expected in the second half of 2020.  If the interim analysis is positive, we plan on initiating a Phase 3 clinical trial thereafter."

**ANSWER:**  The Underwriter Defendants aver that on April 19, 2021, the Court dismissed all claims except allegations relating to Gossamer's alleged misrepresentation that it intended to release the results of its interim analysis of the Phase 2b LEDA study.  *Kuhne*, 2021 WL 1529934.  Therefore, no response is required to Plaintiff's allegations relating to Gossamer's plans for Phase 3 GB001 studies.  To the extent that a response is required to any non-dismissed allegations in Paragraph 85, the Underwriter Defendants deny knowledge or information

---

[8] https://www.fiercebiotech.com/biotech/novartis-asthma-drug-fails-phase-3-raising-doubts-about-gossamer-s-prospects (emphasis added) (last visited on August 30, 2020).

sufficient to form a belief as to the truth of the allegations, except admit that Paragraph 85 contains an accurate quote from the November 12, 2019 Form 10-Q, and respectfully refer the Court to the Offering Materials for their complete contents.

> 86.    On November 12, 2019, Gossamer held an earnings call with analysts to discuss its Third Quarter 2019 financial results.  On this call, Defendant Gujrathi again reiterated that the GB001 LEDA "study is on track to trigger an interim analysis in the first half of 2020, once approximately 2/3 of the patients have completed the trial.  In the second half of 2020, we expect to read out full top line Phase IIb result [sic] for this 400-patient trial."

**ANSWER:** The Underwriter Defendants aver that on April 19, 2021, the Court dismissed all claims except allegations relating to Gossamer's alleged misrepresentation that it intended to release the results of its interim analysis of the Phase 2b LEDA study.  *Kuhne*, 2021 WL 1529934.  Therefore, no response is required to Plaintiff's allegations relating to Gossamer's plans for Phase 3 GB001 studies.  To the extent that a response is required to any non-dismissed allegations in Paragraph 86, the Underwriter Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations, except admit that the transcript of a November 12, 2019 earnings call contains the quoted language and attributes it to Defendant Gujrathi.  The Underwriter Defendants respectfully refer the Court to the transcript of the November 12, 2019 call for its complete contents.

> 87.    In addition, Defendant Gujrathi discussed that at the American College of Allergy, Asthma, Immunology Annual Scientific Meeting in Houston, TX, Gossamer "presented 2 posters related to asthma and GB001.  The first contained detailed results from the previously discussed proof-of-concept Phase II study run by our partner, Teijin Pharma, in a 158 mild-to-moderate Japanese asthmatics.  The study met its primary endpoint of change in morning peak expiratory flow from baseline versus placebo.  Additionally, in the poster, we showed that treatment with 20 milligrams of GB001 led to a 71% reduction in the risk of asthma worsening in the overall population, and an 84% reduction in the elevated eosinophilic population.  These data reinforce our belief

UNDERWRITERS' ANSWER TO SAC

that baseline blood eosinophils are a potential useful marker for response to GB001."

**ANSWER:** The Underwriter Defendants aver that on April 19, 2021, the Court dismissed all claims except allegations relating to Gossamer's alleged misrepresentation that it intended to release the results of its interim analysis of the Phase 2b LEDA study. *Kuhne*, 2021 WL 1529934. Therefore, no response is required to Plaintiff's allegations relating to Gossamer's plans for Phase 3 GB001 studies. To the extent that a response is required to any non-dismissed allegations in Paragraph 87, the Underwriter Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations, except admit that the transcript of a November 12, 2019 earnings call contains the quoted language and attributes it to Defendant Gujrathi. The Underwriter Defendants respectfully refer the Court to the transcript of the November 12, 2019 call for its complete contents.

88. On this same call, an analyst from John Berenberg, Gossler & Co. KG asked "[f]irst, on GB001. Just a follow-up on the LEDA program. Can you tell us what data should we expect to be released at the interim analysis?" Defendant Gujrathi responded:

> So at the time of the interim analysis, that's again, with about 2/3 of patients have reached 24 weeks and with the primary endpoint. We will be looking at the primary endpoint, which is a composite. We'll be looking at the 5 subcomponents of the composite to ensure consistency and what we're really looking -- be looking at the rate of worsened events. And so that's really the key endpoint that we'll be looking for at the study. We'll also look, of course, at lung function, and we'll be looking at safety and tolerability as well. ***Just to be clear, we will not be releasing any of this data since this will be an ongoing study, but we will be indicating whether we think the data's in support of moving forward into Phase III, planning and initiation purposes***. And so that's what the level of disclosure we'll be providing. But really what we'll be looking for is very robust data on the composite endpoint, consistency across all the subcomponents of the composite and, of course, consistency with the secondary endpoint.

