Jacob A. Walker (SBN 271217)
**BLOCK & LEVITON LLP**
260 Franklin Street, Suite 1860
Boston, MA 02110
(617) 398-5600 phone
jake@blockleviton.com

*Attorneys for Lead Plaintiff*
*and the Proposed Class*

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SCOTT KUHNE, individually and on behalf of all others similarly situated,<br><br>      Plaintiff,<br><br>v.<br><br>GOSSAMER BIO, INC., SHEILA GUJRATHI, M.D., BRYAN GIRAUDO, FAHEEM HASNAIN, JOSHUA H. BILENKER, M.D., KRISTINA BUROW, RUSSELL COX, THOMAS DANIEL, M.D., RENEE GALA, OTELLO STAMPACCHIA, Ph.D., MERRILL LYNCH, PIERCE, FENNER & SMITH INCORPORATED, SVB LEERINK LLC, BARCLAYS CAPITAL INC., and EVERCORE GROUP L.L.C.,<br><br>      Defendants. | Case No.: 3:20-cv-00649-DMS-DEB<br><br>**DECLARATION OF JACOB A. WALKER IN SUPPORT OF: (I) LEAD PLAINTIFF'S MOTION FOR FINAL APPROVAL OF SETTLEMENT AND PLAN OF ALLOCATION AND CERTIFICATION OF THE CLASS FOR SETTLEMENT PURPOSES ONLY; AND (II) LEAD COUNSEL'S MOTION FOR AN AWARD OF ATTORNEY'S FEES AND REIMBURSEMENT OF LITIGATION EXPENSES**<br><br>Date:        June 24, 2022<br>Time:       1:30 pm<br>Judge:     Hon. Dana M. Sabraw<br>Dept.:      13A |

I, JACOB A. WALKER, pursuant to 28 U.S.C. § 1746, hereby declare as follows:

1. I am an attorney licensed to practice before all courts of the State of California and this Court. I am a partner at Block & Leviton LLP, Lead Counsel for Lead Plaintiff Scott Kuhne and the Class in the above-captioned action. I respectfully submit this Declaration in support of: (I) Lead Plaintiff's Motion for Final Approval of Settlement and Plan of Allocation and Certification of the Class for Settlement Purposes Only; and (II) Lead Counsel's Motion for an Award of Attorneys' Fees and Reimbursement of Litigation Expenses.[1]

2. I have personally participated in, overseen, and monitored the prosecution of this Action, and have otherwise been kept informed of developments in this Action by attorneys working with me and under my supervision. Thus, if called upon, I could and would competently testify to the matters set forth herein.

## I. PRELIMINARY STATEMENT

3. After nearly two years of hard-fought litigation and vigorous arm's-length negotiations, which included the assistance of the Honorable Daniel E. Butcher during the Early Neutral Evaluation process, Lead Plaintiff has achieved a substantial and valuable Settlement of this Action, which the Court preliminarily approved on March 14, 2022 in its Order Preliminarily Approving Settlement and Authorizing Dissemination of Notice to the Class (the "Preliminary Approval Order"). ECF No. 69.

4. This case has been vigorously litigated from the outset. The Settlement was achieved only after counsel, among other things: (i) conducted a comprehensive investigation into the allegedly wrongful acts; (ii) drafted a detailed initial complaint for violations of the federal securities laws, and a detailed First Amended Class Action Complaint, which was further amended after an informal conference with

---

[1] All capitalized terms that are not otherwise defined herein shall have the meanings set forth in the Stipulation. ECF No. 66-2.

Defendants (the "SAC"); (iii) researched and briefed an opposition to Defendants' motion to dismiss the SAC; (iv) served and responded to a total of 96 discovery requests, and met and conferred with Defendants over the scope of those requests; (v) worked closely with experts to analyze damages issues; (vi) engaged in thorough mediation efforts, which included the exchange of comprehensive mediation statements and an Early Neutral Evaluation Conference ("ENE Conference" or "mediation") with the assistance of Magistrate Judge Butcher; (vii) researched and briefed Lead Plaintiff's motion for class certification; and (viii) engaged in extensive negotiations regarding the terms of the proposed Settlement. At the time the Settlement was reached, Lead Counsel had a thorough understanding of the strength and weaknesses of the Settling Parties' positions.

5. Further, as discussed in more detail below, this Action presented significant challenges, particularly concerning materiality and damages.

6. In deciding to settle, Lead Plaintiff and Lead Counsel took into consideration the significant risks associated with establishing liability, as well as the duration and complexity of the legal proceedings that remained ahead. The Settlement was achieved despite the Court's dismissal of all but one of Lead Plaintiff's alleged misrepresentations and despite vigorous opposition by Defendants who would have continued to raise serious arguments concerning, among other things, the extent of damages and injury to members of the Class, as well as materiality. Accordingly, in the absence of a settlement, there was a very real risk that the Class could have recovered nothing at all or an amount significantly less than the negotiated Settlement.