> (Emphasis added).

**ANSWER:** The Underwriter Defendants aver that on April 19, 2021, the Court dismissed all claims except allegations relating to Gossamer's alleged misrepresentation that it intended to release the results of its interim analysis of the Phase 2b LEDA study. *Kuhne*, 2021 WL 1529934. Therefore, no response is required to Plaintiff's allegations relating to Gossamer's plans for Phase 3 GB001 studies. To the extent that a response is required to any non-dismissed allegations in Paragraph 88, the Underwriter Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations, except admit that the transcript of a November 12, 2019 earnings call contains the quoted language and attributes it to a Joh. Berenberg, Gossler & Co. analyst and Defendant Gujrathi, respectively. The Underwriter Defendants respectfully refer the Court to the transcript of the November 12, 2019 call for its complete contents.

89.    The same analyst then asked: "A follow-up question on Novartis at the Phase III program. So based on your discussions with the FDA and the 0 trial failure. Do you think that the FDA would require you to run a similar Phase III trial in moderate asthma patient population with the lung function endpoint? Or is it possible that the study could be avoided in your pivotal program?" Defendant Gujrathi responded:

We have had conversations with the FDA, where they were very interested in characterizing the efficacy in a broader population beyond moderate-to-severe eosinophilic asthma patients. We definitely wanted to have that as our patient population for the Phase IIb LEDA study because we think that's where the highest scientific rationale lies in terms of the underlying biology for those patients, and the potential therapeutic effects for DP2 antagonism as well as any TH2-related mechanism. But we do know that they are interested in that characterization.

And Novartis has done quite a bit now to generate data in the moderate asthmatics in the mild-to-moderate setting as well as looking at to all-comers in the LUSTER trial. So our plan is to continue to have regulatory dialogue, and to talk about that plan. We're ready to see what the data from, again, our own LEDA study. Of course, we will look at the LUSTER-1 and 2, our data sets when they become available and take all that back to the

- 44 -                    UNDERWRITERS' ANSWER TO SAC

regulatory authorities to discuss and finalize our Phase III plan. I will say that we're seeing clear benefits in the mild-to-severe eosinophilic asthma setting, really not a lot of benefit in those other patient populations. We will try to streamline our Phase III program. We think that's the right thing to do for patients. And we also think that's the best use of the adopting revenue sources as well. So those will be some of our intention.

**ANSWER:** The Underwriter Defendants aver that onApril 19, 2021, the Court dismissed all claims except allegations relating to Gossamer's alleged misrepresentation that it intended to release the results of its interim analysis of the Phase 2b LEDA study. *Kuhne*, 2021 WL 1529934. Therefore, no response is required to Plaintiff's allegations relating to Gossamer's plans for Phase 3 GB001 studies. To the extent that a response is required to any non-dismissed allegations in Paragraph 89, the Underwriter Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations, except admit that the transcript of a November 12, 2019 earnings call contains the quoted language and attributes it to a Joh. Berenberg, Gossler & Co. analyst and Defendant Gujrathi, respectively. The Underwriter Defendants respectfully refer the Court to the transcript of the November 12, 2019 call for its complete contents.

90. On December 16, 2019, Novartis announced that it was terminating the development of its DP2 antagonist fevipiprant for asthma after it failed another pair of Phase 3 clinical trials. Analysts noted that, "[f]or Gossamer, detailed data from fevipiprant would likely weight heavily on GB001, its lead drug in the same class."[9]

**ANSWER:** The Underwriter Defendants aver that on April 19, 2021, the Court dismissed all claims except allegations relating to Gossamer's alleged misrepresentation that it intended to release the results of its interim analysis of the Phase 2b LEDA study. *Kuhne*, 2021 WL 1529934. Therefore, no response is required to Plaintiff's allegations relating to the Novartis product. To the extent

___

[9] https://www.biopharmadive.com/news/novartis-fevipiprant-discontinue-asthmagossamer/569149/ (last visited on August 30, 2020).

that a response is required to any non-dismissed allegations in Paragraph 90, the Underwriter Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 90, except admit that the cited article contains the quoted language, and attributes this language to analysts.  The Underwriter Defendants respectfully refer the Court to the cited article for its complete contents.