7. The proposed Plan of Allocation was developed with the assistance of Lead Plaintiff's damages expert, and provides for the fair and equitable distribution of the Net Settlement Fund to Class Members.

8. For the reasons set forth below, Lead Counsel believes that final approval of the Settlement and Plan of Allocation should be granted, and that the

Court should approve Lead Counsel's request for attorneys' fees and reimbursement of Litigation Expenses.

## II.  SUMMARY OF LEAD PLAINTIFF'S CLAIMS

9.  Lead Plaintiff's claims are fully set forth in the SAC. The fundamental allegation in this Action is that Defendants made materially false and misleading statements in materials accompanying Gossamer's February 8, 2019 Initial Public Offering ("IPO") and failed to disclose material adverse facts about the Company's business, operations, and compliance policies. Specifically, that Defendants misrepresented and/or failed to disclose to investors that Gossamer did not plan to release the details of its interim analysis of the Phase 2 LEDA study.

10.  Lead Plaintiff asserts claims against all Defendants under Section 11 of the Securities Act of 1933 (the "Securities Act") and against the Gossamer Defendants under Section 15 of the Securities Act.

11.  The Action seeks to recover damages on behalf of a Class of all investors who purchased or otherwise acquired Gossamer common stock between February 8, 2019 and December 13, 2019, inclusive (the "Class Period"), and/or who acquired Gossamer shares pursuant or traceable to Gossamer's Registration Statement and Prospectus in connection with its February 8, 2019 IPO.

## III.  PROCEDURAL HISTORY

12.  On April 3, 2020, Plaintiff Scott Kuhne initiated this Action by filing a class action complaint for violations of the federal securities laws. The initial complaint alleged violations §§ 11, 12(a)(2), and 15 of the Securities Act, as well as of §§ 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and SEC Rule 10b-5 promulgated thereunder. ECF No. 1. The Action was assigned to the Honorable Dana M. Sabraw.

13.  By Order dated June 30, 2020, Judge Sabraw appointed Mr. Kuhne as Lead Plaintiff and approved his selection of Block & Leviton LLP as Lead Counsel. ECF No. 17.

14. On August 31, 2020, Lead Plaintiff filed his First Amended Class Action Complaint, alleging violations of §§ 11 and 15 of the Securities Act, as well as under §§ 10(b) and 20(a) of the Exchange Act and Rule 10b-5 promulgated thereunder. ECF No. 27.

15. On October 13, 2020, the counsel for the parties held an informal conference regarding Defendants' anticipated Rule 12(b)(6) motion. As a result of that conference, the parties jointly agreed that Lead Plaintiff should be granted leave to file a second amended complaint and that Defendants should not be required to respond to the First Amended Complaint. ECF Nos. 28-29.

16. On November 20, 2020, Lead Plaintiff filed his Second Amended Complaint ("SAC"), alleging violations of § 11 of the Securities Act against all Defendants, and violations of § 15 of the Securities Act against the Gossamer Defendants. ECF No. 30. The SAC alleged that Defendants made materially false and misleading statements in materials accompanying the IPO and failed to disclose material adverse facts about the Company's business, operations, and compliance policies. Specifically, the SAC alleged that Defendants misrepresented and/or failed to disclose to investors: (1) the purported clinical validation of Novartis' oral DP2 antagonist; (2) that Gossamer did not plan to release the details of its interim analysis of the Phase 2b LEDA study and did not plan to launch a Phase 3 trial for GB001 upon such analysis; and (3) as a result of the foregoing, Defendants' public statements were materially false and misleading at all relevant times. The SAC further alleged that Defendants made materially false and misleading statements that artificially inflated the price of Gossamer common stock and that, as a result, the Class suffered damages.

17. On January 19, 2021, the Gossamer Defendants moved to dismiss the SAC, and also filed requests for incorporation by reference and judicial notice. ECF Nos. 32-33. The Underwriter Defendants joined the Gossamer Defendants' motion. ECF No. 33. On February 18, 2021, Lead Plaintiff filed his papers in opposition.

ECF No. 35. On March 22, 2021, the Gossamer Defendants filed their reply papers, as well as a further request for judicial notice. ECF Nos. 36. The Underwriter Defendants joined the Gossamer Defendants' reply. ECF No. 37.

18. By Order dated April 19, 2021, Judge Sabraw granted in part and denied in part Defendants' motion to dismiss. ECF No. 39. The Court denied the motion to dismiss in part, finding that the SAC sufficiently alleged that the Registration Statement misrepresented that Gossamer intended to release the results of its interim analysis of the Phase 2b LEDA study for its drug candidate, GB001 (the "Remaining Claim"). All other claims were dismissed.