> 91.    Another analyst commented that "Gossamer had pulled off a highly successful $276m Nasdaq flotation in February, and one reason investors stuck with the company in October is that it itself had indicated that the Zeal trials [by Novartis, who announced their failure in October 2019] would likely fail. ***Today that credibility suffered a major sentiment knock-bac**k*, and Gossamer bulls and other DP2 inhibitor developers alike would do well to take note."[10]

**ANSWER:**  The Underwriter Defendants aver that on April 19, 2021, the Court dismissed all claims except allegations relating to Gossamer's alleged misrepresentation that it intended to release the results of its interim analysis of the Phase 2b LEDA study.  *Kuhne*, 2021 WL 1529934.  Therefore, no response is required to Plaintiff's allegations relating to the Novartis product.  To the extent that a response is required to any non-dismissed allegations in Paragraph 91, the Underwriter Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 91, except admit that the cited article contains the quoted language, and attributes this language to an analyst.  The Underwriter Defendants respectfully refer the Court to the cited article for its complete contents.

> 92.    ***On this news, Gossamer's stock price plummeted by over 37% in one day***, from a December 13, 2019 close of $25.37 to a December 16, 2019 close of $15.96 per share.[11]

---

[10] https://www.evaluate.com/vantage/articles/news/trial-results/other-shoe-drops-gossamers-gb001 (last visited on August 30, 2020).

[11] This reflects one trading day, as the weekend fell over December 14-15, 2019.

**ANSWER:** The Underwriter Defendants deny the allegations in Paragraph 92 except admit that (i) on December 12, 2019, Gossamer's stock price closed at $25.63, and (ii) on December 13, 2019, Gossamer's stock price closed at $25.37.

93. On March 24, 2020, Gossamer filed 2019 Annual Report on Form 10-K (the "2019 10-K") with the SEC.

**ANSWER:** The Underwriter Defendants admit that the date reflected on Gossamer's 2019 10-K is March 24, 2020.

94. In its 2019 10-K, Gossamer acknowledged that:

The results from preclinical studies or clinical trials of a product candidate or a competitor's product candidate in the same class may not predict the results of later clinical trials of our product candidates, and interim results of a clinical trial are not necessarily indicative of final results. Product candidates in later stages of clinical trials may fail to show the desired safety and efficacy characteristics despite having progressed through preclinical studies and initial clinical trials. In particular, while two Phase 2 clinical trials of GB001 had been conducted prior to our acquisition of GB001, we do not know how GB001 will perform in future clinical trials, including as a result of any differences from targeting a population of more severe asthma subjects with elevated eosinophil counts, as well as other differences in our planned trial design. Further, GB001 did not meet its primary efficacy endpoint of improvement in FEV1 over 10 weeks in the first Phase 2 clinical trial conducted by Pulmagen Therapeutics (Asthma) Limited, or Pulmagen, and the second Phase 2 clinical trial conducted by Pulmagen and its partner, Teijin, was limited to only Japanese patients. While we have designed our ongoing Phase 2b trial in a manner intended to address what we believe to be the shortcomings of the first Pulmagen Phase 2 clinical trial, we cannot be certain that such failure was not due to GB001 itself or that the results of our ongoing Phase 2b trial will otherwise be successful in a broader patient population. In addition, in October 2019, Novartis announced that its oral DP2 antagonist, fevipiprant, failed to improve lung function in a pair of Phase 3 clinical trials of patients with moderate asthma, and in December 2019, Novartis announced that the pooled analysis from a pair of pivotal Phase 3 clinical trials of patients with moderate-to-severe asthma did not meet the

UNDERWRITERS' ANSWER TO SAC

clinically relevant threshold for reduction in rate of moderate-to-severe exacerbation and that the results did not support further development of fevipiprant in asthma. It is not uncommon to observe results in clinical trials that are unexpected based on preclinical studies and early clinical trials, and many product candidates fail in clinical trials despite very promising early results.

**ANSWER:** The Underwriter Defendants aver that on April 19, 2021, the Court dismissed all claims except allegations relating to Gossamer's alleged misrepresentation that it intended to release the results of its interim analysis of the Phase 2b LEDA study. *Kuhne*, 2021 WL 1529934. Therefore, no response is required to Plaintiff's allegations relating to the Novartis product. To the extent that a response is required to any non-dismissed allegations in Paragraph 94, the Underwriter Defendants admit that Paragraph 94 contains an accurate quote from the 2019 10-K, and respectfully refer the Court to the Offering Materials for their complete contents.