19. On May 17, 2021, Defendants filed their answers to the SAC. ECF Nos. 43, 44. On June 4, 2021, pursuant to a joint motion of the Settling Parties, the Court struck allegations relating to the dismissed claims from the SAC. ECF Nos. 48-49.

20. Discovery commenced shortly thereafter.

21. On July 21, the Settling Parties participated in the ENE Conference facilitated by Magistrate Judge Butcher. The mediation ended without reaching an agreement, and accordingly the Court entered a Scheduling Order Regulating Discovery and Other Pre-Trial Proceedings. ECF No. 57.

22. On September 17, 2021, Lead Plaintiff filed his motion for class certification. ECF No. 58.

23. After the unsuccessful ENE Conference, the Settling Parties continued to engage in informal settlement discussions, which ultimately resulted in the Settlement presently before the Court.

24. On October 29, 2021, the Settling Parties filed a Joint Notice of Settlement and Motion to Vacate Deadlines. ECF No. 61. On November 2, 2021, the Court entered an Order Vacating Pending Dates and Deadlines, in anticipation of the parties' expected settlement. ECF No. 63.

## IV. DISCOVERY

25. Following the denial in part, of Defendants' motion to dismiss, the parties commenced discovery.

26. On May 26, 2021, counsel for the Settling Parties conducted a Rule 26(f) conference telephonically.

27. On July 6, 2021, the Settling Parties served their respective initial disclosures.

28. On July 7, 2021, the Gossamer Defendants made their first production of documents, in connection with their initial disclosures and with Lead Plaintiff's informal request for certain information in advance of the parties' upcoming ENE Conference.

29. On July 14, 2021, following intensive negotiations, the Settling Parties lodged their Joint Discovery Plan and Rule 26(f) Report with the Court. ECF No. 53.

30. On July 30, 2021, the Gossamer Defendants served their first set of thirty Requests for Production of Documents on Lead Plaintiff. On August 5, 2021, Lead Plaintiff served his first sets of Request for Production of Documents on Defendants, propounding thirty-six requests on the Gossamer Defendants and twenty-three requests on the Underwriter Defendants. On August 18, 2021, Gossamer served its first set of seven Interrogatories on Lead Plaintiff.

31. The Settling Parties subsequently met and conferred over the scope and relevance of the total ninety-six requests. These efforts included telephonic meet and confer sessions.

32. Lead Plaintiff also prepared third-party document requests, which, due to the parties reaching an agreement to settle, were never served.

## V. NEGOTIATION OF THE SETTLEMENT

33. On July 7, 2021, the Gossamer Defendants made their first production of documents, in connection with their initial disclosures and with Lead Plaintiff's

informal request for certain information in advance of the parties' upcoming mediation.

34. On July 21, 2021, the Settling Parties participated in the ENE Conference, facilitated by Magistrate Judge Butcher. Prior to the ENE Conference, the Settling Parties exchanged detailed ENE statements on the salient factual and legal issues expected to arise during the discussions. Specifically, the Settling Parties disputed: (1) whether Lead Plaintiff adequately alleged materially false and misleading statements, and whether Defendants would be able to establish a negative causation defense; (2) whether Lead Plaintiff would be able to certify a class; (3) whether Lead Plaintiff's remaining claim would survive summary judgment or at trial; and (4) whether the Class suffered damages and, if so, the amount of damages. During the full-day session, the Settling Parties presented their respective legal positions in the case. The ENE Conference ended without reaching an agreement.

35. After the unsuccessful ENE Conference, the Settling Parties continued to litigate the Action, but also continued to engage in informal settlement discussions. Those discussions ultimately resulted in an agreement to settle and release all claims arising out of, based upon, or related to the purchase of Gossamer common stock during the Class Period and the allegations, representations, or omissions set forth in the SAC.

## VI. SUMMARY OF THE SETTLEMENT

36. The Settlement provides that the Defendants will pay $2,375,000 in cash into an Escrow Account for the benefit of the Class. The "Class" is defined as all persons who purchased Gossamer common stock between February 8, 2019 and December 13, 2019, inclusive (the "Class Period"), and/or who acquired Gossamer shares pursuant or traceable to Gossamer's Registration Statement and Prospectus in connection with the IPO. Excluded from the Class are Defendants and their families, the officers, directors, and affiliates, and their legal representatives, heirs, successors or assigns, and any entity in which Defendants have or had a controlling

interest. Stipulation, at ¶ 1.3; Amendment to Stipulation and Agreement of Class Action Settlement, dated May 19, 2022, attached hereto as Exhibit 1.[2]

## VII. COMPLIANCE WITH THE PRELIMINARY APPROVAL ORDER

37. Pursuant to the Court's Preliminary Approval Order, Lead Counsel, through the Court-appointed Claims Administrator, Angeion Group ("Angeion"), implemented a comprehensive notice program whereby through records maintained by Defendants, beginning on April 8, 2022, Angeion caused, among other things, the Notice and Claim Form (together the "Notice Packet") to be mailed to potential Class Members. *See* Declaration of Brittany M. Cudworth of Angeion Group, Regarding: (A) Mailing of Notice and Proof of Claim; (B) Publication of the Summary Notice; and (C) Report on Requests for Exclusion and Objections Received, ("Cudworth Decl."), ¶¶ 4-8, attached hereto as Exhibit 2.