95.    After the markets closed on May 12, 2020, Gossamer issued a press release accompanying its First Quarter 2020 financial results. In this release, Gossamer announced that, contrary to its prior assertions, it was not going to immediately launch the Phase 3 study for GB001. In addition, Gossamer did not share any specifics of its interim analysis of the Phase 2b study of GB001:

> [R]ecently completed a pre-specified interim analysis of LEDA, its Phase 2b clinical study of GB001 in moderate-to-severe eosinophilic asthma. The interim analysis was based on approximately the first two thirds (~320) of patients who either completed or withdrew from the study. The Independent Data Monitoring Committee (IDMC) reviewed results from the interim analysis and recommended continuation of the study to its completion without modification. Based on the results of the interim analysis and the IDMC recommendation, Gossamer has commenced initial Phase 3 planning and supportive activities in anticipation of the completion of the study and final analysis of the study data. The final decision to proceed to Phase 3 will be made based on the totality of the final data from the LEDA study, as well as discussions with global regulatory

> authorities.  Topline results from LEDA continue to be expected in the second half of 2020.

**ANSWER:**  The Underwriter Defendants aver that on April 19, 2021, the Court dismissed all claims except allegations relating to Gossamer's alleged misrepresentation that it intended to release the results of its interim analysis of the Phase 2b LEDA study.  *Kuhne*, 2021 WL 1529934.  Therefore, no response is required to Plaintiff's allegations relating to Gossamer's plans for Phase 3 GB001 studies.  To the extent that a response is required to any non-dismissed allegations in Paragraph 95, the Underwriter Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 95, except admit that Gossamer issued a press release on May 12, 2020 that contains the quoted language.

> 96.    Then on October 13, 2020, Gossamer announced the topline results for the Phase 2b LEDA trial of GB001 in eosinophilic asthma: the trial failed to meet its primary endpoints.  Moreover, the Company announced that GB001 had failed to meet its primary or secondary endpoints in the Phase 2 TITAN trial for treatment of chronic rhinosinusitis.

**ANSWER:**  The Underwriter Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 96.

> 97.    As a result of misstatements and omissions in the IPO materials, and the precipitous decline in the market value of Gossamer's securities, Lead Plaintiff and other members of the Class have suffered significant losses and damages.

**ANSWER:**  The Underwriter Defendants aver that Paragraph 97 states a legal conclusion to which no response is required.  To the extent that a response is required, the Underwriter Defendants deny the allegations in Paragraph 97.

> 98.    Shares of Gossamer common stock were sold at $16.00 per share in the IPO.

**ANSWER:**  The Underwriter Defendants admit the allegations in Paragraph 98.

UNDERWRITERS' ANSWER TO SAC

99. The facts regarding the IPO materials began to emerge after the IPO, as detailed herein. On April 3, 2020, the date the initial complaint in this action was filed (ECF No. 1), Gossamer's stock price closed at just $10.19 per share, down from a 2019 high of $27.15 per share.

**ANSWER:** The Underwriter Defendants deny the allegations in Paragraph 99, except admit that on April 3, 2020, Gossamer's stock price closed at $10.19.

## X.  CLASS ACTION ALLEGATIONS

100. Lead Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of a class of all persons and entities who purchased or otherwise acquired Gossamer shares pursuant or traceable to Gossamer's Registration Statement and Prospectus in connection with its IPO, seeking to recover damages caused by Defendants' violations of the federal securities laws and to pursue remedies under §§ 11 and 15 of the Securities Act. Excluded from the Class are Defendants, directors and officers of the Company, as well as their families and affiliates.

**ANSWER:** The Underwriter Defendants aver that Paragraph 100 states a legal conclusion to which no response is required. To the extent that a response is required, the Underwriter Defendants deny that this case is appropriate for class-action treatment and deny all other allegations in Paragraph 100.

101. This action is properly maintainable as a class action.

**ANSWER:** The Underwriter Defendants aver that Paragraph 101 states a legal conclusion to which no response is required. To the extent that a response is required, the Underwriter Defendants deny that this case is appropriate for class-action treatment and deny all other allegations in Paragraph 101.

102. The members of the Class are so numerous that joinder of all members is impracticable. The disposition of their claims in a class action will provide substantial benefits to the parties and the Court.

**ANSWER:** The Underwriter Defendants aver that Paragraph 102 states a legal conclusion to which no response is required. To the extent that a response is required, the Underwriter Defendants deny that this case is appropriate for class-

action treatment and deny all the allegations in Paragraph 102, except deny knowledge or information sufficient to form a belief as to what Plaintiff knows or believes concerning the number of putative class members.