38. As of May 19, 2022, a total of 27,340 Notice Packets have been mailed. Cudworth Decl. ¶ 8.

39. On or before April 8, 2022, the Notice and Claim Form were also posted to www.GossamerSecuritiesLitigation.com (the "Settlement Website"). *Id*. ¶ 10.

40. On April 18, 2022, the Summary Notice was published in *Investor's Business Daily*, and in *The Wall Street Journal* on April 20, 2022. *Id*. ¶ 9.

41. The Notice described, *inter alia*, the claims asserted in the Action, the contentions of the Parties, the course of the litigation, the terms of the Settlement, the maximum amounts that would be sought in attorneys' fees and Litigation Expenses, the Plan of Allocation, the right to object to the Settlement, and the right to seek to be excluded from the Class. *See* Cudworth Decl. Ex. A (Notice). The

---

[2] *See also* Memorandum of Points and Authorities in Support of Lead Plaintiff's Motion for Final Approval of Settlement and Plan of Allocation and Certification of the Class for Settlement Purposes Only ("Final Approval Brief") at Section VI (addressing typo in end date of Class Period in original Stipulation and Agreement of Class Action Settlement).

Notice also stated the deadlines for objecting, seeking exclusion and submitting claims, and advised potential Class Members of the scheduled Settlement Hearing before this Court. *Id*.

42. The Summary Notice clearly and concisely provided information concerning the Settlement and the means to obtain a copy of the Notice. *See* Cudworth Decl. Exs. B, C.

43. In addition to the Notice and Claim Form, the Claims Administrator posted other relevant documents to the Settlement Website, provided a phone number for Class Members to call with any questions concerning the Settlement, and established a dedicated email address for inquiries about the Settlement. *Id*. ¶¶ 10-11.

44. As set forth in the Preliminary Approval Order, the deadline for Class Members to object to the Settlement, Plan of Allocation, or to the application for attorneys' fees and expenses – or to exclude themselves from the Class – is June 3, 2022. While this deadline has not yet passed, to date, not a single Class Member has objected to the Settlement or requested exclusion from the Settlement. *Id*. ¶¶ 14-15. Should any objections or requests for exclusion be received, Lead Plaintiff will address them in his reply papers, which are due June 17, 2022.

## VIII. RISKS OF CONTINUED LITIGATION

45. Lead Plaintiff and Lead Counsel believe in the merits of the Remaining Claim. Lead Plaintiff and Lead Counsel also realized, however, that continued litigation would have been costly, risky, and drawn out. Lead Plaintiff and Lead Counsel carefully considered these risks during the period leading up to the Settlement and throughout the settlement discussions with Defendants.

46. As discussed below, in agreeing to settle, Lead Plaintiff and Lead Counsel weighed, among other things, the substantial and immediate cash benefit to the Class against: (i) the uncertainties associated with trying complex securities cases; (ii) the difficulties and challenges involved in establishing materiality and

damages; (iii) the difficulties involved in certifying a class; (iv) the fact that, even if Lead Plaintiff prevailed at summary judgment and trial, any monetary recovery could have been substantially less than the Settlement; and (v) the inevitable delays that would follow even a favorable final judgment, including appeals.

47. Although Lead Plaintiff partially succeeded in defeating Defendants' motion to dismiss, the Court dismissed all but one of Lead Plaintiff's claims. With respect to the Remaining Claim, the Court merely found that "reasonable minds could disagree on whether Gossamer's statements . . . were material misrepresentations." ECF No. 39 at 13. The Court also rejected Defendants' negative causation defense, noting that "the issue is more appropriate for resolution at a later stage." *Id.* at 13-14. Thus, Lead Plaintiff's success post-motion to dismiss was far from guaranteed.

48. Lead Plaintiff faced the immediate challenge of overcoming Defendants' likely arguments to his motion for class certification. Specifically, Lead Plaintiff expected Defendants to argue that many investors were aware that Gossamer never intended to disclose the interim results from the Phase 2 LEDA trial, and therefore, individualized issues would predominate, precluding class certification.

49. Next, Lead Plaintiff would have to defeat Defendants' inevitable arguments on materiality, negative causation and damages.