103.   There is a well-defined community of interest in the questions of law and fact involved in this case.  Questions of law and fact common to the members of the Class which predominate over questions which may affect individual Class members include:

a)     Whether Defendants violated the Securities Act;

b)     Whether Defendants omitted and/or misrepresented material facts;

c)     Whether the IPO materials contained untrue statements of material fact;

d)     Whether the Individual Defendants signed the Registration Statement;

e)     Whether the Underwriter Defendants acted as underwriters;

f)     Whether Defendants' statements omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

g)     Whether the price of the Company's stock was artificially inflated; and

h)     The extent of damage sustained by Class members and the appropriate measure of damages.

**ANSWER:** The Underwriter Defendants aver that Paragraph 103 states a legal conclusion to which no response is required.  To the extent that a response is required, the Underwriter Defendants deny that this case is appropriate for class-action treatment and deny all other allegations in Paragraph 103.

104.   Lead Plaintiff's claims are typical of those of the Class because Lead Plaintiff and the Class sustained damages from Defendants' wrongful conduct alleged herein.

**ANSWER:** The Underwriter Defendants aver that Paragraph 104 states a legal conclusion to which no response is required.  To the extent that a response is

UNDERWRITERS' ANSWER TO SAC

required, the Underwriter Defendants deny that this case is appropriate for class-action treatment and deny all the allegations in Paragraph 104, except deny knowledge or information sufficient concerning whether or when Plaintiffs or any putative class members acquired Gossamer common stock pursuant to the IPO.

105.    Lead Plaintiff will adequately protect the interests of the Class and have retained counsel who are experienced in class action securities litigation.  Lead Plaintiff has no interests that conflict with those of the Class.

**ANSWER:** The Underwriter Defendants aver that Paragraph 105 states a legal conclusion to which no response is required.  To the extent that a response is required, the Underwriter Defendants deny that this case is appropriate for class-action treatment and deny all other allegations in Paragraph 105.

106.    The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual members of the Class, which would establish incompatible standards of conduct for Defendants; or adjudications with respect to individual members of the Class would, as a practical matter, be dispositive of the interest of other members or substantially impair or impede their ability to protect their interests.

**ANSWER:** The Underwriter Defendants aver that Paragraph 106 states a legal conclusion to which no response is required.  To the extent that a response is required, the Underwriter Defendants deny that this case is appropriate for class-action treatment and deny all other allegations in Paragraph 106.

107.    There will be no difficulty in the management of this litigation.

**ANSWER:** The Underwriter Defendants aver that Paragraph 107 states a legal conclusion to which no response is required.  To the extent that a response is required, the Underwriter Defendants deny that this case is appropriate for class-action treatment and deny all other allegations in Paragraph 107.

108.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

UNDERWRITERS' ANSWER TO SAC

**ANSWER:** The Underwriter Defendants aver that Paragraph 108 states a legal conclusion to which no response is required. To the extent that a response is required, the Underwriter Defendants deny that this case is appropriate for class-action treatment and deny all other allegations in Paragraph 108.

109. Defendants have acted on grounds generally applicable to the Class with respect to the matters complained of herein, thereby making appropriate the relief sought herein with respect to the Class as a whole.

**ANSWER:** The Underwriter Defendants aver that Paragraph 109 states a legal conclusion to which no response is required. To the extent that a response is required, the Underwriter Defendants deny that this case is appropriate for class-action treatment and deny all other allegations in Paragraph 109.

## XI.  CAUSES OF ACTION
### COUNT ONE
### VIOLATIONS OF § 11 OF THE SECURITIES ACT
### (AGAINST ALL DEFENDANTS)

110. Lead Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

**ANSWER:** The Underwriter Defendants repeat and incorporate by reference their responses to Paragraphs 1-109 as if fully set forth herein.

111. The Registration Statement for the IPO was inaccurate and misleading, contained untrue statements of material facts, omitted to state other facts necessary to make the statements not misleading, and omitted to state material facts required to be stated therein.

**ANSWER:** The Underwriter Defendants aver that Paragraph 111 states a legal conclusion to which no response is required. To the extent that a response is required, the Underwriter Defendants deny the allegations in Paragraph 111.

112. Gossamer is the registrant for the IPO. The other Defendants named herein were responsible for the contents and dissemination of the Registration Statement.

**ANSWER:** The Underwriter Defendants deny the allegations in Paragraph 112, except admit that (i) Gossamer was the registration of the IPO, and (ii) the Underwriter Defendants participated in drafting and disseminating the Offering

UNDERWRITERS' ANSWER TO SAC

Materials in connection with the IPO.