50. Although Lead Plaintiff and Lead Counsel believe that the Court's motion to dismiss decision makes it unlikely that Defendants' materiality challenges would succeed at summary judgment, success at trial would be far from assured. As the Court itself noted – "reasonable minds could disagree on whether Gossamer's statements . . . were material misrepresentations." ECF No. 39 at 13. Indeed, there was a risk that a jury might not find that Gossamer's Registration Statement indicated the Company planned to release the interim results at all, and thus no misrepresentations were made. Lead Plaintiff would also have to overcome the

Walker Decl. ISO Final Approval & Attys' Fees
Case No. 3:20-cv-00649-DMS-DEB

10

possibility that a jury would find any misrepresentation immaterial as evidenced by, among other things, the fact that Gossamer's stock price only dropped $0.67 cents per share when, in November of 2019, the Company's CEO stated they would not be releasing the interim results.

51. Lead Plaintiff would seek to defeat Defendants' negative causation defense by arguing that the November 2019 corrective disclosure was not a complete corrective disclosure as Defendants continued to indicate the Company would disclose an indication of the results of the interim analysis of the Phase 2b LEDA study—even if they did not plan to release the actual results. Therefore, Defendants would be required to prove that none of the decline in value of Gossamer stock on April 3, 2020 (the date the complaint was filed), was attributable to Gossamer's false promise to release the results of the interim study. Deciding the issue of negative causation at summary judgment would therefore require significant discovery into the causes of the price movement of Gossamer's stock over a significant period of time, the "value" of Gossamer's stock, and an expensive battle of the experts.

52. Even if Lead Plaintiff defeated summary judgment, Defendants would undoubtedly have presented their negative causation defense and vigorously contested Lead Plaintiff's proposed damages methodology to a jury, where it would be impossible to predict with any certainty which arguments would prevail.

53. Although Lead Plaintiff's damages expert estimated maximum recoverable damages between $53.6 million and $73.2 million, actual damages were likely to be significantly lower. Among other things, Lead Plaintiff would have to contend with the fact that the market's reaction to the November 2019 corrective disclosure was only a drop of $0.67 per share, that Gossamer's share price in November 2019 was still above its IPO price of $16.00 per share, and the risk that a jury would attribute a significant amount of the decline in Gossamer's value to factors other than the Remaining Claim. Accordingly, Lead Counsel believes that

the risk of going before a jury on the complex issues of negative causation and damages weighed heavily in favor of settlement.

54. Lead Plaintiff and Lead Counsel also considered that even success at trial carries the risk of a reduced recovery, an unfavorable result on appeal, and significant delays, including post-trial motions and appeals.

## IX. THE PROPOSED PLAN OF ALLOCATION

55. Here, Lead Plaintiff prepared the Plan of Allocation after careful consideration of Lead Plaintiff's theories of liability and damages. Lead Plaintiff prepared the Plan of Allocation after careful consultation with economic expert Chard Coffman of Global Economics Group, LLLC, with the objective of equitably distributing the Net Settlement Fund to Class Members.

56. The Plan of Allocation was fully described in the Notice, and to date, there has been no objection to the proposed plan. *See* Cudworth Decl. ¶ 15, & Ex. A (Notice at 8-13).

57. The Plan of Allocation provides for distribution of the Net Settlement Fund to Authorized Claimants who submit timely and valid Claim Forms demonstrating a loss on their transactions in Gossamer Securities during the Class Period. The formula to apportion the Net Settlement Fund among Authorized Claimants provides for a *pro rata* distribution of the Net Settlement Fund subject to a discount for § 10(b) claimants, as those claims were not ultimately press in Court.

58. Because the proposed Plan of Allocation does not unjustly favor any Class Member, segment of the Class, or Lead Plaintiff, Lead Counsel believes that the plan is fair, reasonable, and adequate and should be approved.

## X. LEAD COUNSEL'S APPLICATION FOR ATTORNEYS' FEES IS FAIR AND REASONABLE

59. For Lead Counsel's efforts on behalf of the Class, Lead Counsel is applying to the Court for an award of attorneys' fees of 25% ($593,750) to be paid from the Settlement Fund. The percentage method is the standard and appropriate

method of fee recovery because it aligns the lawyers' interest in being paid a fair fee with the interests of Lead Plaintiff and the Class in achieving the maximum recovery in the shortest amount of time required under the circumstances. Use of the percentage method has been recognized as appropriate by the Supreme Court and Ninth Circuit for cases of this nature where an all-cash common fund has been recovered for the Class.

60. Based on the quality of the result achieved, the extent and quality of the work performed, the significant risks of the litigation, and the fully contingent nature of the representation, Lead Counsel respectfully submits that the requested fee award is reasonable and should be approved. As discussed in greater detail in the Fee Brief, a 25% fee award is consistent with fee award percentages granted in this Circuit in similar complex, contingent litigation, and is the "benchmark" for such awards set by the Ninth Circuit.