113.   As the issuer of the shares, Gossamer is strictly liable to Lead Plaintiff and the Class for any misstatements or omissions in the Registration Statement.

**ANSWER:** The Underwriter Defendants aver that Paragraph 113 states a legal conclusion to which no response is required.  To the extent that a response is required, the Underwriter Defendants deny the allegations in Paragraph 113.

114.   None of the Defendants named herein made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Registration Statement were true, and/or without omissions of any material facts, were not misleading.

**ANSWER:** The Underwriter Defendants aver that Paragraph 114 states a legal conclusion to which no response is required.  To the extent that a response is required, the Underwriter Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations with respect to the remaining Defendants.

115.   By reason of the conduct alleged herein, each Defendant violated, and/or controlled a person who violated, § 11 of the Securities Act.

**ANSWER:** The Underwriter Defendants aver that Paragraph 115 states a legal conclusion to which no response is required.  To the extent that a response is required, the Underwriter Defendants deny the allegations in Paragraph 115.

116.   Lead Plaintiff acquired Gossamer shares pursuant and/or traceable to the Registration Statement for the IPO.

**ANSWER:** The Underwriter Defendants deny knowledge or information sufficient to form a belief as to the truth of whether or when Lead Plaintiff members acquired Gossamer common stock.

117.   Lead Plaintiff and the Class have sustained damages. The value of Gossamer stock has declined substantially subsequent to and due to Defendants' violations.

**ANSWER:** The Underwriter Defendants deny the allegations in Paragraph 117.

UNDERWRITERS' ANSWER TO SAC

118. At the time of his purchase of Gossamer shares, Lead Plaintiff and the other members of the Class were without knowledge of the facts concerning the wrongful conduct alleged herein and could not have reasonably discovered those facts prior to within one year of bringing this lawsuit. Moreover, fewer than three years elapsed between the time that the securities upon which this Count Three is brought were offered to the public and the time Lead Plaintiff filed this Complaint.

**ANSWER:** The Underwriter Defendants deny the allegations in Paragraph 118, except (i) deny knowledge or information sufficient to form a belief as to the truth of the allegations in the second sentence of Paragraph 118, and (ii) admit the allegations in the last sentence of Paragraph 118.

## XII. COUNT TWO
### VIOLATIONS OF § 15 OF THE SECURITIES ACT
### (AGAINST ALL DEFENDANTS EXCEPT THE UNDERWRITER DEFENDANTS)

119. Lead Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

**ANSWER:** The Underwriter Defendants repeat and incorporate by reference their responses to Paragraphs 1-118 as if fully set forth herein.

120. This Count is brought pursuant to § 15 of the Securities Act against Gossamer, Gujrathi, Giraudo, Hasnain, Bilenker, Burow, Cox, Daniel, Galá, and Stampacchia.

**ANSWER:** The Underwriter Defendants aver that the allegations in Paragraph 120 are not directed to the Underwriter Defendants. Further, because Paragraph 120 contains no factual allegations, no responsive pleading is required.

121. Gujrathi, Giraudo, Hasnain, Bilenker, Burow, Cox, Daniel, Galá, and Stampacchia each were control persons of Gossamer by virtue of their positions as director and/or senior officer of Gossamer. These Defendants each had a series of direct and/or indirect business and/or personal relationships with other directors and/or officers and/or major shareholders of Gossamer. Gossamer controlled these Defendants.

**ANSWER:** The Underwriter Defendants aver that Paragraph 121 states a legal conclusion to which no response is required. The Underwriter Defendants

- 55 -     UNDERWRITERS' ANSWER TO SAC

further aver that the allegations in Paragraph 121 are not directed to the Underwriter Defendants. Therefore, no response to Paragraph 121 required. To the extent that a response is required, the Underwriter Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 121.

122. Defendants each were culpable participants in the violations of § 11 of the Securities Act alleged in Count Three above, based on their having signed and/or authorized the signing of the Registration Statement and having otherwise participated in the process that allowed the IPO to be successfully completed.

**ANSWER:** The Underwriter Defendants aver that Paragraph 122 states a legal conclusion to which no response is required. The Underwriter Defendants further aver that the allegations in Paragraph 122 are not directed to the Underwriter Defendants. Therefore, no response to Paragraph 122 required. To the extent that a response is required, the Underwriter Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 122.