61. To date, there have been no objections to the request for attorneys' fees and reimbursement of Litigation Expenses. *See* Cudworth Decl. ¶ 15.

**A.      The Result Achieved**

62. Courts in this Circuit has consistently recognized that the result achieved is a significant factor to be considered in making a fee award. Here, the $2,375,000 Settlement is an excellent result. The cash recovery has been obtained solely through the efforts of Lead Counsel at a relatively early stage of the litigation. The decision to settle was made based on a thorough understanding of the strengths and weaknesses of the case and avoids the substantial expense, delay, risk, and uncertainty of continued litigation and trial. As a result, Class Members will receive compensation for their losses and avoid the substantial expense, delay, and uncertainty of continued litigation.

63. The Settlement represents approximately 3.2% to 4.4% of the total maximum damages potentially available in this Action and is an excellent result. Indeed, the median recovery in securities class actions in 2020 was approximately

1.7% of estimated damages. *See* Janeen McIntosh and Svetlana Starykh*, Recent Trends in Securities Class Action Litigation: 2020 Full-Year Review* (NERA Jan. 25, 2021) at 20, Fig. 16, attached hereto as Exhibit 3.

64. The Settlement obtained provides an immediate and substantial benefit to the Class and supports Lead Counsel's fee request.

**B.      The Substantial Risks of the Litigation**

65. This Declaration and the memoranda in support of the Settlement and fee request describe the substantial risks of the litigation.

66. This was a challenging case from the outset and there was a real risk that the Action would not proceed past the motion to dismiss stage, as evidenced by the Court's decision dismissing all but one of Lead Plaintiff's claims.

67. The Class faced a potential barrier to class certification based on Defendants' anticipated argument that many class members actually knew that Gossamer did not intend to release its interim results, which presented individualized questions that would overwhelm any common questions and thus preclude certification of a class.

68. Additionally, convincing a jury that Defendants made a material misrepresentation was far from guaranteed given the nature of the alleged misstatement sustained by the Court and Defendants' inevitable argument that the market did not react in November 2019 when Gossamer's CEO informed investors that the Company would not be releasing the interim study results.

69. Plus, overcoming Defendants' negative causation defense at summary judgment and trial would come down to an expensive, and highly uncertain battle of the experts.

70. Moreover, the classwide damages amount was highly dependent on the plaintiff-friendly assumptions and method used to measure those damages. Thus, the arguments raised by Defendants could have materially reduced the amount of recoverable damages and adversely affected any potential recovery.

71. Although Lead Counsel believed in the merits of the Action, there would be many challenges in establishing all of the requisite elements and a substantial risk that Defendants would prevail at any given stage of the litigation.

72. Accordingly, the $2.375 million recovery in the face of these risks supports the requested fee.

**C.     The Skill Required and Quality of Work**

73. The requested fee is also warranted in light of the extensive efforts on the part of Lead Counsel, as outlined above, required to produce this result.

74. Lead Counsel are highly experienced in securities litigation and have a long and successful track record of representing investors in such cases. Lead Counsel has successfully prosecuted securities class actions and complex litigation in federal and state courts throughout the country, including in this Circuit. *See* Block & Leviton Firm Resume, attached hereto as Exhibit 4.

75. Lead Counsel's experience and skill was critical to defeating, in part, Defendants' motion to dismiss.

76. Additionally, Lead Counsel's reputation as experienced counsel in complex cases, persistent efforts and thorough investigation greatly enhanced Lead Counsel's ability to negotiate the Settlement in an efficient manner to the benefit of the Class.

77. The quality and vigor of opposing counsel also supports Lead Counsel's fee request. Defendants are represented by highly experienced prominent counsel, who vigorously represented their clients. The Gossamer Defendants were represented by Latham & Watkins LLP and the Underwriter Defendants by O'Melveny & Myers LLP. The fact that Lead Counsel achieved an excellent result in the face of such formidable legal opposition further evidences the quality of their work.

78. Lead Counsel spent approximately 360.3 hours of time on this case. This time was spent vigorously pursuing this litigation from its outset.  By the time

Walker Decl. ISO Final Approval & Attys' Fees
Case No. 3:20-cv-00649-DMS-DEB

15

the Settlement was reached, Lead Counsel had, among other things: (i) reviewed and analyzed Gossamer's SEC filings, press releases, investor conference call transcripts, and other public statements, as well as (a) publicly available documents, reports, announcements, and news articles concerning Gossamer, and (b) research reports prepared by securities and financial analysts regarding Gossamer; (ii) worked with a damages and loss causation expert to analyze Gossamer's stock price movement and to consider Gossamer's potential arguments at class certification and summary judgment; (iii) drafted the initial complaint for violations of the federal securities laws, and the detailed First Amended Class Action Complaint, which was further amended after an informal conference with Defendants (the "SAC"); (iv) researched and briefed an opposition to Defendants' motion to dismiss the SAC; (v) served and responded to a total of 96 discovery requests, and met and conferred with Defendants over the scope of those requests; (vi) briefed Lead Plaintiff's motion for class certification; (vii) drafted and exchanged detailed mediation statements that set forth the facts of the case and analyzed the strengths of the Action and potential damages; (viii) engaged in an ENE Conference facilitated by Magistrate Judge Butcher; (ix) conducted protracted and time-intensive negotiations regarding the terms of the proposed Settlement; and (x) drafted the initial versions of the Stipulations and exhibits.