## XIII. PRAYER FOR RELIEF

WHEREFORE, Lead Plaintiff prays for relief and judgment as follows:

a) ordering that this action is a proper class action pursuant to Rule 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure on behalf of the Class as defined herein, and a certification of Lead Plaintiff as class representative pursuant to Rule 23 of the Federal Rules of Civil Procedure and appointment of Lead Plaintiff's counsel as Lead Counsel;

b) awarding compensatory and punitive damages in favor of Lead Plaintiff and the other class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including prejudgment and post-judgment interest thereon.

c) awarding Lead Plaintiff and other members of the Class their costs and expenses in this litigation, including reasonable attorneys' fees and experts' fees and other costs and disbursements; and

UNDERWRITERS' ANSWER TO SAC

> d)     awarding Lead Plaintiff and the other Class members such other relief as this Court may deem just and proper.

**ANSWER:** The Underwriter Defendants deny that Plaintiff and the putative class are entitled to relief against the Underwriter Defendants, and the Underwriter Defendants respectfully request that the Court dismiss all the remaining claims against them with prejudice and order such further relief as the Court deems just and proper.

## XIV.  DEMAND FOR JURY TRIAL

> Lead Plaintiff hereby demands a trial by jury in this action of all issues so triable.

**ANSWER:** The Underwriter Defendants deny the allegations in Plaintiff's demand for a jury trial, except admit that Plaintiff states that he demands a jury trial.

<u>DEFENSES</u>

Without assuming any burden of proof, persuasion, or production not otherwise legally assigned to the Underwriter Defendants as to any element of Plaintiff's claim, brought individually and on behalf of the putative class, the Underwriter Defendants are informed and believe, and on that basis allege and assert the below defenses.  The Underwriter Defendants reserve the right to raise any additional defenses, cross-claims, and third-party claims of which they may become aware through discovery or other investigation, as may be appropriate at a later time.

<b>FIRST DEFENSE</b>

The claim asserted against the Underwriter Defendants in the Second Amended Complaint under Section 11 of the Securities Act fail to allege facts sufficient to state a claim upon which relief may be granted.

<b>SECOND DEFENSE</b>

Plaintiff's claims are barred, in whole or in part, because Plaintiff or other

UNDERWRITERS' ANSWER TO SAC

members of the Putative Class lack standing to assert them to the extent they did not purchase Gossamer stock in or traceable to Gossamer's Initial Public Offering.

### THIRD DEFENSE

The Underwriter Defendants are not liable to Plaintiff or the putative class because the Offering Materials and documents incorporated therein did not contain any false or misleading statements of material fact or omissions of material fact, and the Underwriter Defendants are not responsible in law or fact for any alleged false or misleading statement or omission of material fact by others, or for any statement not contained in the Offering Materials and documents incorporated therein.

### FOURTH DEFENSE

The facts the Second Amended Complaint alleges were misrepresented or omitted were accompanied by cautionary language that rendered the alleged misrepresentation or omission not misleading, and thus rendered the alleged misleading statements inactionable under the "bespeaks caution" doctrine.

### FIFTH DEFENSE

Plaintiff and the putative class are not entitled to any recovery under the Securities Act from the Underwriter Defendants because, at all relevant times, the Underwriter Defendants acted with due diligence with respect to the matters alleged in the SAC.  The Underwriter Defendants conducted a reasonable and diligent investigation and had reasonable grounds to believe, and did believe, at the time the Offering Materials became effective, that the statements in the Offering Materials were true and that there were no misstatements of material facts or omissions of material facts that were necessary to make the statements therein not misleading.

### SIXTH DEFENSE

Plaintiff's and the putative class's claim is barred, in whole or in part, because at all relevant times, the Underwriter Defendants relied in good faith on the representations, reports, expert opinions, and advice of others.

## SEVENTH DEFENSE

Any damages or injuries suffered by Plaintiff or the putative class, if any, were not legally caused by any act or omission on the part of the Underwriter Defendants.

## EIGHTH DEFENSE

Any damages or injuries suffered by Plaintiff or the putative class, if any, are not the result of any alleged misrepresentations or omissions in the Registration Statement, and are the result of a superseding, intervening, or independent cause and unrelated to any act or omission on the part of the Underwriter Defendants, and are the proximate result, either in whole or in part, of actions or omissions of persons or entities other than the Underwriter Defendants.

## NINTH DEFENSE

If and to the extent the Offering Materials are determined to contain false or misleading statements (which the Underwriter Defendants deny), Plaintiff and the putative class either knew or should have known about the matters alleged in the Second Amended Complaint and their own negligence or other fault proximately contributed to the injuries allegedly suffered by Plaintiff and the putative class from the purchase and sale of the offered securities, and bars any recovery to the extent thereof.