79.     Moreover, Lead Counsel will continue to work towards effectuating the Settlement in the event the Court grants final approval. No additional compensation will be sought for this work.

80.     Lead Counsel expended a total of 360.3 hours prosecuting this Action. The billing rates for partners range from $800 to $1,075, associates' rates range from $550 to $700, and paralegals' rates are $280.

81.     I believe that the time reflected in the firm's lodestar calculation and the expenses for which payment is sought as stated herein are reasonable in amount and were necessary for the effective and efficient prosecution and resolution of the

litigation. These expenses are all of a type that courts have routinely approved in similar class action cases.

82.     The hourly rates for our attorneys and professional support staff are their standard rates and are the same as, or comparable to, the rates submitted by my firm and accepted by courts for lodestar cross-checks in other class action fee applications. My firm's rates are set based on periodic analysis of rates used by firms performing comparable work and that have been approved by courts.

83.     As set forth below, Attorneys and Professional Support Staff at Block & Leviton billed the following aggregate hours to this matter as of the date of filing, with fees applied at the firm's current billing rates, equating to a lodestar of $244,245.50:

| Timekeeper: | Type | Hours | Hourly Rate | LODESTAR |
|---|---|---|---|---|
| Jeffrey C. Block | P | 9.5 | $1,075 | $10,212.50 |
| Jacob A. Walker | P | 103.1 | $800 | $82,480.00 |
| Steven Teti | A | 107.7 | $700 | $75,390.00 |
| Nathaniel Silver | A | 136.9 | $550 | $75,295.00 |
| Rachel Murphy | PL | 3.1 | $280 | $868.00 |
| TOTAL | | 360.3 | | $244,245.50 |

P = Partner; A = Associate; PL = Paralegal

84.     Accordingly, the requested fee of 25% of the cash recovery, net of expenses, which equates to approximately $593,750, represents a lodestar multiplier of 2.43, which is well within the range of one to four frequently used as a cross check by courts in this Circuit. Given the excellent result achieved in this Action, Lead Counsel's 360.3 hours, valued at $244,245.50, support the reasonableness of the fee request.

85. The hourly fees listed above are the current fees used by Block & Leviton, except in the case of Steven Teti, whose hourly rate is the last hourly rate assigned to Mr. Teti prior to his departure from the firm.

**D. The Contingent Nature and Financial Burden**

86. This Declaration and the memoranda in support of the Settlement and fee request describe the substantial risks of the litigation. Those same difficulties also constituted risks that Lead Counsel might never be paid for their efforts. Indeed, Lead Counsel has not been compensated for any time or expense since this case began in April of 2020.

87. Courts consistently recognize that the risk of receiving little or no recovery is a major factor in considering an award for attorneys' fees. This risk is even more pronounced in securities class actions where the PSLRA makes surviving past the motion to dismiss stage particularly challenging.

88. Lead Counsel knows from experience that despite the most vigorous and competent of efforts, attorneys' success in contingent litigation such as this is never assured. Even plaintiffs who get past summary judgment and succeed at trial may find a judgment in their favor overturned on appeal or on a post-trial motion. Because the fee to be awarded in this matter is entirely contingent, the only certainty from the outset was that there would be no fee without a successful result and that such a result would be realized only after a lengthy and difficult effort. As discussed in greater detail above, this case was fraught with significant risk factors concerning liability and damages.

89. The contingent nature of this Action weighs in favor of the requested fee for the additional reason that there would have been no recovery without Lead Counsel's efforts. Lead Counsel filed the initial complaint in this Action and moved for appointment as Lead Counsel in connection with Lead Plaintiff's motion for appointment as Lead Plaintiff. The vast majority of securities class actions draw multiple applications for appointment as lead plaintiff and lead counsel—that is the

Walker Decl. ISO Final Approval & Attys' Fees
Case No. 3:20-cv-00649-DMS-DEB

18

very purpose of the PSLRA provision requiring notice to be disseminated advising shareholders of the lead plaintiff deadline. Tellingly, not one law firm other than Block & Leviton submitted a leadership application in the Action—a fact that underscores the perceived undesirability and difficulty of taking this case on a contingency basis.