## TENTH DEFENSE

Plaintiff and the putative class are not entitled to any recovery from the Underwriter Defendants under the Securities Act because the damages alleged represent something other than the depreciation in value of the offered securities resulting from such part of the Offering Materials not being true or omitting to state a material fact required to be stated therein or necessary to make the statements therein not misleading.

## ELEVENTH DEFENSE

Plaintiff's and the putative class's claim against the Underwriter Defendants

- 59 -                    UNDERWRITERS' ANSWER TO SAC

is barred and subject to estoppel in whole or in part by their own actions, omissions, and/or negligence.

### TWELFTH DEFENSE

Plaintiff's and the putative class's claims against the Underwriter Defendants are barred in whole or in part because of the contribution of or the comparative fault and contributory negligence of Plaintiff or the putative class, or other entities or persons.

### THIRTEENTH DEFENSE

Plaintiff's and the putative class's claims against the Underwriter Defendants are barred in whole or in part because the alleged damages or other injuries were caused solely by the acts or omissions of Plaintiff, the putative class, or others over which the Underwriter Defendants had no control.

### FOURTEENTH DEFENSE

Plaintiff's and the putative class's claim against the Underwriter Defendants is barred in whole or in part because of inequitable conduct and unclean hands.

### FIFTEENTH DEFENSE

The Underwriter Defendants are entitled to recover contribution from others for any liability they incur as a result of any of the alleged misrepresentations, omissions, and conduct alleged in the Securities Act claims against the Underwriter Defendants.

### SIXTEENTH DEFENSE

Plaintiff and the putative class are not entitled to any recovery from the Underwriter Defendants because Plaintiff and the putative class purchased Gossamer securities with actual or constructive knowledge of the risks involved in an investment in Gossamer securities, and thus assumed the risk that the value of the securities would decline if such risks materialized.

### SEVENTEENTH DEFENSE

Plaintiff's claims for damages are barred, in whole or in part, because

Plaintiff has incurred no legally cognizable injury or damages under the Securities Act of 1933, including but not limited to the provisions and damages limitations of 15 U.S.C. § 77$k$(e).

## EIGHTEENTH DEFENSE

Plaintiff is not entitled to any recovery from the Underwriter Defendants because one or more members of the putative class ratified the alleged wrongful acts and omissions alleged in the Second Amended Complaint

## NINETEENTH DEFENSE

Plaintiff and the putative class are not entitled to any recovery from the Underwriter Defendants because, with respect to portions of the Offering Materials made on the authority of experts retained to assist in preparing such documents (other than the Underwriter Defendants), the Underwriter Defendants had no reasonable grounds to believe, and did not believe, at the time such part of the Offering Materials became effective, that the statements therein were untrue or that there was an omission to state a material fact required to be stated therein or necessary to make the statements therein not misleading, or that such part of the Offering Materials did not fairly represent the statement of the expert.

## TWENTIETH DEFENSE

The Underwriter Defendants adopt by reference any applicable defense pleaded by any other defendants not expressly set forth herein.

## TWENTY-FIRST DEFENSE

The Underwriter Defendants reserve the right to raise any additional defenses, cross-claims, and third-party claims not asserted herein of which they may become aware through discovery or other investigation, as may be appropriate at a later time.

## TWENTY-SECOND DEFENSE

Plaintiff's claims are barred, in whole or in part, because at all relevant times Underwriter Defendants had no duty to disclose any information that the Complaint

UNDERWRITERS' ANSWER TO SAC

alleges was omitted from the Registration Statement, to the extent that such information existed at the time the Registration Statement was filed or became effective.

**TWENTY-THIRD DEFENSE**

Plaintiff's claims are barred, in whole or in part, because some or all of the purported misstatements or omissions alleged in the Complaint reflect or pertain to non-actionable statements of corporate optimism or puffery.

**TWENTY-FOURTH DEFENSE**

Plaintiff's claims are barred, in whole or in part, because at all relevant times Underwriter Defendants acted in good faith, including by acting in conformity with the law and rules and regulations of the Securities and Exchange Commission.

Dated:  May 17, 2021

MATTHEW W. CLOSE
LEAH GODESKY
BRITTANY ROGERS
O'MELVENY & MYERS LLP


By:      */s/ Matthew W. Close*
Matthew W. Close
mclose@omm.com

*Attorneys for Defendants*
*Merrill Lynch, Pierce, Fenner & Smith*
*Incorporated; SVB Leerink LLC;*
*Barclays Capital Inc.; and Evercore*
*Group L.L.C.*

- 62 -                    UNDERWRITERS' ANSWER TO SAC