90. Thus, the contingent nature of Lead Counsel's representation strongly favors the requested fee.

### E. The Awards in Similar Cases

91. Courts also look at awards in similar cases in determining whether the requested fee is reasonable.

92. In the Ninth Circuit, courts repeatedly permit awards of attorneys' fees ranging from 20 to 30 percent of settlement funds, with 25 percent as the "benchmark" award.

93. Given the result achieved and the risks undertaken by Lead Counsel in pursuing this Action, the requested "benchmark" fee of 25% is fair and reasonable.

### XI. REIMUBRSEMENT OF THE REQUESTED LITIGATION EXPENSES IS FAIR AND REASONABLE

94. Lead Counsel is also moving for reimbursement of Litigation Expenses that were reasonably and necessarily incurred in prosecuting this Action.

95. As detailed below, Lead Counsel is seeking reimbursement of a total of $27,319.38 in out-of-pocket costs and expenses, all of which were advanced by Lead Counsel:

| Category | Expense |
|---|---|
| Court Fees | $812.00 |
| Expert Fees | $22,456.25 |
| Fact Investigation | $2,000.00 |
| Legal Research | $435.63 |

| Travel & Meals | $1,615.50 |
| **TOTAL EXPENSES:** | **$27,319.38** |

96. From the beginning of the case, Lead Counsel were aware that they might never recover any of their expenses, and, at the very least, would not recovery anything until the Action was successfully resolved. Lead Counsel also understood that, even assuming the case was ultimately successful, reimbursement for expenses would not compensate them for the lost use of funds advanced by them to prosecute this Action. Thus, Lead Counsel were motivated to, and did, take steps to assure that only necessary expenses were incurred for the vigorous and efficient prosecution of the case.

97. Of the total amount of Litigation Expenses, approximately $22,456.25 or 82% was expended on Lead Plaintiff's experts and consultants. Lead Plaintiff retained and consulted with experts in the fields of loss causation and damages to assist in the prosecution of the Action. Lead Plaintiff's expert on damages also assisted Lead Counsel during the ENE Conference and settlement negotiations with Defendants and with the development of the proposed Plan of Allocation.

98. The remaining expenses related to court fees, fact investigation, legal research, and travel and meals. Because much of the case took place during the COVID outbreak, travel costs were extremely limited.

99. In view of the complex nature of this Action, the Litigation Expenses were reasonably and necessary to pursue the interests of the Class. Accordingly, Lead Counsel respectfully submits that the request for reimbursement of Litigation Expenses is fair and reasonable.

## XII. THE REQUESTED AWARD FOR LEAD PLAINTIFF IS FAIR AND REASONABLE

100. Lead Counsel also requests that the Court approve an award of $5,000 for Lead Plaintiff, Scott Kuhne. An award for reimbursement of a class

representative's reasonable costs and expenses is authorized under the PSLRA. 15 U.S.C. § 77z-1(a)(4).

101. As set forth in the accompanying Declaration of Scott Kuhne ("Kuhne Decl.") attached hereto as Exhibit 5, Lead Plaintiff spent a significant amount of time contributing to the litigation and benefiting the Class by: reviewing the relevant documents, including court filings; staying apprised of developments of in the case and making himself available to Lead Counsel; providing Lead Counsel with information and materials regarding his investments; responding to document requests and interrogatories propounded by Defendants; attending the ENE Conference; and conferring with Lead Counsel throughout the litigation, including the ENE Conference and settlement negotiations. *See* Kuhne Decl. ¶¶ 4-5, 10.

102. Additionally, as described above, had Lead Plaintiff not retained Lead Counsel, authorized the filing of the initial complaint in this Action, and moved the Court to lead the case, the Class would have no recovery at all as no other individual or entity sought appointment as lead plaintiff.

103. Moreover, the Notice stated that Lead Counsel would request reimbursement of Litigation Expenses in an amount not to exceed $60,000, which may include an application for reimbursement of the reasonable costs and expenses incurred by Lead Plaintiff directly related to his representation of the Class. To date, there have been no objections to such a request. Cudworth Decl. ¶ 15. Thus, Lead Counsel believes that the requested award for the time and effort Lead Plaintiff has expended on behalf of the Class is fair and reasonable.

### CONCLUSION

For all the foregoing reasons, Lead Counsel respectfully requests that the Court: (1) grant final approval of the Settlement and Plan of Allocation as fair, reasonable, and adequate, and finally certify the Class for settlement purposes only; (2) approve the application for an award of attorneys' fees of 25% of the Settlement Fund ($593,750), plus reimbursement of $27,319.38 in Litigation Expenses that

were reasonably and necessarily incurred in Lead Counsel's prosecuting and resolving this Action; and (3) approve the requested service award of $5,000 for Lead Plaintiff.

I declare under penalty of perjury that the foregoing is true and correct. Executed on this 20th day of May 2022, at Boston, Massachusetts.

*/s/ Jacob A. Walker*
Jacob A. Walker
